1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
 2                     LUFKIN DIVISION

 3   FAMILY ONE, INDIVIDUALLY  )
     AND AS GUARDIANS AND NEXT )
 4   FRIENDS OF MINOR CHILD    )  Case No.
     ONE; ET AL.,              )  9:22-cv-00028
 5                             )
         Plaintiffs,           )
 6                             )  Beaumont, Texas
     vs.                       )
 7                             )
     ADAM DALE ISAACKS, MIRANDA)
 8   LYNN DUKES ISAACKS, LITTLE)
     LEAGUE BASEBALL, INC.     )
 9   A/K/A LITTLE LEAGUE       )
     INTERNATIONAL, TEXAS      )
10   DISTRICT 12 LITTLE        )
     LEAGUE, EVADALE LITTLE    )
11   LEAGUE, AND BEAR CREEK    )
     HUNTING CLUB,             )
12                             )
         Defendants.           )
13   ------------------------------------------------------
         TRANSCRIPT OF PLAINTIFFS' MOTION TO COMPEL
14            AND TO STRIKE OBJECTIONS HEARING

15                    September 8, 2022

16      BEFORE THE HONORABLE MICHAEL J. TRUNCALE
                UNITED STATES DISTRICT JUDGE
17   ------------------------------------------------------

18   APPEARANCES:

19   For the Plaintiffs:

20          MR. DAVID E. BERNSEN
            MR. CADE BERNSEN
21          MS. MARIANNE E. LAINE
            The Bernsen Law Firm
22          420 North Martin Luther King, Jr. Parkway
            Beaumont, Texas 77701
23          dbernsen@bernsenlaw.com
            cbernsen@bernsenlaw.com
24          mlaine@bernsenlaw.com

25
```

2

1  APPEARANCES (continued):

2  For the Defendants
   Little League Baseball, Inc.
3  and Texas District 12 Little League:

4              MR. GEOFFREY S. HARPER (videoconference)
               Winston & Strawn LLP - Dallas
5              2121 North Pearl Street, Suite 900
               Dallas, Texas 75201
6              gharper@winston.com

7              MR. BRANDON W. DUKE
               MR. ISAAC B. VILLARREAL
8              Winston & Strawn LLP - Houston
               800 Capitol Street, 24th Floor
9              Houston, Texas 77002
               bduke@winston.com
10             ivillarreal@winston.com

11
   For the Defendant
12 Miranda Lynn Dukes Isaacks:

13             MR. BRUCE M. PARTAIN
               Wells Peyton Greenburg & Hunt LLP
14             550 Fannin Street, Suite 600
               Beaumont, Texas 77701
15             bpartain@wellspeyton.com

16
   ALSO PRESENT:
17
               MS. BRITLYN SANDERS, Legal Assistant
18             The Bernsen Law Firm

19

20

21
        ***********************************************
22             APRIL HARGETT, CSR, RPR, RVR
              Federal Official Court Reporter
23                 300 Willow Street
                Beaumont, Texas  77701
24

25

3

1      Proceedings reported by stenotype.  Transcript

2          produced by computer-aided transcription.

3                         ---0---

4          (The following proceedings were held in open

5          court commencing at 10:14 a.m., reported as

6          follows:)

7          (Call to Order of the Court.)

8          THE COURT:  Thank you.  Please be seated.

9          All right.  The Court calls -- the Court

10   calls the case of *Family One, Individually and as*

11   *Guardians and Next Friends of Minor Child One and others*

12   *vs. Adam Dale Isaacks, et al.*, including various

13   defendants associated with the Little League Baseball.

14          We're here today on discovery matters;

15   primarily motions to strike certain objections, a motion

16   to compel certain documents, an issue regarding the

17   organization of proposed documents.  And although it's

18   not this -- this hearing has not been noticed to discuss

19   this, there is an issue that has arisen regarding

20   certain -- a deposition of a particular individual who

21   lives in -- a man named Brent Stahlnecker who lives in

22   Williamsport, Pennsylvania.  I -- if the parties

23   don't -- aren't prepared to move to discuss that, I'll

24   respect that, or if you want to discuss that, we can go

25   ahead and talk about that.  I have some thoughts about

4

1 all these things.

2          First, let me have a roll call.  I mean, I

3 know you, but I want to go ahead and get everybody on

4 the record and -- just who you are and if you're ready

5 to proceed.

6          Ms. Laine, I'll start with you.

7          MS. LAINE:  Marianne Laine on behalf of the

8 plaintiff.

9          MR. C. BERNSEN:  Cade Bernsen on behalf of

10 plaintiff, and Ms. Britlyn Sanders, who is a legal

11 assistant with our firm.  And David Bernsen.

12          THE COURT:  Okay.  Thank you very much.

13          And, Ms. Sanders, I'm glad you're here

14 because I know you probably know more about these

15 discovery requests than anybody.

16          MR. C. BERNSEN:  Absolutely.

17          THE COURT:  All right.  And then on the other

18 side -- Mr. Villarreal, I'll start with you.

19          MR. VILLARREAL:  Yes, sir.  Yes, your Honor.

20 Mr. Villarreal, Mr. Duke, and Mr. Harper for defendant

21 Little League Baseball and District 12.

22          THE COURT:  Right.  I understand.

23          And Mr. Harper had an issue with being here.

24 I allowed him to be here by Zoom because he had lawyers

25 in person and so that is consistent with my requirement

5

1  that parties appear.

2          Mr. Partain, I know this -- go ahead.

3          MR. PARTAIN:  Good morning, your Honor.

4  Bruce Partain.  I represent Miranda Isaacks.

5          THE COURT:  Right.  And Mr. Adams sends his

6  regard.  He -- they have apparently, I'm told, shut the

7  freeway or interstate -- whatever road he's on --

8  apparently, there is some kind of a traffic issue.  And

9  we did send smoke signals back to him and say we would

10 be glad to delay slightly.  And -- but his GPS is saying

11 he won't get here until after -- about 11:30, and I

12 thought we'd just proceed, you know, without him.  And,

13 besides, I don't think he's directly in the line of

14 fire.

15         I know we have experienced lawyers here.  We

16 have three -- at least that I know of -- three former

17 law clerks in the Eastern District, which is helpful.

18 And I think I probably should give a bit of an opening

19 statement, I guess you might say, or speech so you, at

20 least, know, kind of, where the Court is on discovery

21 matters.  I know Mr. Villarreal has heard the speech

22 numerous times and is probably tired of hearing it, but

23 perhaps worth repeating just so everybody knows, kind

24 of, the approach that the Court takes to things.

25         I know Mr. Bernsen will remember life before

1  the -- I think it was the 1989 amendments to the local

2  rules.  That was at a time when Mr. Bernsen devoted his

3  talents to defending the corporate interests of -- not

4  just of America but some of the largest corporations in

5  the world.  Driving up this morning, I remembered a case

6  we tired against each other where you were representing

7  corporate America and I was representing the injured,

8  *Mr. Dwayne Short v. Black & Decker*.

9          And I think -- notwithstanding my best

10 efforts, I think the jury was probably out about

11 15 minutes before you got a defense verdict in that

12 case.  I don't remember exactly, but you did an

13 outstanding job in that case.  And I mention that

14 because he's seen both sides of the docket.  I know my

15 law clerks -- the law clerks who have been in here have

16 seen both sides of the docket.  And back -- I think it

17 was around '89 -- there was a new rule that came out,

18 local Rule 26(d).  And I thought it was the -- kind of

19 the end of the world in many ways.  Communism had really

20 come to Southeast Texas.

21          However, I worked with this rule for about

22 30 years in federal court and found it to be quite

23 useful.  And, in fact, it was great because when we got

24 to trial, we knew -- we knew everything you needed to

25 know about the case.  And from the standpoint now of a

1  judge, I see the wisdom in it that Judge Parker and

2  Judge Fisher had when they, no doubt, came up with this.

3  But, also, before I say anything else, the briefing on

4  this issue by both sides is quite impressive, and my

5  compliments to both sides for flushing out these deals.

6            In fact, these are almost treatises on

7  discovery.  And it's well-written, well-researched, and

8  I commend both sides for that effort.  Having said that,

9  back to this rule, and looking at it from the judge's

10 perspective, discovery disputes were important.  But to

11 put some things in perspective, in the three and a half

12 years since I've been on the court, things have changed.

13 When I was -- took my oath, I had seven civil cases

14 assigned to me.  Seven.  Now -- now we're probably

15 running between Beaumont and Lufkin civil cases assigned

16 to me over 500 per year.  Per year.  That should give

17 you the idea of the litigation activity that has

18 increased here.  It looks as if I will be on the bench

19 -- we've got five trials scheduled that are going to go.

20 I'll be on the bench all of October and into November

21 trying them back to back to back similar to the days

22 when Judge Fisher used to sit on the bench and try them

23 one right after another.  Well, that's the Beaumont

24 division now.

25            And that -- I say that in the context of --

1   oh, by the way, we also have two significant injunctions

2   on top of the other trials, as well as, as you former

3   law clerks know, all of the other day-to-day incidental

4   orders that get turned out just -- just because, you

5   know, it's like motor oil in an engine.  It keeps it all

6   going.  But this rule, I think, was designed, perhaps,

7   to help the judges with beautifully written objections

8   and briefs on discovery because it does take time.  And

9   I had been sending these to our wonderful magistrate

10  judges, but I wanted to keep this one as opposed to just

11  referring it to one of our magistrates.

12           So let's get back to the rule.  The rule says

13  that you must -- these are to guide you -- whether or

14  not a piece of information is relevant to any person.

15  You have to produce anything relevant to any party's

16  claim or defense.  And that includes identifying

17  individuals who, if they were know, would might

18  reasonably be expected to be deposed or called by a

19  witness by any of the parties.  And it's likely to have

20  an influence -- that's broad -- or affect the outcome of

21  a claim or defense.  It's information that deserves to

22  be considered in the preparation, the evaluation, or

23  trial of a claim or defense and is information that --

24  and this is interesting because I always thought I might

25  have to stand in front of Judge Fisher and explain why

```
1   I'm an unreasonable attorney.  I'm sure he inserted this
2   language.  Is information that reasonable and competent
3   counsel would consider reasonably necessary to prepare,
4   evaluate, or try a claim or defense.
5            As I've said many times, as
6   Mr. Villarreal will attest, the discovery bucket
7   in the Eastern District is big.  Big bucket.  The
8   admissibility bucket is smaller.  Different set of
9   rules apply to that, but in looking at this, we have
10  to -- I have to view it from a rather broad brush.  That
11  does not mean that privileges or legitimate objections,
12  especially to the things being unreasonably burdensome
13  or expensive or harassing or things of that nature --
14  that those objections go away.  But -- and it's a
15  relative thing.
16           Now, I come to this position as your judge,
17  in large part having learned a lot of lessons from
18  litigating cases against Mr. Bernsen and other fine
19  lawyers in Southeast Texas, and -- like, for example,
20  number of documents.  Well, I've been in cases where the
21  number of documents were in the millions, and we had to
22  use documents in a cloud.  I remember one case I
23  produced documents that came from China.  They arrived
24  in an 18-wheeler with a forklift to carry them off.  We
25  opened up all those boxes, and all those millions of
```

1  documents were in Chinese.

2          Opposing counsel didn't even come to inspect,

3  but we produced them.  They were available for

4  inspection.  Now, you say, well, that might be

5  oppressive.  Well, we tried that, but given the

6  magnitude of that case, it's worth scouring the earth to

7  find every document that's important.  On the other

8  hand, a slip-and-fall at Walmart.  I know the number

9  20,000 has been raised.  Well, 20,000 documents might be

10  excessive for a slip-and-fall case at Walmart.  So it's

11  all a matter of degree, and there isn't a direct formula

12  that I can apply.  But that's where the lawyering comes

13  in.  But know that on a significant case -- and I think

14  this is probably a significant case -- 20,000 documents

15  is not excessive.  And I'm just using that as, kind of,

16  a guide to things.

17          Since we're talking without going through the

18  specifics, I appreciate a couple of things.  Number one,

19  the dilemma that lawyers on both sides -- but mostly on

20  the defense side -- have when it comes to raising

21  objections.  As you know, if you don't raise an

22  objection, you waive it.  And having to explain to a

23  client why you didn't raise what might be in most courts

24  considered a legitimate objection might be, kind of, a

25  hard pill to have to swallow and -- certainly in

1  representing your client.  However, in 34 years of the

2  practice of law, I learned -- sometimes after being

3  admonished by various judges -- that, perhaps, I should

4  use a deer rifle with my objections as opposed to a

5  shotgun because a deer rifle is more effective.

6          And with that being said, I would often

7  raise -- well, actually, toward the end, I, kind of,

8  even gave up on that and just put one or two that I

9  thought are -- could stand in front of a judge and

10  defend, even if it meant I waived an objection.  I'll

11  deal with the client later on.  I'm representing them

12  on -- so sometimes less is more.  But I do think a way

13  to do it is to go ahead and put a lot of objections --

14  as many as you can justify -- and then when pressed by

15  opposing counsel, then thin it out, prune the tree, and

16  go with those.

17          And, I think, as I understand it, that has

18  happened pretty much in this case.  Am I correct on

19  that?  Let me first hear from the plaintiff?  Or there

20  may be a few lingering ones we still need to deal with,

21  but -- the microphone -- either use that one or --

22          MR. C. BERNSEN:  Judge, is the question --

23  well, it's complicated.

24          THE COURT:  Uh-huh.

25          MR. C. BERNSEN:  First, you know, the -- the

1  fact that they -- that they used general objections and

2  these reservations of rights and then saying they're

3  objecting because there's a motion to dismiss pending.

4  And they're reserving their right to produce documents

5  after you've ruled on that.  You know, those were

6  completely inappropriate.  And then on top of that, they

7  went in each one and did boilerplate, cut-and-paste

8  objections.  And so our stance is that -- over in state

9  court, I remember -- and I think it is the rule here --

10  that if you -- valid objections that are obscured by

11  voluminous boilerplate objections are waived.

12            And so our stance is that their objections

13  are waived on all of them because what they did -- for

14  instance, like on plaintiffs' Request for Production

15  No. 3, it was due -- they filed their answer July 13th

16  and produced zero documents.  They just -- they just did

17  this huge general objections, reservation of rights

18  saying it's premature because of the motion to dismiss.

19  All of which is completely -- is my understanding is

20  completely inappropriate under the federal rules and

21  here in the Eastern District as well in Beaumont.

22            And then underneath all those, Judge, then

23  they would say -- they would just go through the laundry

24  list; vague, ambiguous, irrelevant, overly broad, unduly

25  burdensome.  And so we're in a situation -- I drafted

1  the discovery.  I mean, I drafted it.  And I went

2  through -- the words that I used -- it was -- it was --

3  I mean, I thought I did a pretty good job.  And I went

4  through and used their own terminology.

5          THE COURT:  Including subfolder, to-do items,

6  LLB meeting minutes, and meeting agenda?

7          MR. C. BERNSEN:  Yes, your Honor.  And I have

8  exhibits to show you where -- you know, not all of them,

9  but an example -- all of the terminology we used comes

10 from their website.  And then they're coming in and

11 saying --

12          THE COURT:  Okay.

13          MR. C. BERNSEN:  -- vague, ambiguous.  No,

14 it's not.  No, it's not.  Unduly burdensome.  Ten

15 years -- ten years is too much.  No, it's not.  Ten

16 years is not too much, Judge.  What we have evidence of

17 is that these little boys were hurt and molested and

18 raped in some cases '21, '20, '19, '18, possibly '17.

19 So we're asking for ten years of documents.

20          THE COURT:  You mean 17 years ago?

21          MR. C. BERNSEN:  No.  No.  '20, the years.

22          THE COURT:  In the year.  Okay.  I'm sorry.

23          MR. C. BERNSEN:  The year.

24          So when they brought it up before, ten years

25 is too much.  No, it's not.  It's not.  Because if you

14

```
 1  think about it, we're talking about ten years from
 2  today.  And so, you know --
 3            THE COURT:  Okay.
 4            MR. C. BERNSEN:  So -- anyway, it is not --
 5  they put that in their motion and their sur-reply that
 6  they filed yesterday that it's -- that the objection
 7  issue is -- is somehow -- I think what they're getting
 8  to is moot, and it's not in our mind because we believe
 9  all their objections have been waived.  And then, plus,
10  the ones that they changed -- was it yesterday?  This
11  week?
12            MS. LAINE:  It was two days ago.
13            MR. C. BERNSEN:  Two days ago, they
14  finally -- we have these amended objections -- the
15  latest ones two days ago -- and they're still
16  withholding many, many documents.  They're still --
17  there's still a bunch of boilerplate objections that
18  carried over from the first inappropriate round of
19  objections.  So when you say has it been settled, it's
20  complicated.  No, it hasn't, in our mind.
21            THE COURT:  We're still at the 30,000-feet
22  level at this point.  And that was Mr. Cade Bernsen
23  speaking.  And I appreciate the comments.  And we may
24  have to drill down a little bit later on.
25            Let me just say -- I saw Mr. Duke shaking his
```

1    head, yes, that we did trim the bush back a little bit.

2            Do you want to address this issue?

3            MR. DUKE:  Well, I was nodding that we did

4    amend and that the amounts of -- there was a meet and

5    confer back and forth, and several of the issues that

6    were raised in the initial motion had been addressed.

7    And that was what I was responding to, but Mr. Harper

8    was directly involved in those.

9            THE COURT:  All right.  Mr. Harper, I'll let

10   you speak.

11           And, again, we're at the 30,000-foot level.

12   We'll drill down later as we go.

13           MR. HARPER:  Your Honor, in light of that, I

14   wasn't -- obviously, there was a lot raised there.  I

15   will just tell you that we're doing the best that we can

16   here.  We recognize that there was some objections that

17   were aggressive, and we -- the first thing I did when I

18   got here was work with everyone to take care of it.  In

19   fact, after -- we had a separate meet and confer with

20   them last week.  We went back and revisited some of

21   this.  That's why it took so long to be here.

22           We're -- we feel like we've done what -- what

23   we think is right at this point with the objections we

24   have left.  I'm not really sure --

25           THE COURT:  Okay.  So we may drill down

 1 later.

 2         Let me make a comment that -- with the idea

 3 of ten years -- you know, if it's just an unlimited

 4 request, that would be overly broad because it's not

 5 limited as to time.  Ten years may well be appropriately

 6 tailored, I'll say that, just, kind of, from the outset.

 7 And the other thing I heard in that exchange was, well,

 8 we, kind of, don't want -- the defendants don't want to

 9 produce records pending rulings on dispositive motions.

10 And what I have discovered is that essentially motions

11 to stay in this court will rarely be granted because

12 we've seen early on how that can be abused.  And, in a

13 way, withholding documents pending a ruling on a

14 dispositive motion, in a sense, is a quasi or semi stay

15 that a party has imposed on a case without even, you

16 know, coming to me.

17         There may well be, as some of you know -- in

18 the patent cases that come before me now, by agreement

19 we -- and it is in scheduling orders.  We'll put the

20 damage discovery after the Markman hearing because that

21 makes economic sense in the preparation of a case.

22 We've discovered that in hurricane cases, it is a good

23 thing to put the bad faith discovery in damages after

24 discovery on the basic damages to the structure because

25 oftentimes cases settle after you've sorted out how many

1  shingles have been torn off the roof.  In the case of a

2  patent, how is the patent being defined.  And people --

3  so that makes sense.  And there may be some times when

4  we'll want to alter the scheduling order to accommodate

5  the specific needs of a case because it makes economic

6  sense.

7          However, people ask me over and over again,

8  will you stay -- we're confident our 12(b)(6) motion,

9  our motion for summary judgment is going to be granted,

10 or our motion to remand the case back to state court

11 will be granted, therefore stop all discovery.  And I

12 don't do that.  And that's just -- as I mentioned

13 before, that's with a special understanding.  I don't do

14 that because we have, not only an open basket for

15 discovery in the Eastern District, but with initial

16 disclosures and the way we proceed, we want to get the

17 discovery out there.

18         If the case gets remanded back to state

19 court, well, then you can take your discovery from --

20 that you got in federal court and take it back to the

21 state court with you and use it there.  If there's

22 discovery -- and, by the way, if something needs to be

23 protected, I'm pretty liberal about granting protective

24 orders, so you don't have to worry about that.  Let's

25 get that information out here, exchanged, and if a

1  dispositive motion is granted, well, what I would say to

2  the defense counsel is take a victory lap and write a

3  long letter to your client telling them what a great

4  lawyer you are and that you won.

5        At that point, whatever was produced in

6  discovery is -- yeah.  There was some expense associated

7  with it, but, you know, it's the cost of doing -- it's

8  just -- that's life, you know.  And we don't hold off on

9  discovery until we tidy up -- because then that creates

10  other issues.  If I do that, then it's inevitable that

11  we're going to have to completely modify the scheduling

12  order and bump everything back, which that's pretty easy

13  to do if you have a court with only seven cases in it.

14  But when you're running 500 civil filings a year, what

15  we're finding is we're running out of, well, I can give

16  you a trial setting in a month.  Those days are over.  I

17  mean -- and then we're looking at a year down the road.

18  Next thing you know this case is three years old, and,

19  as the law clerks know, I'm having to explain to the

20  Fifth Circuit why I haven't disposed of this case.

21        And so, you know, there are some pressures

22  that come to play that you may not know of.  So I'm

23  really not inclined to allow delays in discovery pending

24  dispositive motions.  I want to go ahead and get that

25  out.  Besides, there might be some document that may be

1   produced that may have bearing on some dispositive

2   motion, which if you'll notice in my scheduling order --

3   and I know Mr. Villarreal is aware of this having

4   clerked for me -- I do something that's a little

5   different than what most federal judges do across the

6   country.  I put my discovery deadline after the motions

7   for dispositive motions because just in the event

8   there's just some little tidbit -- oh, my goodness, we

9   forgot to get some evidence on that particular

10  element -- you have a very limited window to fix that,

11  but at least the scheduling order isn't outcome

12  determinative.  I want the scheduling order to be

13  outcome neutral as best as it can be.  Deadlines are

14  deadlines.  I don't want the scheduling order to be used

15  as a tool to say, got you, when it's just a matter of

16  scheduling.

17          And as I remember on this case now, we set it

18  pretty far down the road because we thought it was going

19  to be a rather complex case with a lot of discovery.

20  And I think that's probably proven to be the case.

21  So -- yeah.  I pushed things off, but if I have to amend

22  the scheduling order again to accommodate delayed

23  discovery production, then, well, I might as well go

24  ahead and write my letter now to the Fifth Circuit

25  saying this case is going to be a delayed case.  And,

1   you know, that's not what we want to do.

2           So -- now, I understand, too, in cases with a

3   lot of discovery, you may have some rolling discovery.

4   And that's understandable.

5           I saw Mr. David Bernsen look like he wanted

6   to say something.

7           Go ahead.  Then I have some more general

8   comments at the 30,000-foot level, and then we'll get

9   down to the weeds here in a minute.

10          MR. D. BERNSEN:  Thank you.  For the record,

11  David Bernsen.

12          THE COURT:  Uh-huh.

13          MR. D. BERNSEN:  Thank you for allowing us to

14  have this hearing today.  And things have changed.  I've

15  seen -- you and I have both seen change over the course

16  of litigation in this building and other buildings.  And

17  what we're trying to do and what we've said in our

18  motion is that we're trying to keep to the Court's

19  instructions and the scheduling order that we -- that

20  this Court has set.  And we're having difficulty getting

21  there.  And that's why we're here before the Court.

22          The comments about the -- well, we don't have

23  any issues with counsel about the specific requests for

24  production, we disagree with.  There are -- there are

25  issues, and it began, as we said in the motion -- and I

1  set out a timetable -- we set out a timetable to see

2  the -- to allow the Court to see the evolution of this

3  case in terms of the disclosures, lack of disclosures,

4  and the discovery -- trying to get documents that we

5  think should have been produced in disclosures.  And

6  then we're having trouble, even with the specific --

7  Cade Bernsen's request for production.

8          At the outset, your Honor -- and I want to

9  say this:  Mr. Isaacks was arrested in the latter --

10 like, the 30th of December.  There are documents that

11 show that Little League and District 12 and everybody

12 knew about it immediately.

13         THE COURT:  Uh-huh.

14         MR. D. BERNSEN:  On January the 18th, I

15 believe, Cade, my son, sent a letter -- a representation

16 letter, as well as a preservation of document letter, to

17 both of these defendants.

18         On January the 30th, we filed a 62-page

19 petition, which teed it up on all of the areas that we

20 thought were important.  And we know that these

21 defendants -- or at least Little League Baseball -- this

22 is not their first rodeo in these type of cases.  And

23 having been on the defense side and knowing that we have

24 produced, as defense lawyers, millions of documents, and

25 we have specifically produced them in terms of being

1   responsive to a particular request for production.  One

2   of the primary objections that we have, in addition to

3   others, is the method and manner in which they produced

4   those documents.

5           They -- I know they have certificates or

6   affidavits saying it's produced in the ordinary course

7   of business.  Well, the rules say that if you keep them

8   all in a box all mixed up and that's the ordinary course

9   of business --

10          THE COURT:  Well, hold on.  Let me just

11  discuss something.  That's Rule 30 --

12          MR. D. BERNSEN:  Thirty-four.

13          THE COURT:  Let me see here.  And -- let's

14  just deal with that because that is on my mind, too.

15          MR. D. BERNSEN:  Mine's all highlighted and

16  earmarked and has paperclips and tabs and everything.

17          THE COURT:  Yeah.  And you, kind of, know --

18  my concern -- it uses the term "or".  And I know I have

19  that marked.  Let me see here.

20          MR. D. BERNSEN:  I believe it's

21  34(b)(2)(B).

22          THE COURT:  34(b)(2)(B.)  Yeah.

23  Double (i) -- single (i).  "A party must produce

24  documents as they are kept in the usual course of

25  business."  Okay.  Fair enough.  "Or must organize and

1 label them to correspond to categories in the request."

2          Now, again, I go back -- sometimes in this

3 job, I find myself being more the way I was as a lawyer

4 than as a judge.  Because I had the -- proud to be able

5 to represent some of the largest companies in America

6 and, you know, around the world.  And, you know, you get

7 your request for production.  You don't go to your

8 client's place of business and just start collecting

9 documents, right?  You say they've requested 30 items,

10 and we need to find documents pertaining to these 30

11 items.  And although, I think, in this case, it's more

12 like 200.

13          But as you collect documents from the client,

14 you're keying them to the request.

15          MR. D. BERNSEN:  Absolutely.

16          THE COURT:  And what we used to do was say,

17 okay, here's Bates Stamp 1 through 20,000 -- Documents

18 1,000 to 2,000 pertain to Request For Production 7, 10,

19 and 15.  And you know that because that's why you --

20          MR. D. BERNSEN:  Collected them.

21          THE COURT:  -- collected them to begin with.

22 And I think -- I think -- I don't see that it's being

23 overly burdensome just as a general principle to do

24 that.  At least to tie it to the request -- and,

25 granted, there could be some overlap.

24

1              MR. D. BERNSEN:  Sure.

2              THE COURT:  And that's why you sometimes do

3    it that way.

4              MR. D. BERNSEN:  Yes.

5              THE COURT:  I don't have a problem with that.

6              MR. D. BERNSEN:  Well, we would need -- we

7    would ask the Court to suggest -- order the defendants

8    to do that.  You mentioned this earlier, your Honor.

9    I've represented Mobil.  I've represented recently

10   Valero, and we produced millions of documents, whether

11   it was personal injury, tax case, whatever.  And that's

12   how you go get them from your clients, whether it's this

13   plant's facility here or if it's up in Illinois or out

14   in California.  We would sit down and get them.  And

15   when we produced them, they were in response to a

16   particular category or request or -- so that the other

17   side, both plaintiffs and defendants, could see what the

18   heck we were producing in response to what a particular

19   request was.

20             With the Court's --

21             THE COURT:  You may.

22             MR. D. BERNSEN:  Your Honor, on the 29th of

23   August at 10:00 o'clock, they produced these documents.

24   It was, I think -- I think it was 23,000 Bates labeled.

25   Well, I had to put it up.  I'm old school.  I like to

1   see and read the documents and touch them.  And this is

2   the first of 35 books or the third of 35 books in this

3   latest production.  And if you go through them -- any of

4   the production -- there's not a rhyme or reason as to

5   subject matter, topic, date.  And you've got that as one

6   Bates label.  That's one -- that is 51 -- 0005128.

7   Well, it's a spreadsheet with about 40 documents -- 40

8   pages.  Well, I've read them.  I've gone through here,

9   and I've tabbed them.  They are documents that are

10  incomplete.

11          There are documents that are not -- don't

12  have the attachments to them.  And so -- and I don't

13  know what this is in response to because, not only do

14  defendants not identify the particular request for

15  production, they don't identify which of the -- we filed

16  three or four -- four requests for production, so we

17  don't know what these documents are responsive to.

18  Request for Production No. 4 or 3 or 2.  We know it is

19  not one because we were trying to get the insurance

20  policy.  But we don't know -- and we're supposed to go

21  look through it and pick out ourselves -- the gentleman

22  -- I can't think of the young lawyer's name, nice man,

23  said, "If you have a question, tell us, and we'll go

24  tell you what it's responsive to."

25          Well, your Honor, we both know that's how you

1 collect them from your client.  Here's the topics and

2 give me what you have.  And that's all we're asking them

3 to do is -- it's -- what they've done is not fair.  It's

4 not reasonable.  If this is the ordinary course of

5 business, which I don't think it is -- even with their

6 affidavits, it's -- we would ask this Court to ask these

7 defendants --

8            THE COURT:  Well, like that spreadsheet, it's

9 produced -- that's kept in the normal course of business

10 as a spreadsheet.

11            MR. D. BERNSEN:  Yes.

12            THE COURT:  Fair enough.  But the other part

13 of the rule -- and so we're clear, it is

14 34(b)(2)(B)(i) -- it says "or".  It's not "and".  It's

15 "or".  And I think it is reasonable.  So I'm going to

16 order that the -- that there be some sort of a

17 supplement that identifies the -- and ties the Bates

18 stamped number or numbers -- usually there's a range --

19 to a specific one or more request for production.

20            Is there any problem with doing that?  Let me

21 ask the defendant before we leave this point.

22            MR. DUKE:  I'm going to refer to Mr. Harper.

23 He did note that it's difficult for him to hear.

24            So to the extent you can talk into the

25 microphone, that would be helpful.

1           MR. D. BERNSEN:  Me?

2           MR. DUKE:  Yeah.  I'm just saying --

3           MR. D. BERNSEN:  I'm sorry.  Usually, I'm too

4  loud, and people tell me to calm down.

5           MR. DUKE:  I just thought I'd mention that.

6           MR. HARPER:  Sorry.  Your Honor, we will do

7  whatever you want.  The only issue is going to be time.

8  With the amount of documents we have and then, of

9  course, the problem is so many are tied to ten or more

10  requests.  It's going to take a while, but I would

11  say -- for that, your Honor, I would ask -- we're happy

12  to do it.  It will take us -- I'd like at least a week,

13  two weeks.

14           THE COURT:  A week?  Two weeks?

15           MR. D. BERNSEN:  I hear counsel, and I

16  feel -- I feel his pain.

17           THE COURT:  I know.

18           MR. D. BERNSEN:  The -- we've lost a summary,

19  your Honor.  These documents -- some of these documents

20  should have been produced with the initial

21  disclosures --

22           THE COURT:  But we are where we are now, and

23  we're trying to fix the flat tire.  And it's going to

24  take -- I understand you're saying this tire should have

25  been fixed back in July.  Okay.  We're in September.

1 He's wanting one or two weeks, which --

2          MR. D. BERNSEN:  How about ten days?

3          THE COURT:  Ten days is splitting the

4 difference, and I'm comfortable with that.

5          Is that to your satisfaction?

6          MR. HARPER:  Your Honor, the answer is, you

7 know -- I've learned we meet whatever deadline you give

8 us --

9          THE COURT:  We're going to give you a

10 deadline of ten days to do that.  And --

11          MR. DUKE:  Your Honor, I just wanted to -- I

12 think Mr. Villarreal wanted to mention something.

13 But --

14          THE COURT:  Please do.

15          MR. DUKE:  I think -- just for a second, we

16 wanted to correct the misimpression how these documents

17 were collected was the way it was described and maybe

18 had been done in the past.  Just because of the broad

19 scope of the request, it's actually -- you do ask your

20 clients for their entire files and e-mails, and we have

21 to sort through them to try to help identify them.  It

22 is a little bit different.

23          I agree with Mr. Harper.  We're happy to

24 do whatever -- we're obviously going to do whatever the

25 Court says.

1          THE COURT:  But, I mean --

2          MR. DUKE:  I don't want to leave the

3   misimpression that the affidavits are somehow incorrect

4   or wrong.  They were collected and produced in ordinary

5   course.  They're e-mail electronic files that have --

6          THE COURT:  That's great.

7          MR. DUKE:  -- searchable information that --

8   so we're going to have to do what they would have done

9   and that's what's generally done in the past.  And the

10  offer that was made was --

11         THE COURT:  Well --

12         MR. DUKE:  -- for things -- like, some of the

13  requests say, "Identify the documents used to create" --

14  you know, "used to respond or" -- yeah.  "Used to

15  support this position" or things like that -- that would

16  normally be an interrogatory.  We're happy to -- our

17  offer was, if that's something that you couldn't easily

18  do because the way the request was worded, we were happy

19  to do it.

20         But, setting that aside, if the Court wants

21  us to go through the individual documents and identify

22  those, we'll do that.

23         THE COURT:  I suppose if -- you know, I go

24  back to the rule and the wisdom of Judge Fisher and

25  Judge Parker.  I was vehemently opposed to it -- quietly

1   so -- when the rule came out.  I saw the wisdom in it.

2   In fact, in some cases, I just dispensed with sending a

3   request for production at all because I was getting what

4   I thought would be -- everything that a reasonable

5   lawyer thought -- I had some pretty good lawyers on the

6   other side that I thought were pretty reasonable.  And

7   if I thought I was getting enough information to go try

8   a case -- I can't make the case out of these -- can't

9   make a campfire out of these sticks, then there's no

10  fire to be made.

11          So what it may be then -- what I'm hearing

12  is, yes, you've got some documents that were related to

13  a request for production.  And notwithstanding over 200

14  requests for production being sent, there might be a

15  document that doesn't fit one of those categories, but

16  you come under the default provision of our local rule.

17  And if that's the case, then you're saying you produced

18  it just because you thought it might have bearing on

19  some claim or defense.  I guess you could do that, too,

20  but identify it that way.  But if you don't think it

21  relates to one of the requests for production, but you

22  thought it was -- maybe there should have been -- no

23  offense to Mr. Cade Bernsen -- but maybe he should have

24  come up with an additional request for that and didn't

25  think of it, and you went ahead and produced it anyway.

31

 1  That's fine.

 2          MR. DUKE:  I think we're good.  And so we're

 3  happy to -- I think he just wanted to clarify some

 4  stuff.  I think I briefly did that.

 5          THE COURT:  Thank you very much.

 6          MR. D. BERNSEN:  Okay.

 7          THE COURT:  So we're going to get that done

 8  in ten days.  So that takes care of that.

 9          Now, do you want to talk -- before we drill

10  down, do we want to talk about this witness?

11          MR. D. BERNSEN:  Yes.  Yes.  We can do that

12  right now.

13          THE COURT:  Is the defense ready to talk

14  about that?

15          MR. DUKE:  Yeah.

16          THE COURT:  Technically, it wasn't noticed

17  for this.  Let me say -- before I came out here -- I

18  don't know this guy.  He lives in Pennsylvania.  He's an

19  officer or somehow or another has a position with the

20  Little League.  Unless I'm misunderstanding something --

21  and I certainly would appreciate being corrected if I

22  misunderstood something -- unlike some of the local

23  people, I doubt he's going to have any information from

24  his own personal knowledge about what happened to these

25  young men.

32

```
1          Any -- I'm, kind of, having a hard time
2  understanding how he would have any information
3  outside of his position as an officer in the Little
4  League, Inc., or whatever the entity is.  With that
5  being the case -- and giving consideration to he's all
6  of the way in Pennsylvania, and there's an expense to
7  flying up there and renting hotels and renting cars that
8  cost a fortune now and all this other stuff.  Produce
9  him one time in his capacity as a corporate official.
10 And then that being said, maybe a 30(b)(6) would be the
11 way -- it is not a waste of everybody's time.  Granted,
12 they'll woodshed him, but I'm sure the -- you've
13 probably woodshedded a couple of yours.
14          MR. D. BERNSEN:  Absolutely.
15          THE COURT:  I mean, that's fair.  That's fair
16 game.  Getting him queued up so he's not completely in
17 the dark.  At least he knows what policies and
18 procedures he's going to be asked to opine or give an
19 opinion about or testimony about as a corporate officer
20 and avoid having to come back later at expense to
21 everybody.  Mr. Partain's client, as I recall at our
22 last meeting -- there might be limited budgets
23 associated.  And I think Mr. Adams' client as well.  I'm
24 not sure.
25          But, I mean, I think -- I've, kind of, got to
```

1  balance some things here.  And I'm thinking that the

2  30(b)(6) would be a way you can get this guy's

3  deposition, and it's clean.  And, at least, he knows,

4  kind of, in advance the subject matter.  I'm not asking

5  you to deliver the questions you're going to ask him,

6  but I think that's probably a pretty fair way to

7  proceed.  And maybe not just in terms of what 30(b)(6)

8  has to offer us as guidance, but just the practicalities

9  of getting an all-in-one stop shop without having to go

10  back to Pennsylvania for a second -- and, also, by the

11  way, I know plaintiffs typically don't like to produce

12  their witnesses more than once.

13          MR. D. BERNSEN:  That's absolutely true.

14          THE COURT:  And -- because you don't want to

15  give the other side a second bite at the apple unless

16  there's a -- sometimes a supplemental deposition is

17  authorized but with very stringent limits.  I'll produce

18  my client or my -- for second deposition, but you're not

19  going to go back and ask what you asked the first time

20  to see if he's changed his opinion about that.

21          You know, so I think that's -- I'm inclined

22  to go with this 30(b)(6) unless there's something I'm

23  missing that this guy has some information outside of

24  his position as an official within the company.  What am

25  I missing?  Anything?

34

```
 1            MR. D. BERNSEN:  No, your Honor.  Thank you.
 2   Those are points well-taken.  Originally, one of the
 3   reasons we did not want to do a 30(b)(6) one was up
 4   until the 29th of August, we didn't have any documents.
 5            THE COURT:  Okay.
 6            MR. D. BERNSEN:  And so I said, well, you
 7   want us to go take a 30(b)(6) person, and we don't
 8   even -- y'all are not producing documents that I know
 9   you have.  That was one issue.  The second issue is he's
10   the man who signed the discovery and -- supposedly
11   coordinated the discovery, and I have some questions I
12   want to ask --
13            THE COURT:  Did he verify the
14   interrogatories?
15            MR. D. BERNSEN:  Yes, sir, he did.
16            THE COURT:  Okay.
17            MR. D. BERNSEN:  So I want to ask him about
18   that because -- I'll just say this:  I've got a feeling
19   he's -- he'll be more forthcoming if I'm looking at him
20   eyeball to eyeball.  And I expect to take his deposition
21   myself and ask him about some of these documents that
22   he's supposed -- they were supposed to have produced.
23   And we'll -- when they produced them -- he is also the
24   -- yeah.  I'll tell him -- it's fine.
25            THE COURT:  We're going to go with
```

35

1  30(b)(6) --

2           MR. D. BERNSEN:  Your Honor, excuse me one

3  second.  This first document right here.  Excuse me.

4  This is their --

5           THE COURT:  While he's getting back to the

6  lectern, I want to think Ms. Sanders for keeping him

7  organized.

8           MR. D. BERNSEN:  Okay.  Your Honor, this is

9  their disclosures -- these documents.  It's 1 through

10 1310.  It is -- it is three -- four documents -- ten

11 documents with Evadale Little League.  The rest of it

12 are manuals -- Little League manuals -- you could go get

13 it from somebody else.  They didn't produce their

14 insurance policy.  We raised Cain about it.

15          Marianne, can you hold that second document

16 up?

17          Then they sent us -- what's the date on that?

18          MS. LAINE:  June 17th is the dec pages and

19 COIs.

20          MR. D. BERNSEN:  COIs.  In those dec pages

21 for District 12, it lists something -- we met and

22 conferred with Mr. Orwig.  The red documents are the

23 insurance policies that Little League Baseball produced.

24 Not District 12.  And --

25          THE COURT:  Are they defendants under

36

1  reservation of rights?

2          MR. D. BERNSEN:  No.  They gave these --

3  these policies.  And in there --

4          THE COURT:  No.  But are they defending the

5  case under reservation of rights?

6          MR. D. BERNSEN:  They say no.  I mean, not

7  that we know of.

8          THE COURT:  Okay.

9          MR. D. BERNSEN:  They've not said anything.

10          But in these -- in these documents -- and

11  this is something I want to talk to Mr. Stahlnecker

12  about -- is that -- and I'll just pick one of them.  On

13  LLB Production 002231, it's got -- that's produced by

14  Little League Baseball.  It says, "Named insureds:

15  Little League Baseball, Inc.  Business of the named

16  insured:  Little League Baseball Administrators."

17          And the motion to dismiss says that they're

18  separate and independent entities, and so we tried to

19  subpoena the underwriting of this.  That's something we

20  want to take care of because it appears that they're one

21  in the same, and there are other issues like that

22  throughout.  And so, yeah, there's some information

23  specifically with Mr. Stahlnecker -- I want to talk

24  about the production or lack of production that he was

25  in charge with.

37

1          THE COURT:  Well, then -- that's in his

2   official capacity.  And he signed the interrogatories in

3   his official capacity.  And I'm sure you can -- you'll

4   ask him about a lot of these things.  And I'm saying you

5   can take his deposition, but I think it needs to be --

6   you need to tell him, you know, the areas that you want

7   him to -- so he can talk about his discovery responses.

8   That might be one area, you know.

9          MR. D. BERNSEN:  That'll be fine.

10          THE COURT:  Policies and procedures, history

11   of other -- maybe other things.  I don't know.  I'm not

12   sure -- I'm sure you-all have a pretty good idea of what

13   you're going to want to ask him anyway.

14          MR. D. BERNSEN:  Do you want to say

15   something?

16          My son keeps jumping up and down.

17          I think we can limit the areas, and then if

18   there are other areas that we need to go back --

19          MR. C. BERNSEN:  Yeah, Judge.  I'm just

20   reluctant -- you know, I feel -- I'm nervous about

21   agreeing to take -- you know, the corporate rep

22   deposition is obviously -- that's an important

23   deposition.  And, you know, we just got 20,000 documents

24   plus last week, and we've got -- there are other things

25   going on.

1           So we're going up to Williamsport to take

2   this lady named Samantha Mahaffey who was in charge of

3   their child protection program.  And I wanted to take

4   Stahlnecker because, basically -- you know, like, on the

5   internet, it says he was basically in charge of

6   overseeing the child protection program and other safety

7   programs.  And so I -- and, you know, he signed the

8   interrogatories.  I obviously felt we had a legitimate

9   reason to take his deposition in his individual

10  capacity.  And just because, you know, they said, well,

11  he may be our corporate rep so you have to convert this

12  deposition into a corporate rep depo.  And I'm like,

13  "We're not ready yet."  I mean, we just got -- we just

14  got tens of thousands of documents, and we're still

15  trying to sort through things.

16          I'm just, kind of, nervous -- you know, we

17  need to take this Ms. Mahaffey's deposition.

18          THE COURT:  Well --

19          MR. C. BERNSEN:  But I'm just nervous

20  converting Mr. Stahlnecker's deposition in -- you know,

21  in less than two and a half weeks to a corporate rep

22  depo.

23          THE COURT:  Okay.  It sounds like you-all,

24  kind of, have got it scheduled?

25          MR. D. BERNSEN:  Yes.  We have reservations

1  and everything.

2          THE COURT:  Let me -- let me -- again, this

3  is more of a -- 34 years of being a trial lawyer talking

4  more than a judge.  The way we used to do it is

5  sometimes you -- if you come across some areas in a

6  deposition that require additional interrogation, I

7  guess is a good word -- 20,000 documents and there's

8  something there -- whatever.  You know, you could always

9  hold a deposition open and continue it at another time.

10 Now, you know, that's not ideal because what we want to

11 try to do -- what I think you-all want to try to do is

12 make it a one-shot deal.  You'll probably take both of

13 these people's depositions in the same trip and save

14 everybody some money, defense money, and everybody.

15         On the other hand, if there's some surprise

16 or something that comes up and -- and it may be a

17 benefit to the defendant as well, perhaps, to say, well,

18 we'll produce him again in another month or whatever

19 and --  and that gives them 30 days to woodshed him on

20 those additional points -- excuse me -- to allow him to

21 become well-versed in the subject matter.

22         MR. C. BERNSEN:  Judge --

23         THE COURT:  I guess there are ways you can --

24 that would, perhaps, satisfy Mr. Cade Bernsen's

25 articulated concern.  But, hopefully -- I suspect, with

1  Ms. Sanders' help especially, you'll be ready for that

2  deposition.  You're going to know what you want to ask.

3  You're going to know -- you've probably already written

4  out your questions, and you can just say I'm going to

5  ask these subject matters right here.  And then you're

6  not giving him the questions in advance, but you're

7  giving him the subject matter.  He's going to testify

8  about these things.

9             MR. D. BERNSEN:  We can do that.

10            THE COURT:  And they may say, well, there's

11 something he doesn't have any knowledge of and there's

12 another witness.  And we may need to get that out there

13 and say -- maybe there's another person that needs to be

14 deposed, and you get a third deposition while you're up

15 there in Pennsylvania.

16            MR. D. BERNSEN:  We can do that, your

17 Honor --

18            THE COURT:  It just clarifies it.

19            Mr. Villarreal, do you want to say something,

20 I think?

21            MR. VILLARREAL:  I think the Court has ruled

22 on the matter.  So nothing --

23            THE COURT:  That's fine.

24            MR. D. BERNSEN:  If we need additional time

25 up there -- I think the rules are seven hours, I think,

41

1   for a deposition.

2           MS. LAINE:  The -- I believe the rule says

3   seven hours.

4           THE COURT:  Yeah.  Now, what we don't want,

5   of course, is to wear the man out where he's exhausted

6   and, you know, even another pot of coffee doesn't help.

7   And you're just, you know -- although, sometimes people

8   like to just solider on through and get it over with so

9   you don't get a chance to go back home and reload.

10          MR. D. BERNSEN:  That's right.

11          THE COURT:  I mean, time deadlines work both

12  ways, you know.

13          MR. DUKE:  We're happy -- I think seven hours

14  is probably more than sufficient for a deposition -- for

15  almost any deposition, in my experience, but I've never

16  been one to, like, cut the clock off if they have, like,

17  30 more minutes.

18          MR. D. BERNSEN:  There you go.

19          THE COURT:  And a lot of that, too -- I mean,

20  if you have a lawyer who is just wasting everybody's

21  time or is just out of control -- but if someone's being

22  pretty proficient and focused and getting the job done

23  and have a little extra --

24          I appreciate, Mr. Duke, your position on that

25  because that's --

```
1              MR. DUKE:  I mean, I know the rules are there
2    for the rules, but I think they are also there to guide
3    counsel and -- we'll see how the day's going.  If
4    it's --
5              THE COURT:  And let me say -- and I used it a
6    couple of times -- I won't mention the lawyer.  No one
7    in this room.  I don't even think he has a license
8    anymore.  But our local rules have that discovery
9    hotline, and we assign a magistrate judge to be on call
10   each month.  And I've used that right in the middle of a
11   deposition and got -- got to what was right pretty
12   quickly.  You know, you might take an extra long lunch
13   so the magistrate judge can set up.  But, I think if
14   y'all are in the middle of a deposition and y'all run --
15   somebody runs into a problem, on either side, can use
16   that.  So you might want to take your rule book with you
17   with your local rules and --
18             Yes, Mr. Villarreal.
19             MR. VILLARREAL:  Judge, if I may just
20   interrupt for a second.  Mr. Duke has a hard deadline to
21   be in Houston, and he asked if he could request to be
22   excused.
23             THE COURT:  Yes.  That will be fine.
24             And, Mr. Villarreal, why don't you get next
25   to the microphone so we can hear you a little bit better
```

43

1  in case.  And we haven't forgotten you online.

2          MR. DUKE:  I was here just in case of

3  technical difficulties.  I ended up talking more than I

4  had hoped.  This is my chance to shut up.

5          Thank you, your Honor.

6          THE COURT:  Certainly.  I think we've

7  probably dealt with a lot of things at the 30,000-foot

8  level.  So we're going to, essentially, have you -- have

9  the documents tied to requests for production.  We're

10 going to have this deposition as a corporate rep

11 deposition.

12         MR. D. BERNSEN:  We'll provide the subjects.

13         THE COURT:  Pardon?

14         MR. D. BERNSEN:  We'll provide the subject

15 areas.

16         THE COURT:  Yes.  And then I think we said

17 ten days to do the production of documents.

18         We've talked about -- I guess we're going to

19 need to get down now and go back and start -- and get

20 our drill bit going and drill down a little bit on

21 specific requests for production.

22         Is that -- that's what we're dealing with

23 now.  I've heard that -- and Mr. Duke expressed it --

24 that they have attempted to modify their objections, but

25 they still have some.  We've got to have some way of

44

1   going through it.

2           So which ones are -- I'm not going to ask

3   which ones -- which ones are still left that need a

4   little examination by the Court?

5           MR. C. BERNSEN:  May I sit, your Honor, so I

6   could have my stuff here?

7           THE COURT:  Yes, of course.

8           I've got -- let me just help a little bit

9   here.  Reservation of rights.  As I understand it, the

10  amended response, which is Document 80, removed the

11  reservation of rights.  General objections -- again,

12  Document 80, amended response, removed the general

13  objections.

14          MR. C. BERNSEN:  May I approach, your Honor?

15          THE COURT:  All right.  Do you want to give

16  the other side a copy, too?

17          Thank you.

18          Mr. Cade Bernsen has handed me -- I think I

19  already had this -- defendant Little League Baseball's

20  amended objections and requests to plaintiffs' third

21  requests for production.  I think that's on Exhibit 5 to

22  Document 80.

23          Is that correct, Mr. Cade Bernsen?

24          MR. C. BERNSEN:  Probably so.

25          MR. D. BERNSEN:  We think so, your Honor.

1           MR. C. BERNSEN:  I don't know.  They can look

2  that up.

3           THE COURT:  Hold on.  I have it tagged

4  already.  It is --

5           MR. C. BERNSEN:  So I can --

6           THE COURT:  That's exactly what it is.

7  Uh-huh.

8           MR. C. BERNSEN:  So I guess what I'll do

9  is -- I'm prepared to drill down on -- I think this

10 isn't an exclusive list, but, you know, this has been a

11 very fluid moving situation.  And I think these were

12 filed -- September 6th is two days ago.  So, anyway, I

13 went through them yesterday, and I found some ones that

14 we believe are still -- still problematic, and so I can

15 bring those to your attention now.

16          THE COURT:  All right.  I think that's,

17 perhaps, the way to do it.  And I've been also advised

18 that I have Mr. -- Judge Heartfield has a little problem

19 with his courtroom.  He's going to need to borrow my

20 courtroom.  I'm more than happy -- I always welcome him

21 back.  We're going to need to, kind of --

22          MR. C. BERNSEN:  Plow.

23          THE COURT:  -- plow through it, okay?

24          MR. C. BERNSEN:  Yes, sir.

25          MR. VILLARREAL:  Judge, if I may?

46

1           THE COURT:  Yes.

2           MR. VILLARREAL:  Just for the Court to note,

3  the responses and objections are different per

4  defendant, meaning there's -- they were for both

5  Little League Baseball and for District 12, and the

6  responses are different.

7           THE COURT:  Where are District 12's?

8           MR. VILLARREAL:  It was also an exhibit to

9  our --

10          THE COURT:  Document 80?

11          MR. VILLARREAL:  To Document 80.

12          MR. HARPER:  Exhibit 4.

13          MR. VILLARREAL:  Exhibit 4.

14          MR. C. BERNSEN:  Yeah.  That may be so.

15  I'm -- this is the document I wanted to talk to the

16  Court about.

17          THE COURT:  That's a good point.  Here it is.

18  Exhibit 4 to Document 80, defendant Little League

19  Baseball, Inc.'s -- wait a minute now.  That's

20  objections to the second requests for production.

21          But you're saying there was another entity?

22          MR. VILLARREAL:  Yes, sir.

23          THE COURT:  What was that other entity?

24          MR. VILLARREAL:  District 12.

25          MR. HARPER:  Exhibit 3.

47

1          THE COURT:  Exhibit 3?

2          MR. HARPER:  Yes.

3          THE COURT:  Thank you very much.

4          MR. VILLARREAL:  Just to put us in context,

5   there are disputes over two sets of RFPs to -- directed

6   to two different defendants.  So it's the second set of

7   RFPs and third set of RFPs directed to both

8   Little League International and District 12.

9          THE COURT:  Got it.  Okay.  Good.  I

10  appreciate you clarifying that.

11          So which ones do you want to talk about?

12          MR. C. BERNSEN:  The one that's before you,

13  Exhibit 5, Document 80.

14          THE COURT:  Uh-huh.

15          MR. C. BERNSEN:  If you go to No. 18 --

16          THE COURT:  Okay.  Let me go to 18.

17          MR. C. BERNSEN:  And, Judge, our -- you know,

18  our position is that they've waived -- these objections

19  that sit here -- the current ones -- the current

20  iteration of objections have been waived because

21  throughout this entire time they've -- they've been just

22  boilerplate unfounded bogus objections.  And it's my

23  understanding that if you do that, that you waive your

24  objections.  Any valid objections would be waived.  So

25  our stance is that, basically, these handful of requests

48

1    that we're about to go over, their objections are

2    waived, and they should have to produce the documents.

3             But, you know, for instance, No. 18 is

4    just -- some of these -- again, for the sake of the

5    Court, I can't -- literally can't go through all of them

6    that are frustrating us just because I'm trying to

7    conscientious of your time.  But, like, No. 18 --

8    anyway, this is submissions of the Little League A

9    Safety Awareness Program.  That's something you'll come

10   to learn about in this case.  It's called ASAP.  That's

11   a safety program that these local leagues are supposed

12   to have.  It's supposed to include, you know,

13   protections --

14             THE COURT:  Let me ask this question -- and

15   this may help clarify -- and I also make this

16   observation, and, perhaps, it does reveal a certain

17   ignorance that I have about the file itself -- the

18   case -- any submissions -- overly broad.  What does it

19   mean by the term "submissions"?

20             MR. C. BERNSEN:  Again, Judge, that's a term

21   of art.  All these words that I used in here come from

22   Little League.  That's a term of art that the local --

23             THE COURT:  What are you thinking you're

24   wanting is what I'm driving at?

25             MR. C. BERNSEN:  I'll explain.  So each local

49

1  league is required to submit -- it is a submission -- of

2  an ASAP plan to Little League International each and

3  every year.  And so, again, this question is all of the

4  submissions of Evadale Little League ASAP plans to

5  Little League International over the last ten years,

6  which is -- they know exactly what -- Mr. Stahlnecker

7  knows exactly what I'm talking about.

8           THE COURT:  Excuse me just a minute.  E-L-L

9  is Evadale Little League?

10          MR. C. BERNSEN:  An abbreviation for

11  Evadale Little League.

12          THE COURT:  Okay.  I understand this now.  So

13  you're not asking for every submission for every

14  Little League organization across the state or the

15  country?

16          MR. C. BERNSEN:  No, sir.

17          THE COURT:  We're just talking about the ten

18  that Evadale filed?

19          MR. C. BERNSEN:  Yes, your Honor.  That's the

20  one where the coach and the president is the child

21  molester.  So we're, like, okay, from ten years from

22  today --

23          THE COURT:  The alleged child --

24          MR. C. BERNSEN:  The alleged.  Sorry.  So

25  we're asking for ten years of any submissions from ELL

1  to Little League.

2          THE COURT:  Do these submissions show -- we

3  think we had a violation or we don't or we're all clear?

4          MR. C. BERNSEN:  What it is, is that -- each

5  local league across the country is supposed to -- is

6  required to develop what's called an ASAP plan.  And

7  there's topics that are to be addressed in there like --

8  including safety on the field.  There is a list of 15

9  requirements.  They're supposed to also have, according

10 to their policies, child protection information in there

11 as well.

12          And so we're -- we're asking Little League

13 International to give us every submission for the last

14 ten years of Evadale Little League.  And then, you know,

15 at the end of their objection, your Honor -- which it's

16 not overly broad.  It's not irrelevant.  And then they

17 say, "Defendant is withholding documents based on the

18 foregoing objection."

19          THE COURT:  Right.

20          MR. C. BERNSEN:  And then it says, "Defendant

21 will produce all relevant documents within its

22 possession."  So we're just -- this one should not even

23 be a question.  Like give us the Evadale Little League

24 submissions.

25          THE COURT:  Let me hear from the defendant on

51

1  this one.

2           MR. HARPER:  Your Honor, I think -- this is

3  one of these -- and I'm not blaming them.  I want to be

4  very clear.  This is not to be critical in any way

5  because it's taken us a while to get them documents,

6  which is for reasons we explained.  But we have -- as

7  they are now defining this, we'd agree to give them

8  that.  There's no problem with that at all.

9           THE COURT:  Okay.

10          MR. HARPER:  We read the request as

11 different.  So if they're saying that they are defining

12 "submission" in that way, easy to do, and happy to

13 provide it to them.

14          THE COURT:  Well -- okay.  Before

15 Mr. David Bernsen speaks, I go back -- the more

16 I'm on this job, the more I go back to 34 years of

17 dealing with it.  And what happened in my world --

18 like, if I had a request like this and I filed overly

19 broad, I'm sympathetic to what the defendant is saying.

20 Any submission, overly broad, but then I'd have a

21 conversation or usually the other side would say, "What

22 are you doing with that objection there?"  And you just

23 say, "Well, what do you want, man?"  "Well I want the

24 Evadale -- what they filed -- the annual report they

25 filed."  "Oh, okay."  Now we've defined what we're

1  talking about.

2          And if you're willing to do that, then --

3  now -- and there's an understanding that maybe it didn't

4  exist before -- in a perfect world, all this would have

5  been worked out and the duty to consult with each other

6  before filing a motion to compel and all that, but we're

7  not going to go haggle over all of that formality.

8  Let's just deal -- if he can produce it, then he'll

9  produce it.

10          MR. C. BERNSEN:  And, Judge, may I?

11          THE COURT:  Yes.

12          MR. C. BERNSEN:  Just to be fair, every --

13  like, if they had talked to their clients -- I wrote

14  these discovery requests.  This is their terminology.

15  We -- the submissions -- that is a term of art that they

16  use.  So -- these things -- yes, it is.  Yes, it is.  I

17  can show it to you, Mr. Harper.

18          THE COURT:  Now, let's don't --

19          MR. C. BERNSEN:  All these terms are their

20  terms --

21          THE COURT:  Hold on, Mr. Cade Bernsen.  Let's

22  don't get into an argument between counsel.  Just direct

23  everything to me.  I've already decided.  These

24  submissions -- these annual filings for the last ten

25  years are going to be produced.

53

1          And that can be done pretty quickly, correct?

2          MR. HARPER:  I'm not sure that they have not

3    already been produced.  To the extent they have not

4    been, we will make sure they are out the door

5    certainly -- I know we already picked ten days before.

6    If we can keep that time frame, that will be easier --

7          THE COURT:  In about ten days you can get

8    that produced?  Because he has a deposition in

9    Pennsylvania coming up in about three weeks, I think.

10         MR. D. BERNSEN:  We need those documents

11   before we take the deposition of Ms. Mahaffey.

12         THE COURT:  All right.  I think then -- are

13   we squared away on this one?

14         MR. D. BERNSEN:  Yes, sir.  I'll say this --

15   I've been on the screen before with the defendant and

16   with clients -- they go from one end of the spectrum to

17   the other spectrum, and you know -- you and I, your

18   Honor, we know that.  They have -- Little League

19   Baseball has a data center that has everything at their

20   fingertip.  And one of the -- we'll be back, but they

21   have a list of the players, the managers -- and there's

22   testimony and documents to show that.

23         And they'll be a submission -- ASAP, which is

24   required by each Little League --

25         THE COURT:  Okay.

54

1           MR. D. BERNSEN:  -- throughout the country.

2  And it is by Little League.  And --

3           THE COURT:  So pull that out and get it to

4  you.

5           MR. D. BERNSEN:  A call could be made to the

6  data center and say, "I need" and it's done.

7           THE COURT:  Right.  Well, I understand.

8  We're going to -- I think we can agree on this one.

9  That's going to be produced.  And I suspect there will

10  be some more we'll go through.  And probably ten days is

11  probably a fair amount of time to supplement.

12           MR. D. BERNSEN:  That's fine.

13           THE COURT:  Are we clear on what we're doing

14  on No. 18?

15           MR. D. BERNSEN:  Yes.

16           MR. C. BERNSEN:  Yes, sir.

17           THE COURT:  And then, obviously, if they

18  produce documents to 18, they'll identify them as such.

19  If you feel that they haven't, I suppose you'll be

20  filing a motion that says something else, but -- and

21  that specific request -- that -- the specific issue will

22  probably be dealt with by a magistrate judge at this

23  point.

24           What's the next one on the agenda?

25           MR. C. BERNSEN:  No. 19, your Honor.

55

 1              THE COURT:  Okay.

 2              MR. C. BERNSEN:  This is, you know, any

 3   communication between Little League Baseball and

 4   District 12 regarding ASAP plans for the last ten years.

 5   You know, they say in there they object, and they say

 6   that they're withholding relevant -- withholding

 7   irrelevant communications based on the foregoing

 8   objections.  And then they say it's attorney-client,

 9   work-product.  I'm not exactly sure how any of that

10   would be attorney-client or work-product.

11              THE COURT:  Okay.

12              MR. C. BERNSEN:  I don't know.  We think that

13   it's a simple request.  It's not -- the ten -- like I

14   said, for all these, the ten years is not too much

15   considering this case and the facts of it.  And we just

16   want them to produce those documents.

17              MR. HARPER:  Your Honor, the issue here is

18   that they're no longer just asking for stuff regarding

19   Evadale Little League.  They're now asking for

20   everything regarding to District 12 --

21              MR. D. BERNSEN:  I can't hear him.

22              THE COURT:  Can you speak a little closer to

23   your microphone?

24              MR. HARPER:  Judge, I'm sorry.  I don't know

25   what's wrong.  I can barely hear you, and you can barely

56

1   hear me.  I'm sorry.

2            What I was saying is the issue here is that

3   they're not just asking for stuff with Evadale.  They're

4   asking for every, you know, one that was communicated

5   within District 12, which includes a whole bunch.

6   They're not just asking for the plans.  What they're

7   wanting here or what this would call for here is every

8   plan for everyone within District 12.  Every draft of

9   it.  Every communication back and forth about -- now

10  they're not just limiting it to what they had earlier

11  defined as, you know, "submissions".  They're now

12  seeking every text, every letter.  It's a lot of stuff.

13  We're happy to give them everything regarding Evadale.

14            MR. D. BERNSEN:  I can't hear him.

15            THE COURT:  Okay.

16            MR. VILLARREAL:  I can hear him.

17            MR. C. BERNSEN:  I understand what he's

18  saying.  I can respond to that.

19            THE COURT:  Well, let me say, clearly, if

20  you've got documents that are from an attorney to a

21  client or were produced as work product by an attorney,

22  those are going to be privileged, and the Court is going

23  to respect those privileges.  If there's an issue about

24  that and you want that to be sent to the Court for an in

25  camera inspection, I invite you to do that.  Obviously,

1  personal sensitive information regarding third parties,

2  including minors -- if there's some identifying

3  information, that may well need to be protected as well,

4  but that would be by, I think, redaction as opposed to

5  not -- just not producing the documents.

6          Drafts?  Well, I guess the question is --

7  it's almost hard to imagine that Little League Baseball

8  would send a draft document to District 12.  It seems

9  like they'd probably send them their finished product.

10 And, really, I don't read it as asking for drafts of any

11 communication exchanged between LLB and District 12.  I

12 mean, I can understand -- the need to want to be careful

13 about that.  I'm going to say if there are any drafts of

14 those correspondence, that does not need to be produced

15 because even the -- the request for production itself

16 just asks for matters that were exchanged between LLB

17 and District 12.  So -- that would exclude drafts.  So

18 if it's exchanged, then I think it's out there.

19          And I might add, too, if it's already been

20 exchanged -- unless you can show me, like, an attorney

21 who is representing, say, District 12 sent a letter to

22 District 12, that would be under the attorney-client

23 privilege.  But if the attorney's not representing

24 District 12 but representing LLB, well, then they may

25 well have waived that attorney-client privilege.  So

1  there may be some letters that come with the lawyer's

2  letterhead on it that still would be communication that

3  would be subject to being produced in this case.  I

4  don't know if that's the case or not.

5          MR. D. BERNSEN:  Well, just have them list

6  them.  If they're keeping any by privilege -- I can't

7  imagine any privileged material.  What happened in this

8  is that the ASAP plan evolved -- and this is for the

9  Court's information -- 2017 to '18 because of the public

10 outcry for all of the children being -- you know, the

11 Nassar case in Michigan.  The ASAP plan in Little League

12 Baseball -- they were supposed to have -- part of the

13 ASAP plan -- every league is supposed to have it -- is,

14 you know, the safety -- whether or not there's, you

15 know, broken stands or whatever and concession stands,

16 washing hands, whatever.

17         They were specifically supposed to put, in

18 our opinion -- in our opinion, a list of child abuse

19 grooming, what to look for, how to -- how to protect

20 children, educate parents.  And they -- we don't think

21 they did it.  In fact, we know they didn't.  So there

22 may be drafts going up from 12, but ultimately

23 Little League Baseball had the ultimate and final

24 control on the ASAP plan.  And to get chartered to even

25 play Little League, you had to have an ASAP plan

59

1  approved by Little League Baseball.  So I don't know

2  what he's talking about drafts.  But if there is a

3  draft, it would be from District 12 or somebody going up

4  to Little League.  But, you know, if -- all we want

5  right now is for them to produce the documents and

6  identify what documents they're producing to this

7  request.  I think we're good.  I think we're already

8  there.

9           THE COURT:  Well -- okay.  Drafts that were

10 not actually exchanged -- now, if they did send a

11 draft -- we're sending you a draft of what we're

12 considering, give us your thoughts.  I suppose that

13 would be something -- again, that's actually been

14 exchanged.

15          MR. D. BERNSEN:  Yes.

16          THE COURT:  But, you know, maybe what they

17 actually sent to District 12 was the third draft and --

18 I'm not going to go back through draft one and draft

19 two.

20          MR. D. BERNSEN:  No.

21          THE COURT:  That burdens many things, I can

22 say.  So -- but if it is communication actually

23 exchanged, then I'm going to allow it, but now if

24 there's attorney-client, work-product -- if it's truly

25 that, then produce that for an in camera inspection to

 1  me, and I'll look at it and I'll decide whether it gets

 2  produced or not.

 3          Does that sound appropriate?

 4          MR. HARPER:  I just want to make sure I

 5  understand your ruling, your Honor.

 6          MR. D. BERNSEN:  Yes, your Honor.

 7          MR. HARPER:  And, obviously, it's

 8  appropriate -- we'll do whatever.  But you want the ones

 9  for every single league within District 12 and not just

10  Evadale; is that correct?

11          THE COURT:  No.  I think -- just for

12  District 12, right?

13          MR. C. BERNSEN:  District 12.  Yes.

14  District 12 is the defendant in this case.  And so we

15  want to see -- it's not just Evadale.  District 12 is a

16  defendant in this case, and we want to see all ASAP

17  plans --

18          THE COURT:  Okay.  Help me out here --

19          MR. C. BERNSEN:  The request is very

20  specific.

21          THE COURT:  Help me out here.  District 12 is

22  our area that encompasses Evadale Little League and as

23  well as some other area Little Leagues?

24          MR. C. BERNSEN:  Yes, your Honor.

25          THE COURT:  So is it your concern that maybe

1  District 12 is having a blind eye to what's happening in

2  their district?  Is that what you're, kind of, concerned

3  about?

4          MR. C. BERNSEN:  Absolutely.

5          THE COURT:  Doesn't relate to a claim or

6  defense or maybe they're shuffling coaches back around

7  or something like that.

8          MR. D. BERNSEN:  According to the defendants,

9  they're separate entities.  I don't know.  We disagree.

10  And I think it's going to show -- but there -- so I'm

11  not sure how there would be any privileged material

12  going back and forth.

13          THE COURT:  Well --

14          MR. D. BERNSEN:  But what we want is the

15  exchange between Little League and defendant

16  District 12.

17          THE COURT:  How many -- I'm just curious.

18  How many Little Leagues are there in District 12

19  approximately?

20          MR. C. BERNSEN:  Twelve to 14.

21          MR. HARPER:  Twelve.

22          THE COURT:  Well, 12 -- I thought you were

23  going to say 1,200 or something.

24          MR. C. BERNSEN:  No.

25          THE COURT:  If it's 12, I feel comfortable

62

1  with that.  I do.  I don't think that's overly

2  burdensome.  Although, that's not really -- I'm going to

3  allow that, but --

4           MR. HARPER:  Understood.

5           THE COURT:  So that's my ruling.

6           MR. VILLARREAL:  Judge, a quick

7  clarification.

8           THE COURT:  Yes.

9           MR. VILLARREAL:  Isaac here.

10          THE COURT:  Yes.

11          MR. VILLARREAL:  In my role as an associate,

12 I -- I'm part of the team that recollects the --

13          THE COURT:  Of course.

14          MR. VILLARREAL:  As to RFP 19, is the Court

15 ordering to produce the safety -- the ASAP plans

16 themselves or any communication, any e-mail that has the

17 word "ASAP" in it?

18          THE COURT:  Regarding ASAP safety plans.

19 Yeah.  I mean, I think the submissions that was in

20 No. 18.  No. 19 --

21          MR. VILLARREAL:  Yes.

22          THE COURT:  If Little League Baseball is

23 sending to District 12 e-mails, letters, whatever to --

24 regarding the ASAP safety plan -- and it could be,

25 "Enclosed please find our ASAP plan we want you to fill

1  out" or whatever.  I don't know what it says.  But that

2  communication pertaining to the ASAP safety plan, that's

3  what you need to look for.

4           MR. D. BERNSEN:  With attachments.

5           THE COURT:  Right.  If there's an e-mail with

6  an attachment.  But it seems like you ought to be able

7  to get -- you're just looking for those 12 that

8  pertain -- that go to District 12.

9           MR. VILLARREAL:  Well -- correct.  But -- and

10  I suspect, Judge, that there's going to be

11  potentially -- I need to clarify -- but hundreds of

12  documents because there could be lots of e-mails during

13  the last ten years that at least mention ASAP.  Not

14  whether an attachment to an e-mail is an ASAP plan, but

15  any -- this request is asking for anything, relevant or

16  not, to the program that's called ASAP.  Not just the

17  submissions themselves, but it's asking for everything.

18           THE COURT:  Well, I understand that.  But

19  what we're really -- the objection, as I read your

20  amended response, is not -- really you're talking about

21  any -- especially -- I know the Beaumont Court of

22  Appeals, which was stayed, has ruled that any request

23  that's any and all is overly broad.  The objection, as I

24  read it, is not one of overbreadth -- being overly

25  broad.  And so I don't think that would be a valid

1  objection to make now.  That's been withdrawn.  That's

2  not in this amended response.

3          I think here they're looking for -- it

4  breaches attorney-client privilege, work-product, and

5  sensitive and personal with identifying information.

6  That's the objection that's before me.  So I don't think

7  the fact that there might be hundreds of documents --

8  well, I don't think that's really before me.  Besides,

9  if it were a matter of being overly broad or oppressive

10 or harassing or some how or another excessive, I would

11 overrule those objections.

12         MR. VILLARREAL:  Yes, your Honor.  I just

13 wanted to clarify what the Court is ordering.

14         THE COURT:  Yeah.  Go ahead.  That's it.

15 Next.

16         MR. C. BERNSEN:  No. 22.  Judge -- your

17 Honor, this is -- what we've established is that

18 Little League sends monthly district staff bulletins to

19 all of the district administrators, which would be to

20 District 12 in this case.  And so -- and we know they

21 send one per month.  This is, like, a newsletter that's,

22 like, one to two pages, okay?  And so we've asked for --

23 and it's broad.  I understand that.  But, basically,

24 like, we have -- they've produced maybe -- I don't

25 know -- I'd say maybe a dozen.  We've asked for five

1 years' worth, so there should be 1, you know, times 12

2 times 5. And they produced -- I don't know -- maybe a

3 dozen or so, more or less.

4             And, basically, it's, like, Little League

5 International saying, okay, district administrators,

6 this is the important stuff we're going to want y'all to

7 do. We have the tournament. We have fundraising. We

8 have this. We have this. Child protection. ASAP

9 plans. Those are mentioned in there, too. So we want

10 them to produce -- basically, they have just gone

11 through -- they say, well, not all these bulletins are

12 relevant. And defendant -- we're withholding irrelevant

13 communications based on the foregoing.

14             And what I would say is says who? You're

15 saying they're irrelevant, but, you know, we need to see

16 them. I'm not going to take the defendants' word that

17 they're irrelevant. We believe it is a reasonable

18 request. We want to see what Little League

19 International is telling their district administrators,

20 you know, every month about what the important things

21 that are going on in Little League -- you know, rules,

22 regulations, policies, and all these matters like that.

23 We don't think that that's -- that it's inappropriate at

24 all. And so -- anyway -- but they're basically just

25 saying --

1          THE COURT:  Well, as you spoke, I had thought

2  that the more you were speaking, the more you were

3  actually sounding like former President Ronald Reagan,

4  trust but verify.

5          MR. C. BERNSEN:  Trust but verify.

6          THE COURT:  I didn't realize you were such a

7  fan.  But -- anyway, staff bulletin.  I mean, I don't

8  know.  We're talking about -- what are these, like,

9  monthly bulletins?

10          MR. D. BERNSEN:  Yes.  It's monthly

11 bulletins.  It's produced during the ordinary course of

12 business at Little League Baseball.  It's dispensed over

13 the country.

14          THE COURT:  Some may have bearing on the ASAP

15 program.  Others may be just talking about balls and

16 strikes and new bats that can be used by the kids and

17 things like that, which I -- would be nice to get back

18 to just that.  But, you know --

19          MR. D. BERNSEN:  We think they're all

20 relevant, your Honor, for this reason -- and counsel has

21 said -- he was nodding yes, yes to balls and strikes.

22 Is withholding irrelevant?  The absence of instructions

23 about ASAP is telling, as well as something that's

24 addressing ASAP.  If during the time period of 2018,

25 they've got all this correspondence going about the

1  sexual rape and molestation of these children, they've

2  got legislation, which, believe or not, was actually

3  bipartisan in Washington about here -- here is this

4  legislation that any organization that has -- involves

5  children, you have to do X, Y, and Z.  And if they've

6  got one ASAP here and one ASAP there and there's a hole,

7  and they're talking about raising money or they're

8  talking about concession stands or they're talking about

9  clean bathrooms and making sure they don't wear the arms

10 out, then there's an absence in the face of a growing

11 catastrophe nationwide.

12         And so, yeah, it's relevant.  So for the

13 defendants to say, oh, it's irrelevant.  Says who?  It

14 is limited in time.  It is limited in scope.  It's

15 created and produced in the ordinary course of business,

16 and we shouldn't even be dealing with this.  This should

17 have been produced early on.

18         THE COURT:  And only any staff bulletins that

19 went to District 12, correct?

20         MR. C. BERNSEN:  Yes.

21         THE COURT:  Limited -- because the way the

22 production is -- it says, "any district staff

23 bulletins."  There may be -- I don't know -- hundreds of

24 districts all across the country.

25         MR. C. BERNSEN:  Yes.  And --

68

```
 1            THE COURT:  I think we need to limit it to
 2   just what's going to District 12.
 3            MR. C. BERNSEN:  That's -- I mean, it's our
 4   understanding, I believe, based on testimony -- we've
 5   taken a couple of depositions -- that you have
 6   Little League in Williamsport that sends out bulletins
 7   to all the -- so District 12 should have gotten every
 8   bulletin that --
 9            THE COURT:  As long as we're dealing with
10   just District 12.  If there are different bulletins that
11   go to, hey, folks in the northeast of the United States,
12   that gets too much.
13            MR. D. BERNSEN:  District 12.  District 12.
14            THE COURT:  It will be like -- is it a
15   monthly staff -- is that what it is?
16            MR. C. BERNSEN:  Yes, your Honor.
17            MR. HARPER:  There will be some special ones
18   in there as well.  Judge, if they're that important to
19   them, we can get it.
20            THE COURT:  Well, again, that's why I, kind
21   of, started off my conference today with a -- I didn't
22   want to sound too preachy, but I go back to what I
23   learned is to be -- the wisdom of Judge Fisher and
24   Judge Parker.  And as part of the tradition -- as part
25   of the rules of the Eastern District -- and I know this
```

1  may be different than other districts, but -- around the

2  country, but that's the Eastern District.  And it talks

3  about information that deserves to be considered, all

4  right?  Likely to have an influence on the effect.

5          I heard an argument made that it's not -- if

6  there are 12 times 5, that's 60 bulletins, if my math is

7  correct.  And you want to point out to the jury that

8  only two of the 60 dealt with this issue.  And you're

9  using it to create an adverse inference that shows that

10 they were not on top of this dealing with it.  Of course

11 that might be something the district might say in their

12 defense that -- well, don't tag us because the boys

13 upstairs weren't telling us about this.  But, you know,

14 that's a strategy call, but it could -- either way -- I

15 can see both sides arguing it.  And -- but it could have

16 an influence.  I think -- and we're talking about 60

17 documents, which is not going to break the bank.  I'm

18 inclined -- I'm going to rule that needs to be produced.

19          MR. C. BERNSEN:  Thank you, your Honor.

20          THE COURT:  So what else do we have?

21          MR. C. BERNSEN:  Twenty-four.

22          MR. VILLARREAL:  Just for the record, your

23 Honor, they are not necessarily monthly.  Just for the

24 record.

25          THE COURT:  You didn't produce 12 -- I got

```
 1   it.  Okay.  However many.
 2            Next -- and, by the way, just because it's
 3   being produced, whether or not it becomes relevant or
 4   otherwise meets the rules of evidence -- it's different
 5   than the rules of procedure -- for admissibility, that
 6   may be a different hurdle we'll deal with another day.
 7            MR. D. BERNSEN:  Absolutely.
 8            THE COURT:  Okay.
 9            MR. D. BERNSEN:  Absolutely.
10            MR. C. BERNSEN:  Absolutely, Judge.
11            It says -- 24 -- basically, produce safety
12   audits, safety reviews, safety studies conducted on
13   behalf of Little League over ten years regarding child
14   abuse, including sexual abuse.  And this is very
15   important because -- when I'm -- organizations, you
16   know, like Little League that hold themselves out as
17   gold standard, which they do -- you know, when you're in
18   charge of millions of children and you have a child
19   protection plan, the good organizations, Boy Scouts and
20   Boys & Girls Club of America, you know, you have audits
21   and -- safety audits.  People to come and poke holes in
22   your safety plan.  Tell us how, you know, our -- our
23   safety plan -- the good parts, tell us the weaknesses,
24   and it is supposed to be an ever-evolving process
25   because you're trying to protect children from child
```

1 predators.  I mean, it's a big deal.

2          And so we're asking for ten years of any

3 type of safety audits conducted by or on behalf of

4 Little League concerning the issue of child abuse,

5 including sexual abuse.

6          THE COURT:  Okay.

7          MR. C. BERNSEN:  And their objection is --

8 they say they're withholding -- it's irrelevant, so

9 temporally attenuated -- I guess they're trying to say

10 it's too long in time, and then we'll produce five years

11 of records.  And so we think that ten years is

12 absolutely appropriate because what we're showing is,

13 Judge, and the evidence is going to show is this has

14 happened before.  This is not the first time Little

15 League coaches, presidents, and district staff people

16 have molested their players.  We're already getting

17 evidence of that.  This has happened for a number of

18 years at a number of different places, and they know

19 that.  And that's very important for this case, and so

20 what we want to see -- and it has been happening for

21 decades.

22          THE COURT:  All right.  Let me -- let me come

23 in here and say, again, I guess this goes back to the

24 34 years before I assumed this role.  But ten years is,

25 kind of, a -- there is no rule on it.  The ten-year rule

1  on it or anything.  Most lawyers -- and the rule, you

2  know, it talks about what reasonable lawyers would do --

3  the local rule.  Even with some lawyers who might be a

4  little cranky and ornery from time to time, they usually

5  agree to give up medical records on their clients for

6  ten years.  I mean, ten years is kind of like -- like

7  the gold standard or something.

8         And then the question is:  Do you have a need

9  to sometimes go back further?  Sometimes you do.  Like

10  in personal injury, what if somebody had back surgery

11  12 years ago.  Well, you might want to know that.  So

12  the ten-year rule might not be enough.  You might need

13  to go back 20 years or something.  A whole lifetime?

14  But it's a -- all a matter of degree.

15         I think ten years -- the difference between

16  five years and ten years, that doesn't hit my button.  I

17  mean, I'm okay with producing ten years.  If you can

18  produce ten -- now, if you were to say go back 50 years

19  or 30 years, somehow or another the scale starts to,

20  kind of, swing the other way.  So I know -- I mean, we

21  have ten years on several others.  I'm inclined to go

22  along with ten years.  Now, unless there is just some

23  sort of extremely valid reason why -- something less,

24  which -- I'm okay with ten years.  What I'm more

25  concerned about is are we -- there's an overly broad --

1  is there something about safety audits, safety reviews,

2  or safety studies -- now, I don't know if that's some

3  term of art.  I mean, safety studies, what is that?

4  Some article some guy reads in Newsweek magazine or

5  something?  I mean, is that a study, or is that what --

6  is that an issue?

7         And I guess I want to hear from the defendant

8  or -- are these -- I hate to use the word "term of art,"

9  but safety audits, safety reviews, and safety studies --

10 do we know what we're talking about there?

11        MR. VILLARREAL:  Geoff, do you want to

12 comment on that?

13        THE COURT:  Go ahead.  Go ahead.  Yes,

14 Mr. Villarreal.

15        MR. VILLARREAL:  Oh, I thought Geoff was

16 going to comment.

17        MR. HARPER:  It's Isaac for that one.

18        MR. VILLARREAL:  Yeah.  Okay.  But I can

19 comment on that.

20        It is not a term of art, at least to our

21 knowledge.  Little League does not define "safety

22 audits, safety reviews, or safety studies."  And if it

23 does, then plaintiffs have not identified the document

24 that defines or at least uses that word or those words

25 to -- for us to know what they exactly are looking for.

74

1          THE COURT:  Let me ask you this:  Is there

2    some -- okay.  I'm getting a flavor of the case.  There

3    are ASAP procedures.  There are policies against

4    sexually abusing children, teenagers, whatever they

5    were, minors.  Are there any documents -- and I don't

6    know what you call them -- an audit, a review, or

7    something -- that LLB does to see if these policies are

8    being enforced or whether there have been some

9    violations?  That's my question.  That might be what an

10   audit is or review or study.  Do you know?

11          MR. VILLARREAL:  Your Honor, I cannot

12   disclose the privileged information that we have

13   discussed with our clients, but we have made a very

14   reasonable collection of documents.  And we have

15   produced a substantial amount of documents.  I have to

16   review those again to see if we have already produced

17   the studies -- some type of studies -- because they

18   don't define it right -- about -- about child safety and

19   child abuse.  But I -- we will need to confer, again,

20   with the client to just double check.

21          THE COURT:  Well, if there are -- I don't

22   want to mince words -- but, I mean, if you've got

23   something that shows we went back and we checked

24   District 12 and we found internally that, you know, the

25   policy wasn't being -- it wouldn't be District 12.  It

1  would be LLB.  Our policies were not being enforced

2  consistently.  Some people were lackadaisical about it.

3  Other people weren't.  If you have anything like that,

4  that is some sort of internal -- I'm going to use the

5  word "audit".  I don't know any other word to use.

6  Something that says that.  I think that might be

7  important.

8            MR. VILLARREAL:  And, Judge, can we limit

9  that request then to audits as it concerns District 12?

10           MR. D. BERNSEN:  No.

11           MR. C. BERNSEN:  No.

12           MR. D. BERNSEN:  Your Honor, let me -- may

13  I -- no.  I'm sorry.  I apologize.  Your Honor,

14  herein -- herein goes to the heart of it, this issue,

15  and I'm -- these are very talented -- very talented

16  attorneys.

17           THE COURT:  No question.

18           MR. D. BERNSEN:  There is this drumbeat

19  nationally of abuse -- of abuse of babies and children

20  that are being victimized by youth Catholic churches,

21  Boy Scouts, and Little League -- in sports, generally.

22  Generally, it's everything.  And there is this drumbeat

23  across this country that drove Congress of the

24  United States, both democrats and republicans, to come

25  together and say we have to stop it.  If any -- any

1  organizations, especially one that holds themselves out

2  to be gold standard, they're going to be looking at --

3  we hear this.  We know this.  We've got lobbyists.  We

4  have Google alerts that are talking about it.  How do we

5  protect our players?  How do we protect our little boys

6  and girls who have that -- who had this going on?  And

7  it's going on across this country to Little League

8  Baseball players, girls and boys.

9          And that's why the ten years -- we say ten

10 years -- some of these boys in this case were abused in

11 '18.  So five years between that and -- ten years is

12 reasonable.  And at '18 -- 2018 Congress addressed it.

13 And so there -- a reasonable prudent company or business

14 like Little League Baseball, who's in the heartbeat,

15 would be looking at all of -- they've got evidence of

16 their players being abused.  And so there's an audit.

17 There is a study.  There is a survey by their safety

18 department who were charged specifically with that

19 responsibility to see what's happening and how we

20 prevent it.  And they exist in their internal files of

21 Little League Baseball.  And that's what we're -- that's

22 what we're asking for --

23         THE COURT:  Let me ask you this question:

24 How do we avoid this turning into a trial on abuse

25 nationwide?  Do you see what I'm saying?

1           MR. D. BERNSEN:  I do.  I do.  But -- and

2   herein is the situation is that they are a national and

3   international company.  And if they have knowledge of

4   these boys being abused or this one for years leading up

5   to it and sat there and covered it up like the movie

6   Spotlight where they're covering it up, they're covering

7   it up, and they're doing a blind eye away from it, then,

8   yeah, this -- this case is about that -- about what they

9   did nationally.  It's just like -- whether it's Mobil or

10  whether it's a big company.  Black & Decker.  If they're

11  getting reports that a particular hand tool is killing

12  and hurting people and it hurts somebody up in

13  Hardin County, then, yeah, what would a reasonable

14  prudent person do?  Manufacturer or whatever.

15          Same thing here is what are they doing.  What

16  are their internal stuff -- their documents showing?

17  That's what we're after.  That's what we're after.  And

18  if -- I can tell you up -- there were multiple --

19  multiple instances across this country where

20  Little Leaguers were being abused leading up to and

21  including '18.  Why it's important to go back is because

22  then the legislation said -- Congress stepped in and

23  said enough.

24          THE COURT:  Yeah.  And let me --

25          MR. D. BERNSEN:  And so there's going to be

1    talk back and forth.  They ought to have it.  If they

2    don't, tell us they don't have it, and then we'll bond

3    them for that, if the Court allows it in.  But it is

4    evidence if there is not -- if they know players are

5    being abused and they're not trying to figure out how to

6    stop it, I think that's that evidence.

7              THE COURT:  Let me --

8              MR. D. BERNSEN:  In my opinion.

9              THE COURT:  Again, this, kind of, comes

10   back -- I've been in Mr. Villarreal's shoes before.

11   I've actually tried the defense of one of these, the

12   sexual abuse of a four-year-old girl.

13             MR. D. BERNSEN:  Terrible.

14             THE COURT:  And what was really terrible is

15   my client didn't do it.  It was the current boyfriend of

16   the child's mother.  And that came out at trial.  And,

17   in fact, I was driving down and saw the church where --

18   had the church school and what have you.  You know, if

19   you were to ask a -- the Baptist General Convention of

20   Texas or something like that to produce all audits,

21   well, maybe that got turned in as a complaint had been

22   made, but that number doesn't show the ultimate

23   outcome --

24             MR. D. BERNSEN:  That's right.

25             THE COURT:   -- that somebody was exonerated

1  essentially from that.

2          MR. D. BERNSEN:  That's right.

3          THE COURT:  That's where admissibility might

4  run -- they might say, well, we had 100 of these, but

5  maybe 20 of them were false claims or something.  Who

6  knows, you know?

7          And how -- and that's -- if we get to trying

8  all these different complaints, then that creates --

9  that might not be the right impression to leave on the

10 jury.

11         MR. D. BERNSEN:  I agree with that, your

12 Honor.  That's evidentiary.  I have tried one similar to

13 what you're talking where the man was innocent.  It was

14 the grandfather.  And I tried it.  I actually did

15 criminal work at that time.  It was a criminal case.

16 But I've had product cases where there were multiple

17 people all over the country.

18         THE COURT:  Right.

19         MR. D. BERNSEN:  And so you run into that

20 problem.  But at this point in time of the discovery, we

21 need to look at it.

22         THE COURT:  And it may not be admissible down

23 the road.

24         MR. D. BERNSEN:  Exactly.  Exactly.

25         THE COURT:  Again, I'm going to stress --

1  that's why I gave my little sermonette when we started

2  here.  The discovery basket is bigger.  The

3  admissibility, I'm not so sure.

4          MR. D. BERNSEN:  Absolutely.

5          THE COURT:  That's going to take a lot of

6  scrutiny.

7          MR. D. BERNSEN:  Absolutely.  And we're going

8  in there with our eyes wide open, but we need to be able

9  to see what, if anything, they did.  And the Court is

10  protecting -- we have a confidentiality agreement in

11  place, your Honor, that they -- everything they have

12  produced is confidential.  I disagree with it, but it's

13  confidential.  So anything that they produce is

14  protected by the confidentiality agreement.  And --

15          THE COURT:  Well, what I don't want to have

16  produced is identifying information about teenagers.

17          MR. D. BERNSEN:  I agree.

18          THE COURT:  Children.

19          MR. D. BERNSEN:  I agree.

20          THE COURT:  I think their identities need to

21  be protected.

22          MR. D. BERNSEN:  Absolutely.

23          THE COURT:  Whether they're in Wyoming or

24  wherever they are.

25          MR. HARPER:  To make sure I understand again,

81

1  we're happy to go nationwide, which I understand is your

2  ruling.  But I'm also trying to figure out -- since

3  we're in 80 countries, are you looking for the reports

4  of the other 79 or just the United States here?

5              MR. D. BERNSEN:  I didn't hear what he said.

6              THE COURT:  Oh --

7              MR. VILLARREAL:  Mr. Harper, we're having a

8  little bit trouble hearing.

9              THE COURT:  What I heard him say, I think,

10  was are we going to limit it to the United States as

11  opposed to going international?

12              MR. D. BERNSEN:  United States.

13              THE COURT:  I think we have to limit it to

14  something like the United States.

15              MR. D. BERNSEN:  Yes.

16              THE COURT:  I mean, this is going to get to

17  be more than you ever really -- more than anybody can

18  chew really.

19              MR. D. BERNSEN:  United States.

20              MR. VILLARREAL:  Mr. Bernsen, can we have

21  that agreement for all discovery requests limited to the

22  U.S.?

23              MR. D. BERNSEN:  Yes.

24              THE COURT:  Well, unless it's further limited

25  for District 12.

1          MR. VILLARREAL:  Unless it is limited further

2   to District 12.

3          THE COURT:  I'll grant that.  It's not that

4   we don't have concern -- and the Court does have concern

5   for people and children who live in other countries.  In

6   fact, I'm dealing with a matter right now involving your

7   firm and two children that -- and whether they need to

8   be shipped back to England.  So, I mean, yeah, we see --

9   we deal with children's rights from all around the world

10  here in Beaumont, Texas, in the federal district court.

11  But at some point, I just think we need to draw it down.

12  And then I can see issues -- of course, you could

13  probably translate it for us, but it's going to be in --

14  like those Chinese documents I got in that case.

15  They're going to be in different languages, and it's not

16  much use to anybody really.

17          All right.  So whatever safety audit -- I

18  don't know what it is -- but if it is something that's

19  looking at -- whether they're making sure their

20  procedures are being followed or if they're not being

21  followed -- how many reports -- I mean, either they're

22  not being enforced at all or they are being enforced and

23  we're finding some issues, or maybe they're being

24  enforced and -- I don't know what the evidence is.  It's

25  99.9 percent pure.  It's clean.  Nothing.  And then if

83

1    that's the case, the defendant is going to want to

2    stand up and say, man, we have a system in place that's

3    99 -- Ivory Soap, it floats.

4           MR. D. BERNSEN:  I agree, your Honor.  I

5    suspect if it was 99.9 percent, we would already have

6    seen it, and we wouldn't be having this conversation.  I

7    agree with you.

8           THE COURT:  Okay.

9           MR. D. BERNSEN:  I have been on the other

10   side, and I have seen it.

11          THE COURT:  Yeah.  Okay.

12          MR. D. BERNSEN:  I think we're good.

13          THE COURT:  What else do we have?

14          MR. C. BERNSEN:  No. 29.

15          THE COURT:  Am I assuming that these requests

16   for production -- I haven't compared them -- are

17   essentially the same that you have to the other

18   entities?  So -- is that right?

19          MR. C. BERNSEN:  There may be slight

20   differences, but these are the ones I'm focusing on.

21          THE COURT:  Okay.  Let's just go to what

22   you're focused on.

23          Go ahead.

24          MR. C. BERNSEN:  Thank you, your Honor.

25          So No. 29 is communications -- it's in the

1   same bank -- communications received by Little League

2   regarding allegations of child abuse for ten years,

3   right?  So the ten years, I think the Court has said

4   that's reasonable.  So, basically --

5           THE COURT:  Well, it's reasonable in part

6   because some of this alleged activity occurred five

7   years ago.  So we're talking about -- you know, what was

8   the mindset?  What was happening with LLB during the

9   five years -- it's really -- in a sense, it's asking for

10  five years before the date of the alleged incident.

11  That's really pretty darn reasonable, and I'll state

12  that if anybody wants to have another judge review this.

13  That's really what we're talking about.

14          MR. C. BERNSEN:  I agree.

15          THE COURT:  Go ahead.

16          MR. C. BERNSEN:  And it said -- so,

17  basically, they say they're withholding privileged

18  documents -- so I skipped several --

19          THE DEPUTY:  Microphone, please.

20          THE COURT:  Well, all communications --

21          MR. C. BERNSEN:  I apologize --

22          THE COURT:  Hold on a minute now.  All

23  communications.  Now that, as stated -- as worded could

24  well include letters from lawyers.

25          MR. C. BERNSEN:  And if there's -- just like

85

1  you said earlier, Judge, if there is anything that they

2  feel is privileged -- and, obviously, if they need to

3  hold it back, and we can do in camera.  We can do a

4  privilege log and in camera, that's fine.  I understand

5  that.  But then you get down here and it says it's so

6  temporally attenuated, which, I mean, I think that goes

7  to the ten years again.  That's why I was bringing it to

8  your attention --

9           THE COURT:  Okay.  Regarding allegations --

10          MR. C. BERNSEN:  And then at the very end,

11  they say they've done five years' worth.  And, again,

12  that's why we're here.  Five years' worth, we believe,

13  is not enough.  We asked for ten, and we would ask the

14  Court to tell them to produce ten years.

15          THE COURT:  Well, I'm going with ten years.

16  Five years, we get to the point -- the date of the

17  abuse -- alleged abuse.  But I am very concerned -- this

18  "all communication received by LLB regarding

19  allegations."  They have to assert attorney-client

20  privilege on that.  It would be malpractice to include

21  that.  I'm going to sustain any objection based on

22  attorney-client, work-product.

23          MR. D. BERNSEN:  Absolutely.  That's fine,

24  your Honor.  If they'll extend it ten years, and then

25  we'll deal with the rest of it later.  The issue was --

86

1  they said they produced relevant non-privileged

2  communication for five years.  We just need to extend it

3  for the reasons --

4              THE COURT:  All right.  We'll go ten years on

5  that.

6              MR. C. BERNSEN:  Thank you, your Honor.

7              And then No. 30 -- I'll speed this up.  It's

8  the same principle.  It's all communications sent to

9  Samantha Mahaffey.  That's who they had on their

10 website.  If you have issues, if you have problems,

11 contact Samantha Mahaffey.  That's who -- one of the

12 people we're deposing.  And so we're asking --

13             THE COURT:  Now, again, all communications to

14 her -- in the modern era, lawyers rarely use a letter.

15 Everything is sent via e-mail.  So this woman,

16 Samantha Mahaffey, may be getting correspondence from

17 lawyers -- maybe even the lawyers in this case.  I don't

18 know.  So attorney-client now -- what are we talking

19 about --

20             MR. C. BERNSEN:  No.  Judge, absolutely.

21 There's no doubt she has received e-mails from lawyers.

22 And we're not saying that those should be produced.

23 What we're saying is Little League International had

24 this website on their -- they had this e-mail address on

25 their website telling the public if you have problems or

1  an allegation of child abuse -- I forgot how they said

2  it -- send it to this e-mail address.  And so what we're

3  trying to say is, okay, we want to know any allegations

4  of child abuse -- obviously, excluding attorney-client

5  privilege -- you know, communications from lawyers --

6  all communications in the ten years.  And at the bottom

7  of this, they say we'll give you five years.  That's why

8  we're just here asking the judge to say --

9           THE COURT:  I'm going to go ten years.  Now,

10  no attorney-client.  And, also, I don't want any

11  personal information of -- you know, let's say

12  somebody's mother or somebody said, "I'm out here in

13  Oklahoma and somebody did something to my son and his

14  name is Henry."  Well, I don't want the names.  It has

15  got to be sanitized.  I don't want that.

16           Are we clear?

17           MR. D. BERNSEN:  Yes, sir.  It can be.  We

18  have confidential -- you know, this confidentiality

19  agreement, which we have given the defendants interviews

20  with the boys -- the plaintiffs and everything.  So we

21  are very aware of the need to protect these little

22  people.  And we're not going to do anything like that

23  that that would jeopardize either our folks or anybody

24  else's folks.

25           THE COURT:  The other thing -- let's make

88

1  sure we're clear on something.  I have no doubt the

2  Bernsen firm would not do this, I'm convinced, but the

3  list of potential plaintiffs out there.  I mean, the

4  statute of limitation runs -- it doesn't even start

5  until they're 18.  You know, if personal identifying

6  information were out there in the domain, I mean, that

7  could be a lawyer's bonanza.  And I don't think

8  that's --

9            MR. D. BERNSEN:  We're not doing that.

10            THE COURT:  A fishing expedition that would

11  fill up the nets potentially, and I don't think that's

12  what this should be used for.  That's why I want to have

13  these names redacted.  Do you see what I'm saying?

14            MR. HARPER:  Understood, your Honor.

15            THE COURT:  What else do we have?

16            MR. C. BERNSEN:  No. 31.  It says, "Produce

17  all" -- okay, Judge.  So my dad mentioned it earlier.

18  In 2018, there was the -- Little League supposedly

19  overhauled or amended, changed in some way their child

20  protection programs.  That's an important date to

21  bookmark, 2018.  So all I'm asking for is -- in part, in

22  response to Congress', you know, adoption bipartisan of

23  the Safe Sport Act.

24            THE COURT:  Okay.

25            MR. C. BERNSEN:  So we're just asking for the

1 Little League -- and they objected to this as vague and

2 they're confused about what I'm talking about, which is

3 ridiculous, I think.  I'm asking for Little League

4 meeting minutes and/or meeting agendas.  As you know,

5 any reputable organization that has board meetings --

6 and they also have an agenda in an anticipation of that

7 board meeting -- concerning Little League's 2018 update

8 of its child protection program.  I think it's

9 straightforward --

10 　　　　　THE COURT:  So you're not talking about a

11 couple of people talking about this over the coffee pot

12 back at the office.  You're talking about a meeting of,

13 like, the board of directors or something of the --

14 　　　　　MR. C. BERNSEN:  Correct.  The Little League

15 International changed its child protection policy in

16 2018.  We just want to see the board -- like, what the

17 board talked about when it was on the agenda --

18 　　　　　THE COURT:  If they have minutes of --

19 　　　　　Mr. Villarreal, maybe you can help us on

20 this.  I assume somebody at LLB adopted a change in

21 their program.

22 　　　　　Do we have any idea -- was that done in a

23 formal board meeting or just two guys sitting around at

24 the coffee pot in the kitchen on the 4th floor of some

25 building someplace?

90

1            MR. VILLARREAL:  Yes.  From a reasonable

2  search of the minutes that the client has provided us,

3  the board of directors minutes --

4            THE COURT:  Right.

5            MR. VILLARREAL:  -- there was no comment of

6  the 2018 update of the child protection program.

7            THE COURT:  So the answer is you don't have

8  any documents?

9            MR. VILLARREAL:  We don't have any documents

10 for --

11            THE COURT:  But there was a change, right?

12            MR. VILLARREAL:  There was a change.

13            THE COURT:  I'm just curious.  How did that

14 change come about?

15            MR. VILLARREAL:  The information that we have

16 is that that was done through -- with the involvement of

17 in-house counsel and with the involvement of other

18 personnel within the organization and not necessarily

19 discussed in the formal board meetings.

20            THE COURT:  It was -- it was just a policy

21 change that didn't need to -- from what I'm hearing,

22 didn't rise to get put on an agenda item for purposes of

23 the board of directors meeting.  It was just something

24 that was administratively handled in consultation with

25 attorneys.  Is that your understanding?

91

1              MR. VILLARREAL:  I would say that it was

2    not -- it is not in the minutes of the board of

3    directors meetings and that that was handled by --

4              THE COURT:  Were there any other -- I guess

5    let's expand it.  Beyond board of directors to like

6    board of managers -- I don't know -- anybody, hey, let's

7    all -- I don't know enough about it -- but all of our

8    top level officers, vice presidents, whatever, come

9    together, discuss this, and say we're -- this is what

10   we're going to approve?  Anything like that?

11             MR. VILLARREAL:  We would need to consult to

12   the client about that, your Honor.

13             THE COURT:  Okay.

14             MR. VILLARREAL:  But we have produced

15   documents that talk about the 2018 update to the child

16   protection program.

17             THE COURT:  Well -- okay.  If it is

18   attorney-client, work-product, that's not -- I'm not

19   going to make you produce that.  It sounds to me that

20   your answer is there are no board of directors meeting

21   minutes that pertain to this going back ten years.

22             MR. VILLARREAL:  Correct.

23             THE COURT:  If there are any other -- they

24   had a meeting -- you know, I'm not asking for

25   attorney-client, work-product -- but, you know, some of

1  the officers, people -- somebody -- and I'm not talking

2  about a couple of people sitting by a coffee pot in the

3  coffee shop.  I'm talking about where they sat around

4  and said, "This is the draft of what we're going to put

5  out.  Do you-all think it's a good idea?  All right.

6  We're going to do it."

7          If they have any minutes of those types of

8  meetings, okay?

9          MR. VILLARREAL:  Okay, your Honor.

10          THE COURT:  Produce that.  If you don't have

11  them, then say you don't have them.

12          MR. VILLARREAL:  Okay, your Honor.

13          MR. D. BERNSEN:  Your Honor, I agree.  And if

14  they don't have them -- if that animal doesn't exist,

15  then they -- I want -- we need to have them say so in

16  their --

17          THE COURT:  Yeah.  I understand.  And then --

18  you have the changes, right?  I mean, that's why this is

19  here.

20          MR. D. BERNSEN:  They said in their

21  literature that they changed -- they changed it.  And I

22  think the way Little League operates is that you don't

23  do anything without approval.  So if that's the clients

24  telling the trial attorneys -- I've been there -- just

25  have Mr. Stahlnecker or whoever say it right there in

1   31, and we'll talk to him about that request when we go

2   up to see him.  That's fine.

3            THE COURT:  That's it.  Okay.

4            MR. C. BERNSEN:  Okay.

5            THE COURT:  By the way, on these I said I

6   wanted to have redactions now -- and I don't know the

7   number of documents that we're talking about.  But, I

8   mean, I might be willing to go -- we've been, kind of,

9   using ten days, but I -- he might need more time than

10  that.

11           MR. VILLARREAL:  I can comment on that --

12           THE COURT:  Go ahead --

13           MR. VILLARREAL:  Since -- in my role as an

14  associate.  We would really like more than ten days.  I

15  mean --

16           THE COURT:  Well, I'm talking about on

17  these I'm saying redact -- these nationwide requests,

18  correspondence -- those I've already said ten days,

19  that's ten days.  But on these others, if it's -- you

20  know, require some sort of redaction of personal

21  information, unless you have it --

22           MR. VILLARREAL:  And, your Honor, we will

23  need to collect those e-mails from our client.  So ten

24  days -- more than ten days --

25           THE COURT:  Would 20 days be enough, you

94

1  think?

2          MR. VILLARREAL:  Could we do --

3          Mr. Bernsen, could we agree to more than

4  20 days?

5          MR. D. BERNSEN:  It depends on what you're

6  talking about.

7          MR. VILLARREAL:  We're talking about the

8  e-mails going back ten years.

9          MR. D. BERNSEN:  We could talk about that.

10 What I'm concerned about is in ten days, that all of the

11 documents you produced -- those documents are identified

12 with a specific request for production.

13         MR. VILLARREAL:  The judge has ordered that

14 already, yes.

15         MR. D. BERNSEN:  Anything past that --

16         MR. C. BERNSEN:  That will be fine.  The

17 judge has already -- our fear, obviously, is something

18 is produced after these depositions, and we're like, oh.

19 You know, but as long as the judge has said -- if

20 something comes up and we have to readdress it, then

21 that's -- as long as we have that safety net --

22         THE COURT:  That might be a supplemental

23 deposition, which, I hope, just for your sake, you can

24 avoid just to avoid the travel expenses.

25         MR. C. BERNSEN:  Absolutely.

95

1          THE COURT:  For both sides.  But on that

2     second deposition, now we're not -- we wouldn't be

3     plowing the ground that's we've already plowed, if that

4     happens.

5          MR. C. BERNSEN:  No.

6          THE COURT:  That might be an incentive to use

7     your best efforts to do it.

8          MR. VILLARREAL:  Yes.

9          THE COURT:  As quickly as you can.

10         MR. VILLARREAL:  Okay.  We'll do it as

11    quickly as we can.  With the understanding that the

12    Court allowed at least 20 days.

13         THE COURT:  Yeah.  On these that I haven't

14    specifically specified ten, but know that if it doesn't

15    get produced and they take the deposition and, lo and

16    behold, it comes out to be a smoking gun in there, I'm

17    going to allow a supplemental deposition, even if it

18    means having to pay for an extra trip up to

19    Pennsylvania.

20         I'm not going to be -- I'm not inclined to --

21    under these circumstances -- I think everybody here is

22    working in good faith.  Already produced 20,000

23    documents, et cetera.  I'm not -- I'm not -- people

24    now -- everybody wants sanctions for everything.  File a

25    motion for summary judgment, well, they want sanctions

1  for ever filing a lawsuit.  That's just unbelievable.  I

2  don't know what they're teaching in law schools these

3  days.  Sanctions are something reserved for really bad

4  lawyers doing some really bad things, okay?

5            MR. D. BERNSEN:  We agree, your Honor.

6            THE COURT:  And just discovery -- I mean,

7  everybody is trying to work their hardest to get it

8  done.  I'm -- I'm not inclined, absent some strong

9  conversation about that.

10           MR. HARPER:  Your Honor, I'm sorry.  My back

11 has officially declared it can't sit up anymore.  If it

12 acceptable to you, I would like to go ahead and leave

13 Mr. Villarreal to handle the rest of the hearing.  I'm

14 real sorry.

15           THE COURT:  Yeah.  I can see you're in pain.

16           He had back surgery, which is why I'm

17 allowing him to appear --

18           MR. D. BERNSEN:  Oh, my goodness.

19           MR. C. BERNSEN:  God bless.

20           THE COURT:  And I appreciate what you've

21 offered thus far, but I think you're in very, very

22 strong hands with Mr. Villarreal.  And I think your

23 interests are being protected and the interests of your

24 clients.

25           You are excused.

97

1          MR. HARPER:  Thank you, your Honor.

2          MR. C. BERNSEN:  Hope you feel better.

3          MR. HARPER:  Again, I'm sorry.

4          MR. D. BERNSEN:  Good luck.

5          MR. C. BERNSEN:  No. 36, Judge.  And, Judge,

6  just so you know -- because of the law that was passed,

7  Little League put into its rules and regulations that

8  each local league, including Evadale, was supposed to

9  create -- I'm using their terminology here -- a policy

10 that limits one-on-one contact with minors without being

11 in an observable and interruptible distance from another

12 adult for the last ten years.  And this -- so we're

13 asking for, you know, ELL, Evadale, where he was --

14 Mr. Isaacks was the president and coach --

15          THE COURT:  They either have a policy or they

16 don't --

17          MR. C. BERNSEN:  They either have a policy or

18 they don't.  And so they say irrelevant.  It's not

19 irrelevant at all.  I think that's completely wrong.

20 And it says -- but then it says, "We are withholding

21 documents on the foregoing request," which I'm like,

22 "What?"  But in the next sentence, "Defendant has

23 produced all responsive documents in its possession,

24 custody, or control."  And so it's confusing.  And I

25 just think this is absolutely right on the money --

98

1          THE COURT:  Mr. Villarreal --

2          MR. C. BERNSEN:  And they need to withdraw

3  their objections and just produce any documents they

4  have.

5          THE COURT:  All right.  Mr. Villarreal, do

6  you have a comment on this?

7          MR. VILLARREAL:  Just generally as to how

8  they define "limits one-on-one contact."  If it's

9  your -- plaintiffs' position that the ASAP program must

10  have the one-on-one contact, then, as the judge already

11  ruled, we will produce the documents that are in our

12  possession and control that are the submissions for the

13  ASAP plan for ELL.  That has been ruled on by the Court,

14  and we will comply with the Court order.

15          MR. C. BERNSEN:  I think, Judge, what the

16  case is with this is they don't have anything, all

17  right?  So the answer should be "none."  But they don't

18  want to put that because that's --

19          THE COURT:  Hold on.  They say they're

20  withholding documents --

21          MR. C. BERNSEN:  I know.  That's why I'm

22  confused.  But this is -- this is -- and you'll see,

23  Judge, that every local league is required by

24  Little League to -- it is called -- to have and

25  implement a one-on-one policy, and the policy is,

1  basically, this, Judge -- it makes senses.  Churches do

2  it.  Schools do it.  Where an adult cannot be --

3              THE COURT:  Alone.

4              MR. C. BERNSEN:  -- alone with the kid

5  without another adult there.  And they're all supposed

6  to do it, and we know they didn't have it.  They know

7  they didn't have it.  We're playing this game.  But I'm

8  interested about them saying they're withholding

9  documents.  That's what grabbed my attention.  But this

10 is not -- this is a straightforward, on the -- "hammer

11 on the nail" discovery request.  And it is either going

12 to be none or produce what you have.  But there's no

13 reason to be withholding documents back.

14             MR. VILLARREAL:  Judge, we can amend that

15 response to make it clear.  And I just -- for the

16 record, District 12 Little League and Evadale Little

17 League are separate entities.

18             THE COURT:  I understand.

19             MR. VILLARREAL:  So Evadale might have

20 something that we don't.

21             THE COURT:  Okay.  You're going to look at it

22 and see -- if they have something, you're going to

23 produce it?

24             MR. VILLARREAL:  From our perspective, yes.

25             THE COURT:  You're going to produce it.  And

1  then if they don't have it, just say we have no

2  responsive documents and it's done.

3          MR. VILLARREAL:  Okay.

4          THE COURT:  Is that fair?

5          MR. C. BERNSEN:  Fair.

6          THE COURT:  Next.

7          MR. C. BERNSEN:  No. 38.

8          THE COURT:  Okay.

9          MR. C. BERNSEN:  No. 38, Judge, is a -- they

10 have to do background checks, which is just the bare --

11 you know, every organization around the country does

12 background checks.  And their efficacy is -- we'll talk

13 about that later.

14         But Little League contracted with this

15 company called JDP to do the background checks for local

16 leagues.  And so I think this is straightforward.  It

17 wasn't crazy.  It's not harassing.

18         THE COURT:  You just want the contract

19 between LLB --

20         MR. C. BERNSEN:  And JDP for the last five

21 years.  And they just said, "We will not produce it."

22         MR. VILLARREAL:  We strongly object to that

23 one.  That has no relevance to the case.  So they're

24 seeking contracts between Little League -- my client

25 Little League International with the service provider

101

1  that provides the background checks.  Here it is not

2  disputed in the case that we -- that entities --

3           THE COURT:  Do it?

4           MR. VILLARREAL:  Did the background for

5  Adam Isaacks.  That's not disputed here.  So why would

6  the contract be relevant?

7           THE COURT:  Well, we paid them X number of

8  dollars or whatever.  I don't know.

9           MR. VILLARREAL:  Why would that be relevant?

10          THE COURT:  What I'm more interested in is

11 what did they find out?  What are they --

12          MR. VILLARREAL:  I can tell you that, your

13 Honor.  The background checks came completely clean.

14          THE COURT:  Have you produced those?

15          MR. VILLARREAL:  We produced those.

16          THE COURT:  Well, I'm going to sustain that

17 as not -- that one -- I'm going to sustain that

18 objection.

19          MR. D. BERNSEN:  Okay.  Your Honor, I'm going

20 to say this -- that they came back clean, and we'll

21 define clean.  But these are the people that supposedly

22 did it.  And I want -- you know, their -- their

23 information about -- they came back clean -- I think

24 that the defendants will try to use that.  I would like

25 to see the relationship between JD -- JDP as to what the

1  arrangements were with Little League Baseball to do

2  these background searches.

3          It goes -- it may not be admissible, but it

4  certainly may lead to discovery on whether or not they

5  were doing them correctly, whether or not they were

6  getting paid by Little League Baseball for X -- we don't

7  know.  But it goes to their relationship on the

8  background checks that these defendants are going to try

9  to rely on.  And I would think that we would be able to

10  see what the relationship is.  It saves us -- maybe

11  we'll go take their deposition in the case.

12          THE COURT:  That's what I was thinking.  I'm

13  not telling you what to ask the gentleman in

14  Pennsylvania, but who were your contacts with JDP and

15  what did you ask them to do.  Well, we asked them to

16  do -- to do a criminal background check.  Does it

17  require anything else?  We don't know anything about

18  what they did.  Well, who can -- you might have to

19  contact JDP.

20          MR. VILLARREAL:  Judge, the background check

21  itself says what was searched --

22          THE COURT:  What they did --

23          MR. VILLARREAL:  What was searched and what

24  was the results.  And the results were zero.

25          THE COURT:  So -- in other words, it shows

1  what?  Like, criminal background history, sexual

2  predator, or sexual abuse?  What does it show?

3            MR. VILLARREAL:  All criminal history came

4  out zero.

5            MR. C. BERNSEN:  Yeah.

6            THE COURT:  So then if that's all that's in

7  the report, but you may have an expert that says, no,

8  that's not a thorough background, you know --

9            MR. VILLARREAL:  Plaintiffs can hire a

10 private investigator and see if Adam Isaacks has any

11 other prior criminal convictions.  They could do that.

12           MR. D. BERNSEN:  Your Honor, what you're

13 going to find is that the background checks --

14           MR. C. BERNSEN:  Wait.  Judge, background

15 checks --

16           THE COURT:  It's not polite to interrupt your

17 father.

18           MR. C. BERNSEN:  I'm sorry, your Honor.

19           MR. D. BERNSEN:  Thank you, your Honor.

20 Thank you, your Honor.

21           My son, Cade.

22           MR. C. BERNSEN:  Judge, as I'm becoming an

23 expert on this, background checks -- their effectiveness

24 are minimal for these situations.  90 percent of child

25 sex offenders, child abusers, they have clean records.

1  They have clean records.  That's why you have to have

2  the rules and the safeguards in place to identify

3  grooming and the red flags.  Just so you know at the

4  outset of this, when they say, oh, yeah, it's clean, the

5  experts will show that doesn't mean much.

6           MR. VILLARREAL:  And they're talking about

7  the merits of the case, your Honor.  We're talking about

8  background checks.

9           MR. C. BERNSEN:  I'm just commenting on what

10  you said.

11           THE COURT:  Let's just make sure we're clear.

12           What we're going to do -- I'm going to

13  sustain the objection.  But if these reports are

14  inadequate to really find out if somebody is a predator

15  or something, then whatever they did or didn't do is

16  going to be shown in the reports.  Yeah, they did a

17  background check, but they didn't interview -- they

18  didn't make a phone call or references or anything like

19  that.  That's obvious from the reports.

20           And then if you have people that -- well,

21  that's not the way you do a background.  The school

22  district use a different protocol.  They ask for

23  reference or -- I don't even know what the evidence will

24  be, but it seems like you could get there just by

25  looking at the reports and saying that's a wholly

1  inadequate deal.  And defendants say, look, we -- they

2  did it, and we were satisfied with it.

3            MR. D. BERNSEN:  We're good, your Honor.

4            THE COURT:  And I do -- are we getting, kind

5  of, close because I'm not only giving up my courtroom to

6  Judge Heartfield here in a few minutes, I am giving up

7  my wonderful courtroom deputy, and she's going to need a

8  little refreshment break along the way, too, so she can

9  provide the outstanding service to Judge Heartfield that

10  she's given to me over the years.

11            What else do we need to talk about?

12            MR. C. BERNSEN:  I'm narrowing some down.

13            Which ones did you say?

14            MR. D. BERNSEN:  Samantha Mahaffey.

15            THE COURT:  We talked about Mahaffey already.

16            MR. C. BERNSEN:  Yeah, we did.

17            Let me just do -- yeah.  Judge, real

18  quick, No. 40.  You know, any communications between

19  Little League and the parents of the -- of the ELL,

20  Evadale, teams regarding the circumstances of this

21  lawsuit, which is the scandal.  And then they put some

22  objections, I guess, and then they say, "Defendant will

23  produce to the extent they exist."  We -- you know, we

24  would like you to order them to produce them.

25            MR. D. BERNSEN:  Or say they don't have them.

1          MR. C. BERNSEN:  Or say they don't have them.

2          THE COURT:  Well, I'm going to order them be

3    produced.  I can see that being relevant, but I'm going

4    to stand by what I've said all along.  Identifying

5    information about other minors -- I think that needs

6    to -- I think that needs to not be produced because I

7    want to protect -- we need to protect, I think, the

8    identification of other minors.  I think you want to

9    find out what did they tell parents.

10          MR. C. BERNSEN:  That's it.

11          THE COURT:  Dear Parent of Henry -- you know,

12    Henry's name gets blacked out -- because it's not

13    identifying -- Henry is -- I want that redacted.

14          MR. C. BERNSEN:  We just want to know, Judge,

15    if Little League International after this scandal, you

16    know, identified -- e-mailed, sent any communications

17    to, for instance, the parents, you know, your child was

18    coached by this guy a couple of years ago and he's in

19    jail on multiple counts of child sex offenses, and we

20    just need to let you know that this happened.  Like, you

21    need to have a serious talk with your child.  He may

22    have been exposed to this predator.  We're just trying

23    to get -- which we think a reasonable organization would

24    do.  And all I'm trying to do --

25          THE COURT:  I think you can do that without

1  identifying the --

2              MR. C. BERNSEN:  Absolutely.

3              THE COURT:  -- name of the child either

4  involved in the actual abuse or to this other parent of

5  another child.  That child's identity needs to be

6  redacted.

7              MR. C. BERNSEN:  That's fine with us, Judge.

8              THE COURT:  But if they did something like

9  that, I think that might be relevant.  It could even be

10 an admission against interest.  I don't know what it is.

11 It could show -- I don't know.  I could think of a

12 number of things, that I won't even verbalize, how I

13 think it could be relevant.

14             MR. VILLARREAL:  And for the record,

15 defendants did not object as to relevance.

16             THE COURT:  Yeah, I know.  It's just -- just

17 make sure the identifying information is redacted.

18             MR. VILLARREAL:  Yes, sir.

19             THE COURT:  Because it really doesn't matter

20 whether this letter was sent to Henry or to John.  It

21 doesn't matter.  It's just the fact that the letter

22 itself, if at all, was sent.  That's all I care about.

23             MR. C. BERNSEN:  Real quick before --

24             Mr. Villarreal, are we clear -- we asked for

25 Mahaffey's personal file.  Didn't y'all already say

1  y'all would produce that?

2          MR. VILLARREAL:  I'm sorry.  What was your

3  question?

4          MR. C. BERNSEN:  Didn't y'all agree that

5  y'all would produce Mahaffey's personnel file before the

6  depo?

7          MR. VILLARREAL:  We agreed that we were going

8  to collect that from the client.  We have not at this

9  moment.  We need to review it first to see if there's

10  any relevance to it.  We agreed to review it, and if

11  there is any relevance to the case, we would produce

12  that.  But we can still confer about it.

13          MR. C. BERNSEN:  Okay.

14          MR. VILLARREAL:  And this is not part -- your

15  Honor, he's asking about the fourth set of requests for

16  production.  Not the document that you --

17          THE COURT:  So it's not before the Court at

18  this point in time?

19          MR. VILLARREAL:  Correct.  And that was not

20  part of the motion to compel.

21          THE COURT:  So you're not really prepared

22  to --

23          MR. VILLARREAL:  Right.  That was not part of

24  the motion to compel.

25          MS. LAINE:  Your Honor, to be clear, the

1  motion to compel was filed at a time when there was only

2  one document dump, and it was a small one.  So this has

3  evolved over time, and we've already had discussions

4  about the personnel file of Samantha Mahaffey.  And her

5  deposition is scheduled for September 21st, so we don't

6  want them to not give it to us or dump it on us last

7  minute with a bunch of redactions two days before the

8  depo.

9              THE COURT:  Yeah.  You know, let me say it

10 like this:  That may well be relevant in this sense.

11 What if her personnel file shows -- and I don't mean to

12 say anything critical of anybody who drives a panel

13 truck stocking potato chips in vending machines.

14 Sometimes I, in the course of my career, have had, kind

15 of, an envious eye on those individuals who drive trucks

16 like that and think it might not be a bad life to have,

17 oh, we have to get some more Lay's potato chips in this

18 machine.  And that's my biggest hurdle of the day.  It

19 might be, kind of, a nice life in many ways.

20              But would you want somebody with just that

21 experience or background making decisions about whether

22 or not somebody's qualified and confident to be a

23 Little League coach or, you know, whatever?  I guess --

24 and know procedures, you know, if a complaint is made,

25 well, the law says you're supposed to notify the

1  district attorney in that county or whatever.  I mean,

2  to be qualified and competent for the job, in that

3  sense, maybe having the personnel file -- and, also, was

4  the person -- well, she's our gal in charge of this, but

5  she's on probation right now because of some bad -- I

6  don't know.  I guess that could be -- I can see an

7  argument where it might be relevant.

8            MR. VILLARREAL:  I agree that there might be

9  parts of the employment file that can be relevant.

10  Judge, I cannot represent what is in there because I

11  haven't seen it.

12            THE COURT:  Okay.  That's fair.  I'll tell

13  you what -- and I'm going to -- and even that would have

14  to have certain -- even if you were to produce it,

15  certain redactions because we don't need to know what

16  her contributions to her 401K plan are or what health

17  insurance program she's signed up with or anything like

18  that.  I mean -- and you haven't had a chance to review

19  that.  I guess what I'm saying is I'm leaning toward

20  producing something.  Maybe not all of it.  I don't

21  know.  To know of -- something about her background,

22  whether she has been reprimanded.  You know, sometimes

23  things do show up in personnel files.

24            So -- but if there's a deposition scheduled,

25  let's get that -- let's get that ironed out quickly.

111

1   And if -- I'm going to be pretty much engaged, but we

2   can get that one thing over to a magistrate judge and

3   have the magistrate judge make a determination on that

4   pretty quickly.

5           MR. VILLARREAL:  Yes, sir.

6           MR. D. BERNSEN:  Your Honor, and her medical,

7   we don't want that.  Insurance, no.  This is the head of

8   security.  The head --

9           THE COURT:  Yeah.  What's her background.  I

10  mean --

11          MR. C. BERNSEN:  Yeah, Judge.  Her

12  application, her training, and all that stuff.

13          THE COURT:  I think I've made that plain.

14  All I'm saying is that I want to see that produced.

15  But, in fairness to Mr. Villarreal -- I mean, I think he

16  needs to have an opportunity to at least review it

17  because there could be something in there that has some

18  legitimate -- and if I just said, I'm ruling from the

19  bench, he hasn't seen it, nobody's seen, but it's going

20  to be produced --

21          MR. D. BERNSEN:  No.

22          THE COURT:  And then, well, the judge

23  ruled -- no.  If there is a glaring thing in there that

24  needs to be knocked out, you know, and not produced, I

25  think he needs to have an opportunity to look at that.

1    I think that's fair.

2             MR. D. BERNSEN:  No.  I think that's fair,

3    and that's really well-taken.  Where -- this is, what,

4    Thursday?  Thursday.  We're going to Pennsylvania on the

5    19th, 20th, and 21st.

6             And so we need a turnaround on that -- I

7    don't want -- as soon as you can.

8             MR. VILLARREAL:  We've asked for that to our

9    client already.

10             THE COURT:  Okay.  Let's make it -- let's

11   make sure they have it in ten days.  I know it's pushing

12   it a little close to your deposition time, but I'm also

13   confident that with the members of your team that you

14   have, you will be able to process that information.  And

15   if there's something worthy of a good question on

16   cross-examination, you'll glean it from whatever is

17   produced.

18             MS. LAINE:  Just as a follow-up to that,

19   should there be something we have a dispute about and

20   we're traveling on the 19th and we have a dispute on

21   that day about the rest of the file, is that a hotline

22   call, or is it a call to chambers?

23             THE COURT:  We'll accommodate you as quickly

24   as we can.

25             I think this may be for Judge Heartfield's

113

1  deal.  We've got to go.

2          So, quickly, is there any other hot button

3  one?

4          MR. D. BERNSEN:  We have a hot button one,

5  but we can wait, your Honor.  It's on the underwriting,

6  but we'll get to that.  You've been very kind to us

7  and --

8          THE COURT:  I think you understand that we've

9  got some limitations.  One of our courtrooms is down --

10         MR. D. BERNSEN:  Absolutely.

11         THE COURT:  -- due to a problem they found in

12  there.  And -- and I've got to let my court reporter

13  have a break.

14         MR. D. BERNSEN:  Absolutely.

15         THE COURT:  And -- not only for -- because

16  she's been going a long time here, but she's got to

17  refresh herself for Judge Heartfield, you know.  And --

18         MR. D. BERNSEN:  Thank you, your Honor.

19  Thank you for having us here today and all the court

20  personnel.

21         THE COURT:  All right.  Anything further?

22         MR. VILLARREAL:  Likewise, Judge.  And thank

23  you for the Court's time, too.

24         THE COURT:  I just want to say I do want to

25  have a private moment with Mr. Villarreal in chambers

114

1   unrelated to this.

2           MR. D. BERNSEN:  That's absolutely fine.

3           THE COURT:  He's a former law clerk.  And

4   there's -- not about this.

5           MR. D. BERNSEN:  Good man.  A good man.  You

6   did well.  Thank you.

7           MR. C. BERNSEN:  Thank you, Judge.

8           THE COURT:  All right.  We're adjourned.

9           (Proceedings adjourned at 12:55 p.m.)

10

11                      *     *     *

12

13              COURT REPORTER'S CERTIFICATION.

14           I hereby certify that on this date,

15   September 12, 2022, the foregoing is a correct

16   transcript of the record of proceedings in the

17   above-entitled case.

18

19   _____

          APRIL D. HARGETT
20        Certified Realtime Reporter
          Eastern District of Texas
21        Beaumont, Texas

22

23

24

25

April D. Hargett, CSR, RPR, RVR
(409) 654-2891