**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**LUFKIN DIVISION**

| | | |
|---|---|---|
| **FAMILY ONE, INDIVIDUALLY AND** | § | |
| **AS GUARDIANS AND NEXT FRIENDS** | § | |
| **OF MINOR CHILD ONE; FAMILY** | § | |
| **TWO, INDIVIDUALLY AND** | § | |
| **AND NEXT FRIENDS OF MINOR** | § | |
| **CHILD TWO; FAMILY** | § | |
| **THREE, INDIVIDUALLY AND AS** | § | |
| **NEXT FRIENDS OF MINOR CHILD** | § | |
| **THREE; FAMILY FOUR,** | § | |
| **INDIVIDUALLY AND AS NEXT** | § | |
| **FRIEND OF  MINOR CHILD FOUR;** | § | |
| **FAMILY FIVE, INDIVIDUALLY AND** | § | **CIVIL CASE NO: 9:22cv28** |
| **AS NEXT FRIENDS OF MINOR** | § | |
| **CHILD FIVE; FAMILY SIX,** | § | |
| **INDIVIDUALLY AND AS NEXT** | § | |
| **FRIEND OF  MINOR CHILD SIX;** | § | |
| **FAMILY SEVEN, INDIVIDUALLY** | § | |
| **AND AS NEXT FRIEND OF MINOR** | § | **JURY TRIAL DEMANDED** |
| **CHILD SEVEN; AND FAMILY EIGHT,** | § | |
| **INDIVIDUALLY AND AS NEXT** | § | |
| **FRIENDS OF MINOR CHILD EIGHT,** | § | |
| | § | |
| *Plaintiffs*, | § | **HON. MICHAEL TRUNCALE** |
| | § | |
| **VS.** | § | |
| | § | |
| **ADAM DALE ISAACKS, MIRANDA** | § | |
| **LYNN DUKES ISAACKS,** | § | |
| **LITTLE LEAGUE BASEBALL,** | § | |
| **INCORPORATED,** | § | |
| **LITTLE LEAGUE BASEBALL, INC.,** | § | |
| **LITTLE LEAGUE INTERNATIONAL,** | § | |
| **TEXAS DISTRICT** | § | |
| **12 LITTLE LEAGUE, EVADALE** | § | |
| **LITTLE LEAGUE, AND BEAR** | § | |
| **CREEK HUNTING CLUB,** | § | |
| | § | |
| | § | |
| *Defendants*. | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Plaintiffs, **FAMILY ONE, INDIVIDUALLY AND AS GUARDIANS AND NEXT FRIENDS OF MINOR CHILD, ONE; FAMILY TWO , INDIVIDUALLY AND AS NEXT FRIENDS OF MINOR CHILD TWO; FAMILY THREE, INDIVIDUALLY AND AS NEXT FRIENDS OF MINOR CHILD THREE; FAMILY FOUR, INDIVIDUALLY AND NEXT FRIEND OF MINOR CHILD FOUR; FAMILY FIVE, INDIVIDUALLY AND AS NEXT FRIENDS OF MINOR CHILD FIVE; FAMILY SIX, INDIVIDUALLY AND AS NEXT FRIEND OF MINOR CHILD SIX; FAMILY SEVEN, INDIVIDUALLY AND AS NEXT FRIEND OF MINOR CHILD SEVEN; AND FAMILY EIGHT, INDIVIDUALLY AND AS NEXT FRIENDS OF MINOR CHILD EIGHT** (collectively, "Plaintiffs"), and file this, their Second Amended Complaint, against Defendants **ADAM DALE ISAACKS, MIRANDA LYNN DUKES ISAACKS, LITTLE LEAGUE BASEBALL, INCORPORATED, LITTLE LEAGUE BASEBALL, INC., LITTLE LEAGUE INTERNATIONAL,[1] TEXAS DISTRICT 12 LITTLE LEAGUE, EVADALE LITTLE LEAGUE**, and **BEAR CREEK HUNTING CLUB** (collectively, "Defendants") and in support of this Second Amended Complaint, Plaintiffs would show unto the Court as follows:

---

[1] Defendants Little League Baseball, Incorporated, Little League Baseball, Inc., and Little League International are collectively referred to herein as "LLB" or "Little League Baseball." To date, LLB has represented to Plaintiffs that the named Defendants, Little League Baseball, Incorporated, Little League Baseball, Inc., and Little League International are one and the same.

**TABLE OF CONTENTS**

I.      INTRODUCTION.................................................................................................................7

II.     PARTIES ...........................................................................................................................12

     A.  Plaintiffs ................................................................................................................12

     B.  Defendants.............................................................................................................13

III.    JURISDICTION AND VENUE........................................................................................15

IV.    FACTUAL BACKGROUND ...........................................................................................16

     A.  Nature of the Case. ...............................................................................................16

     B.  Facts of the Case...................................................................................................16

     C.  Senate Bill 534—Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017 ("Safe Sport Act of 2017")...................................................20

     D.  USA Baseball. ......................................................................................................23

     E.  USA - Pure Baseball.............................................................................................25

     F.  Mandatory Training ..............................................................................................26

     G.  Grooming ..............................................................................................................26

     H.  Social Media, Emails, and Texts ..........................................................................29

     I.  LLB, Incorporated ...............................................................................................30

     J.  Little League Baseball Official Regulations, Playing Rules, and Operating Policies...................32

     K.  Charter—Local Little Leagues .............................................................................33

     L.  League Charter Agreements ..................................................................................33

     M.  Volunteer Screening Agreement Local Little Leagues .........................................35

     N.  Local League Constitutions...................................................................................35

     O.  Little League District Administrator Organization Plan .......................................37

     P.  International Congress Little League Baseball and Softball ..................................38

     Q.  Other Functions of Congress ................................................................................38

     R.  Authority of District Administrator.......................................................................39

     S.  Texas District 12 Little League .............................................................................40

T.   District Administrator ........................................................................................... 41

U.   ASAP:  A Safety Awareness Program ................................................................... 42

V.   Foreseeability ........................................................................................................ 44

W.  The Voice in the Wilderness ................................................................................. 44

X.   Superior Knowledge and Superior Resources ...................................................... 49

Y.   Enforcement .......................................................................................................... 49

Z.   Joint Enterprise ..................................................................................................... 52

AA. Little League President Isaacks exploited his position to groom, sexually abuse, and sexually assault players for years without safeguards, oversight or reporting ............................. 54

BB. Texas District 12 Little League District 12 - Acts, Omissions, and Failures .................................. 62

CC. LLB, Incorporated's Complete Authority and Control Over District Little    Leagues and Local Little Leagues ....................................................................................... 66

V.   CAUSES OF ACTION ................................................................................................... 71

A.   Count One—Assault .............................................................................................. 71

B.   Count Two—Sexual Abuse ................................................................................... 72

C.   Count Three—*Sexual Exploitation and Other Abuse of Children* in violation of Federal Anti-Human Trafficking and other federal statutes 18 U.S.C. § 2255. ......................................... 72

D.   Count Four—Negligence Per Se of LLB, Incorporated, District 12, ELL ..................................... 73

E.   Count Five—Negligence ....................................................................................... 75

     1.   Negligent failure to train, supervise, and monitor District 12 ................................. 80

     2.   Negligent Retention of District 12 Administrator Jennifer Roebuck ....................... 81

     3.   Negligent failure to train, supervise, and monitor ELL ........................................... 81

     4.   Negligent failure to enforce rules, regulations, policies, and procedures on District 12, and ELL ................................................................................. 81

     5.   Negligent failure to warn .......................................................................................... 81

     6.   Negligent Undertaking ............................................................................................. 82

F.   Count Six—Respondeat Superior .......................................................................... 83

G.   Count Seven—Ratification ..................................................................................... 84

H.   Count Eight—Negligence of Defendant, Bear Creek ............................................ 84

4

I. Count Nine—Gross Negligence .................................................................... 86

J. Count Ten—Defective Premises .................................................................. 90

K. Count Eleven—Breach of Fiduciary Duty ................................................... 91

VI. ADDITIONAL FACTS RELATING TO MINOR PLAINTIFFS ........................... 92

A. Additional Facts Relating to Minor Plaintiff, Child One. ............................... 92

B. Additional Facts Relating to Minor Plaintiff, Child Two. .............................. 93

C. Additional Facts Relating to Minor Plaintiff, Child Three. ........................... 94

D. Additional Facts Relating to Minor Plaintiff, Child Four............................... 94

E. Additional Facts Relating to Minor Plaintiff, Child Five. .............................. 95

F. Additional Facts Relating to Minor Plaintiff, Child Six................................. 96

G. Additional Facts Relating to Minor Plaintiff, Child Seven. ........................... 97

H. Additional Facts Relating to Minor Plaintiff, Child Eight. ............................ 97

VII. DAMAGES FOR PLAINTIFFS AND MINOR PLAINTIFFS ............................. 98

A. Damages for Plaintiff, Family One, and Minor Plaintiff, Child One ............... 98

B. Damages for Plaintiff, Family Two, and Minor Plaintiff, Child Two ............... 99

C. Damages for Plaintiff, Family Three, and Minor Plaintiff, Child Three .......... 99

D. Damages for Plaintiff, Family Four, and Minor Plaintiff, Child Four............. 100

E. Damages for Plaintiff, Family Five, and Minor Plaintiff, Child Five ............. 101

F. Damages for Plaintiff, Family Six, and Minor Plaintiff, Child Six ............... 101

G. Damages for Plaintiff, Family Seven, and Minor Plaintiff, Child Seven ........ 102

H. Damages for Plaintiff, Family Eight, and Minor Plaintiff, Child Eight ........... 102

VIII. PUNITIVE DAMAGES........................................................................... 103

IX. JURY DEMAND ................................................................................... 103

X. ATTORNEY'S FEES INTERESTS AND COSTS ........................................ 103

XI. CONDITIONS PRECEDENT .................................................................. 104

XII. ALTERNATIVE PLEADINGS ................................................................. 104

XIII.    RELIEF REQUESTED .................................................................................................... 104

# I. __INTRODUCTION__

1.      This case arises from the serial molestation, grooming, and sexual abuse of eight (8) minor Plaintiffs by their trusted Little League Baseball coach. This coach also served as President of Evadale Little League ("ELL") from 2019 to 2021 after having served as the league's Safety Officer from 2017 to 2018. The grooming and abuse began when some of the minor Plaintiff athletes were approximately seven (7) and eight (8) years' old and continued for a period of years until some of the children were approximately eleven (11) and twelve (12) years' old.

2.      Over the years, Little League Baseball has sought to recruit, entice, and attract more and more minor athletes and their parents to enter into the "magical" world of Little League Baseball with statements such as:

> Little League is a program of service to its youth. It is geared to provide an outlet of healthy activity and training under good leadership in an atmosphere of wholesome community participation. The movement is dedicated to helping children become good and decent citizens. It inspires them with a goal and enriches their lives toward the day when they must take their place in the world.

3.      The sexual assaults of the minor Plaintiffs occurred on numerous occasions over the span of many years and could have been prevented had Defendant Little League Baseball taken the mandate of the Little Leaguers' safety in their care, seriously. Despite having previous knowledge that predators such as Adam Isaacks had gained entry into and infiltrated the ranks of Little League Baseball, had access to and sexually abused Little Leaguers, LLB consciously and intentionally chose to put its quest for money and the marketability of the "Little League" institution above the safety of the minor Plaintiffs and Little Leaguers throughout the United States.

4.      Little League Baseball, over the years, has sought to avoid accountability and responsibility for protecting Little Leaguers from a known and foreseeable danger of child

predators in the Little League youth sports organization by employing various schemes and false facades while simultaneously recruiting and receiving money from the parents of minor athletes who entrusted their children to LLB.

5.       In 2017, in response to what was termed an "epidemic of sports related child abuse in the United States," and in the shadow of the "Larry Nassar Case," in which more than 200 young women and children were sexually assaulted by the team doctor of the Unites States Women's Olympic Team, the United States Congress filed and passed Senate Bill 534—"Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017 (the "Safe Sport Act"). The Safe Sport Act (a) mandates reporting suspected child abuse by adults participating in sports; (b) designated the United States Center for Safe Sport as the independent national Safe Sport organization for the United States, exercising jurisdiction over each National Governing Body or "NGB" with regard to safeguarding amateur athletes against abuse, including emotional, physical, and sexual abuse in sports; (c) authorizes and mandates implementation and enforcement of federal rules of best practices for the prevention of sexual and violent crimes nationwide against minor athletes through the designated National Governing Body for that sport with support from the U.S. Center for Safe Sport. The National Governing Body for the sport of baseball in the United States is USA Baseball.

6.       USA Baseball has three (3) classes of membership with one class being (A) National Sports Organization – Youth – organizations which conduct programs in baseball for youths and have members or affiliates in multiple states of the United States or are otherwise sufficiently national in their charter or scope. USA Baseball has 17 National Member Organizations ("NMOs"). Little League Baseball is a NMO of USA Baseball. Stephen Keener, Chief Executive Officer of Little League Baseball, is currently one of a 15-member Board of

Directors of USA Baseball. He is a designated representative of the National Member Organizations.

7.     Pursuant to the federal mandates set forth in the Safe Sport Act, and with support from the U.S. Center for Safe Sport, USA Baseball implemented mandatory policies for the prevention of sexual abuse and violent crimes within baseball organizations entitled "USA – Pure Baseball." Under the authority given to USA Baseball as the National Governing Body for baseball, the Safe Sports Act, and the policies and procedures set forth by USA Baseball applicable to NMOs, Little League Baseball was and is required to comply with and follow all mandates set forth in and by USA Baseball, including USA – Pure Baseball.

8.     Little League Baseball, by and through its officers, directors, and vice principals made a conscious, knowing, and deliberate decision NOT to follow the federal mandates of the Safe Sport Act and USA – Pure Baseball, despite the express warnings and advice from within Little League Baseball, including those from the Security Manager who was given the responsibility of updating LLB's "Child Protection Program" and ensuring it complied with the law. Defendant Little League Baseball has continually failed to implement, uphold, and enforce policies and procedures to protect minor athletes (Little Leaguers) from abuse, including sexual abuse before 2017 and up to and including the date of the filing of this document. LLB chose not to follow the aforementioned mandates in the face of contrary advice from its very own Security Manager tasked with re-vamping the Child Protection Program to ensure its compliance with federal law and USA Baseball policies. Little League Baseball also did not warn parents and other volunteers about the known fact that child sexual predators had infiltrated its organization, as volunteers and/or employees, in districts and leagues nationwide.

9.      The grooming in this case, which constitutes preparatory offenses under the Texas Penal Code §§ 15.01, 15.02, and 15.031, occurred under the authority of LLB. This grooming began and continued under a variety of circumstances, including but not limited to: on the baseball field of Evadale Little League, during team practices, during private practices, at games, during team functions and events, and also electronically.

10.     In his official capacity as ELL President, Adam Isaacks selected/appointed himself as coach and selected his baseball roster. Additionally, in his official capacity as ELL President, Adam Isaacks participated in the re-election of Ms. Roebuck as the District Administrator for Texas District 12 Little League ("District 12"). The authority, respect, and stature granted to Adam Isaacks as coach, President, agent, and vice-principal of ELL accorded him by Little League Baseball gave him the opportunity and means to entice and groom victims over numerous years. Additionally, as a league President, Adam Isaacks was part of the voting and governing body/board of directors of District 12, such that he was a vice principal of not only ELL, but also District 12. Further, as a league President and coach as well as a member of District 12's Board of Directors, Adam Isaacks was an agent of Little League Baseball.

11.     As the President and Secretary of Evadale Little League, and as coach and assistant coach of Evadale Little League teams, Adam Isaacks and Miranda Isaacks had the authority to make the line-ups for each and every Little League game for their team, decide which children played, what positions they played, where they batted in the line-up, who got pulled from the game, and who sat the bench. Part of the grooming process included invitations to team members to go on trips with the coach, assistant coach, and their son (who was also a teammate). LLB provided Adam Isaacks each year with a list of victims and potential victims and gave him the means and methods by which to impose his deviant will. Adam Isaacks chose his victims from his Evadale

Little League Baseball roster and freely exploited the position of authority bestowed upon him by the institution of Little League Baseball and District 12. Similarly, the authority, respect, and stature granted to Miranda Isaacks as Secretary of ELL, "assistant coach" rendered her an agent and/or vice-principal of ELL.

12.     With a complete lack of training, education, warning, safeguards, policies, procedures, and/or oversight within the organizations of Little League Baseball, District 12, and ELL, Adam Isaacks was permitted to implement a scheme to groom and sexually abuse, molest, and assault young boys who participated in Evadale Little League Baseball over the course of four to five years.

13.     Bear Creek, a for-profit "Hunting Club" in Sabine County headquartered in Pineland, Texas, provided sanctuary for Adam Isaacks to commit sexual crimes against children. Bear Creek failed to provide security to minors who were brought to Bear Creek property and sexually abused for numerous years. Bear Creek created, maintained, and allowed to exist an unreasonably dangerous condition by its failure to properly secure its premises, failure to properly supervise and educate its members, failure to have or implement a security plan, and failure to investigate and report the continuous sexual assault of minors over the course of at least four to five years. Ultimately, Adam Isaacks was captured and arrested hiding in his camper at Bear Creek property.

## II.   <u>PARTIES</u>

### A.   <u>Plaintiffs.</u>

14.   Plaintiff, **FAMILY ONE, INDIVIDUALLY AND AS GUARDIAN AND NEXT FRIEND OF MINOR CHILD, ONE**, are individuals of the full age of majority, are the legal guardians of Child One, who is a minor, and all reside in Jasper County, Texas.

15.   Plaintiff, **FAMILY TWO, INDIVIDUALLY AND AS NEXT FRIENDS OF MINOR CHILD TWO**, are individuals of the full age of majority, are the biological mother and father of Child Two, who is a minor, and all reside in Jasper County, Texas.

16.   Plaintiff, **FAMILY THREE, INDIVIDUALLY AND AS NEXT FRIENDS OF MINOR CHILD THREE**, are individuals of the full age of majority, are the biological mother and father of Child Three, who is a minor, and all reside in Jasper County, Texas.

17.   Plaintiff, **FAMILY FOUR, INDIVIDUALLY AND AS NEXT FRIEND OF MINOR CHILD FOUR**, is an individual of the full age of majority, is the biological father of Child Four, who is a minor, and both reside in Jasper County, Texas.

18.   Plaintiff, **FAMILY FIVE, INDIVIDUALLY AND AS NEXT FRIENDS OF MINOR CHILD FIVE**, are individuals of the full age of majority, are the biological father and mother of Child Five, who is a minor, and all reside in Jasper County, Texas.

19.   Plaintiff, **FAMILY SIX, INDIVIDUALLY AND AS NEXT FRIEND OF MINOR CHILD SIX**, is an individual of the full age of majority, is the biological mother of Child Six, who is a minor, and both reside in Jasper County, Texas.

20.   Plaintiff, **FAMILY SEVEN, INDIVIDUALLY AND AS NEXT FRIEND OF MINOR CHILD SEVEN**, is an individual of the full age of majority, is the biological mother of Child Seven, who is a minor, and both reside in Jasper County, Texas.

21.    Plaintiff, **FAMILY EIGHT, INDIVIDUALLY AND AS NEXT FRIENDS OF MINOR CHILD EIGHT,** are individuals of the full age of majority, are the biological mother and father of Child Eight, who is a minor, and all reside in Hardin County, Texas.

22.    Due to the sensitive, private, and potentially retaliatory nature of the Plaintiffs' allegations brought in this Complaint, Plaintiffs request that this Court permit them to proceed under pseudonym.[2]

**B. <u>Defendants.</u>**

23.    Defendant, **ADAM DALE ISAACKS** ("Adam Isaacks"), is an individual of the full age of majority and who, at all relevant times of the incidents made the basis of this lawsuit, which are explained more fully below, resided in Silsbee, Hardin County, Texas.  Currently, Adam Isaacks is incarcerated in the Jasper County Jail, located in Jasper, Texas, for pending criminal charges that relate to his actions and/or conduct that Plaintiffs complain herein. Because Defendant Adam Isaack is incarcerated, he may be served with process through the Jasper County Sheriff at the following address: **Sheriff Mitchell Newman, Jasper County Sheriff, c/o Adam Isaacks (Inmate), 101 Burch Street, Jasper, Texas 75951.**

24.    Defendant, **MIRANDA LYNN DUKES ISAACKS** ("Miranda Isaacks"), is an individual of the full age of majority who resides in Silsbee, Hardin County, Texas. Miranda

---

[2] Courts recognize an exception to the general rule that pleadings name all parties when the issues involved are of a sensitive and highly personal nature. For good cause, as exists here, the Court may permit Plaintiffs to proceed in pseudonym to protect them from threats, intimidation, annoyance, embarrassment, oppression, or undue burden, or expense. Here, granting pseudonym status is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including sexual assault, molestation, and abuse of minors.  Plaintiffs fear the stigma from their families, friends, employers, and the community at large, if their identities are revealed in the public record.

Further, Defendants will not be prejudiced by Plaintiffs' use of pseudonyms. Plaintiffs have revealed their identities to Defendants pursuant to the protective order entered by the Court. Plaintiffs seek redaction of their personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiffs' identities in a manner that will compromise their personal lives, status within the community at large, employment, or employment prospects.

Isaacks was the legal wife of Defendant Adam Isaacks, and she was married to Adam Isaacks at all relevant times of the incidents made the basis of this lawsuit, which are explained more fully below. Miranda Isaacks may be served with process at the following address: **Miranda Lynn Dukes Isaacks, 7247 Ireland Road, Silsbee, Texas 77656.** Miranda Lynn Dukes Isaacks has entered an appearance by and through counsel of record, Bruce Partain, WELLS PEYTON GREENBERG & HUNT, Century Tower, 550 Fannin, Beaumont, Texas, 77701; James Royce Parish and Robert W. Hellner, WOOD SMITH HENNING & BERMAN, 901 Main Street, Suite 3670, Dallas, Texas 75202

25.     Defendant, **LITTLE LEAGUE BASEBALL, INCORPORATED** is a federally chartered corporation pursuant to legislation signed into law by law by President Lyndon Johnson on July 16, 1964. The principal office of the corporation is Williamsport, Pennsylvania. LLB, Incorporated "shall have a designated Agent in the District of Colombia to receive service of process for the corporation. Notice of service on the Agent, or mailed to the business address of the Agent, is notice or service on the corporation." Little League Baseball, Chief Operating Officer, Stephen D. Keener, is the beneficial owner of Little League Baseball, Inc. Little League Baseball, Incorporated has appeared herein.

26.     Defendant, **LITTLE LEAGUE BASEBALL, INC.,** has entered an appearance by and through counsel of record, Geoffrey Harper, William F. Fox, and Ashley Wright, WINSTON & STRAWN, LLP, 2501 N. Harwood Street, 17th Floor, Dallas, Texas 75201, 800 Capitol Street, 24th Floor, Houston, Texas 77002. Little League Baseball, Chief Operating Officer, Stephen D. Keener, is the beneficial owner of Little League Baseball, Inc.

27.     Defendant, **LITTLE LEAGUE INTERNATIONAL**, is an entity related to Little League Baseball, Incorporated. It appears that Little League International is a trade name for Little

League Baseball, Incorporated that expired on October 14, 2021. Little League International also may be used to describe the real property located in South Williamsport, PA. Stephen D. Keener is the beneficial owner of Little League Baseball, Inc. Little League International has appeared herein.

28.     Defendant, **TEXAS DISTRICT 12 LITTLE LEAGUE**, has entered an appearance by and through counsel of record, Geoffrey Harper, William F. Fox, and Ashley Wright, WINSTON & STRAWN, LLP, 2501 N. Harwood Street, 17th Floor, Dallas, Texas 75201, 800 Capitol Street, 24th Floor, Houston, Texas 77002.

29.     Defendant, **EVADALE LITTLE LEAGUE**, has entered an appearance by and through its counsel of record, Kent M. Adams, WILSON ELSER MOSKOWITZ & DICKER, LLP, 909 Fannin Street, Suite 3300, Houston, Texas 77010.

30.     Defendant, **BEAR CREEK HUNTING CLUB** ("Bear Creek"), has entered an appearance by and through its counsel of record, Scott Skelton, SKELTON SLUSHER BARNHILL WATKINS WELLS PLLC, 1616 South Chestnut, Lufkin, Texas 75901.

### III. JURISDICTION AND VENUE

31.     The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States. This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all other claims asserted herein (including all state law claims), as such claims are so related to the claims in the action within the Court's original jurisdiction that they are part of the same case and controversy.

32.     The incidents, which are the subject of this Second Amended Complaint, occurred within the Eastern District of Texas. This Court has personal jurisdiction over all Defendants in this case because they have purposely availed themselves of the privileges and benefits of

conducting business in the State of Texas, including within the Eastern District of Texas, the claims

arise from Defendants' purposeful contacts with the State of Texas. Moreover, Defendants have

waived any challenge to personal jurisdiction by appearing herein.

33.    Venue is proper in the United States District Court for the Eastern District of Texas,

as all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in

Sabine County, Texas, which lies within the Lufkin Division of the Eastern District of Texas. *See*

28 U.S.C. § 1391(b)(2).

## IV.  FACTUAL BACKGROUND

### A.    Nature of the Case

34.    This is a personal injury lawsuit against Defendants relating to the horrendous

attacks, acts, and/or series of acts committed by Defendant Adam Isaacks against Plaintiffs that

involved the sexual abuse, sexual assault, molestation, physical abuse and assault, and/or mental

abuse of the minor Plaintiffs between 2017 and 2021, as well as the acts, omissions, and/or conduct

of the other Defendants named herein. As a result of these harmful acts, omissions, federal

statutory violations, and/or conduct of Defendants, which are set forth more fully in the paragraphs

below, Plaintiffs sustained serious physical and mental harm, for which they seek to recover all

damages they are entitled to receive under the law, as well as equitable relief, against all

Defendants, who are *jointly and severally* liable to Plaintiffs and minor Plaintiffs.

### B.    Facts of the Case

35.    Every young boy begins Little League Baseball with a dream which has been shared

by millions of young boys around the world—to play baseball, make the All-Star team, and,

someday, play in the Big Leagues. For Plaintiffs, their first introduction to baseball was through

the Evadale Little League and their coach, Adam Isaacks. Each young player was instructed by

Adam Isaacks that he was the coach and, if they wanted to play baseball, they had to follow his instructions and demands. His wife, Miranda Isaacks, occasionally acted as the "assistant coach" at practices and games.

36.     In the United States and particularly within Southeast Texas, the term "coach" is a title of honor and inspires trust in the person bestowed with the title. Once a coach, always a coach. Our society gives a certain weight and gravitas to coaches. It is a title of authority, affection, respect, and trust.

37.     Plaintiffs are victims and survivors of childhood grooming, sexual assault, molestation, and abuse at the hands of their Little League Baseball coach and League President, Adam Isaacks. The abuse started when some minor Plaintiffs were approximately 7 and 8 years old and continued for a period of years until some of them were 11 and 12 years' old. Defendants are liable for the grooming, sexual assaults, molestation, and abuses suffered by the Plaintiffs, as more fully described below.

38.     All such grooming occurred under the authority of Little League Baseball in a variety of contexts and/or circumstances, including but not limited to: on the baseball field of Evadale Little League, during team practices, during private practices, at games, during league functions and events, and also electronically. As the President and Secretary of Evadale Little League, and as coach and assistant coach of Evadale Little League teams, Adam Isaacks and Miranda Isaacks had the authority to make the line-ups for each and every Little League game for their team, decide who played, what position they played, where they batted in the line-up, and who got pulled from the game, and who sat the bench. Part of the grooming process included invitations to team members to go on trips with the coach, assistant coach, and their son (who was a teammate). Little League Baseball provided Adam Isaacks each year with a list of victims and

17

potential victims. He was also provided the means by which to impose his deviant will. Adam Isaacks chose his victims from his Evadale Little League Baseball roster and freely exploited the position of authority bestowed upon him.

39.     Stephen Keener, in his official capacity as Little League Baseball's Chief Executive Officer, approved and appointed Jennifer Roebuck as Texas District 12 Administrator on or about October 5, 2018. LLB has the authority in its sole discretion to retain or remove any District Administrator nationwide, including Jennifer Roebuck.

40.     Little League Baseball and Texas District 12 Little League participated, assisted, and approved the selection of Adam Isaacks as President of the Evadale Little League. Following Ms. Roebuck's appointment by LLB CEO Stephen Keener, acting in her official capacity as District 12 Administrator for LLB, Ms. Roebuck appointed Adam Isaacks as President of ELL. Ms. Roebuck also appointed the remainder of the ELL board, including Miranda Isaacks.

41.     On November 4, 2019, at 6:30 p.m.—A meeting was held with the intent to fill the vacant positions on the board for the Evadale Little League. The written minutes of the meeting reflect the following, in pertinent part:

> A meeting was held with intent to fill the vacant positions on the board for the Evadale Little League.
>
> Jennifer Roebuck, District Administrator and District ADA Softball representative Melissa Riedinger for District 12 were present.  They provided a detailed summary of the roles and responsibilities of each position within the board.
>
> The following positions were accepted and filled:
>
> Adam Isaacks—President, 2 year term
> [                ]—Vice President, 1 year term
> Miranda Isaacks—Secretary, 2 year term
> [                ]—Player Agent, 2 year term

Jennifer Roebuck provided a copy of the bylaws that are currently on file for Evadale.  She stated that the new board should have a meeting soon to update these bylaws as well as the park rules.

Jennifer also assisted with updating the league updated information for the board on the data center website.

Melissa Riedinger provided information regarding the need for a website thru Blue Sombrero.  She stated that this would be beneficial with registration as well as the charter that will be submitted.

The new board members exchanged contact information.

The meeting adjourned at 8:10pm.

Text messages between Adam Isaacks and Ms. Roebuck reflect a private meeting on or about October 21, 2019, to discuss ELL. Adams Isaacks was the President of Evadale Little League from 2019 to the end of 2021. He had previously served in various positions on the ELL Board of Directors. He was an authorized coach of several ELL baseball teams from 2017 to 2021, during which time he coached boys in age groups of 6 to 12 years' old. During this time, Adam Isaacks was married to Defendant, Miranda Isaacks, his wife of fifteen years, who served as ELL's Secretary and, on occasion, the assistant coach to her husband. At all relevant times, Adam Isaacks and his wife, Miranda, were residents of Silsbee, Hardin County, Texas and not residents of Evadale, Jasper County, Texas.

42.     Adam Issacks' assaults and sexual abuse of a Jasper County Little Leaguer was first reported to Jasper law enforcement on December 13, 2021. There were additional assaults committed by Adam Issacks after the initial complaint was given until his arrest on December 30, 2021. On December 30, 2021, parents and family members of the abused Little Leaguers located Adam Isaacks hiding in a trailer located at the Bear Creek Hunting Club in Sabine County, Texas. They surrounded the trailer and blocked escape routes until law enforcement officers from Sabine County took Isaacks into custody. At the time of his arrest and capture, Adam Issacks was

19

President/Coach of ELL, a Board Member of Texas District 12 Little League of Little League Baseball, and an agent and/or vice principal of District 12 and Little League Baseball.

C.   **Senate Bill 534 – Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017 (the "Safe Sport Act")**

43.   In 2015 and 2016, allegations of long-term sexual abuse became public against Larry Nassar, who served as the team doctor for the Unites States Women's National Gymnastics Team for 18 years. He used his position as the team's doctor to exploit, groom, and sexually assault at least 265 children and young women. His victims included numerous Olympic athletes. Nassar connected with victims on Facebook as part of the grooming process.

44.   As a result of the Nassar scandal, the entire 18-member board of USA Gymnastics tendered their resignations. The Michigan State University President and Director of Athletics resigned. Nassar's crimes committed at MSU and USA Gymnastics have drawn comparisons to coach Jerry Sandusky's sexual abuse crimes at Penn State University.

45.   The very public Nassar investigation, in which an army of survivors detailed decades of sexual abuse, prompted national attention and reform in both Olympic and amateur sports. It is against this backdrop that Congress passed the Safe Sport Act.

46.   In 2017, the Safe Sport Act was filed and passed out of the United States Congress on "a fast track" to address the "epidemic of sports related Child Abuse in the United States." "Sports is a context that is conducive to sexual abuse where the cultural norms of the sport community allows/creates autocratic authority system, close personal contact with athletes, clear power imbalances between athlete and coach, gives scope of development and maintenance of secrecy, and supports collective silence on matter of sexuality."

47. Safe Sport Act Timeline:

   1. March 6, 2017 – Senate Bill 534, Safe Sport Act of 2017, was filed in the United States Senate.

   2. March 8-28, 2017 – Hearings are held by the Senate Committee on the Judiciary.

   3. June 8, 2017 – The Senate Committee on the Judiciary reported by Co-Sponsor Senator Grassley with an amendment in the matter of a substitute without written report.

   4. November 14, 2017 – Received by the House of Representatives.

   5. January 29, 2018, 5:00 p.m. – Congressman Ted Poe (TX) moved to suspend the Rules and pass the bill as amended.

   6. January 29, 2018, 5:01 p.m. – The House proceeded with forty minutes of debate and, at 6:58 p.m., on motion to suspend the rules, passed the Bill as amended. (406 to 3).

   7. January 30, 2018 – The Senate concurred on House amended Bill.

   8. February 7, 2018 – the Bill was presented to President Donald Trump, who signed it into law on February 14, 2018, effective immediately.

48. In the congressional hearings and debates in both the Senate and House, the message was clear behind the urgency, need, and importance of this landmark legislation to address "the epidemic of child abuse in the United States." The bill, as passed by the Senate, institutes important and minimally necessary measures to ensure the protection of children from abuse in sports:

   1. Mandatory reporting of child abuse to Safe Sport and the authorities. Many states do not mandate such reporting and, therefore, the bill fills the need;

   2. A rule against retaliation for those who report suspected abuse;

   3. A limitation on coaches and other adults from taking a child to a place that is not observable by others; and

4. For the first time, makes amateur sports organizations accountable for the abuse of children.

49.     To accomplish the stated goal protecting of minor athletes, the Safe Sport Act first amended the Victims of Child Abuse Act of 1990 (34 U.S.C. § 20341) by extending the requirement of reporting suspected child abuse, including sexual, to "covered individuals," who learn facts that give reason to suspect that a child has suffered an incident of child abuse, including sexual abuse. The "covered individuals" shall report as soon as possible. The term "as soon as possible" means within a 24-hour period. The act defines "covered individual" as an adult who is authorized by a National Governing Body, a member of a National Governing Body, and an amateur sports organization that participates in interstate or international amateur athletic competition, to interact with a minor or amateur athlete at an amateur sports organization facility or at any event sanctioned by a National Governing Body, a member of a National Governing Body, or such an amateur sports organization." *See* Sec. 1010. Required Reporting of Child Sexual Abuse. (a) Reporting Requirements – Section 226 of the Victims of Child Abuse Act of 1990, 34 U.S.C. § 20341, as amended.

50.     Likewise, the Safe Sport Act amended the Ted Stevens Olympic and Amateur Sports Act of 1978 ("1978 Ted Stevens Olympic Sports Act"), which was an Act to incorporate the United States Olympic Association and to promote and coordinate athletic activity in the United States, to recognize certain rights for the United States athletes, to provide for the resolution of disputes involving NGBs, and for other purposes. It expanded the purpose of the U.S. Center for Safe Sport to:

1. Serve as the independent national safe sport organization and be recognized worldwide as the independent safe sport organization for the United States;

2. Exercise jurisdiction over the corporation, each national governing body, and each paralympic sports organization with regard to safeguarding amateur athletes against abuse, including emotional, physical, and sexual abuse in sports;

3. Maintain an office for education and outreach that shall develop training, oversight, practices, policies, and procedures to prevent the abuse of amateur athletes participating in amateur athletic activities through national governing bodies and paralympic sports organizations.

**D.     USA Baseball**

51.     Since 1978, USA Baseball has been the National Governing Body for the sport of baseball. It represents the sport in the United States as a member of the U.S. Olympic & Paralympic Committee and internationally as a member federation of the World Baseball Softball Confederation.

52.     Nearly every major national amateur baseball organization in America, including Little League Baseball, is united as a USA Baseball National Member Organization. As a result, USA Baseball governs more than 15.6 million amateur players in ballparks and playgrounds across the country.

53.     In 2018, USA Baseball launched BASE (Baseball Athlete Safety Education) as its zero-tolerance campaign for any type of abuse within the sport of baseball. USA Baseball publicly acknowledges,

> [O]ver the course of the last few years, we have seen abuse of minor athletes within the U.S. Olympic family come to the forefront. Too many athletes went unprotected from predators within their sport, which led to the creation of Senate Bill 534. Through SB534 and the governance of the U.S. Center for SafeSport, there are many policies now in place to ensure minor athlete well-being is at the forefront of every sport.

54.     USA Baseball not only provides a "**background check solution and FREE education and training to meet the requirements set out by law, but also provid[es] a way for organizations to easily track who has completed both components, thus making them**

23

**compliant with the law.**" While USA Baseball "executive staff and national team personnel are required to complete the U.S. Center for SafeSport Core Courses to satisfy the educational requirements of SB534, **USA Baseball has created two of its own FREE Abuse Awareness online courses – one for adults and one for minors – for the general public."** By successfully completing a standard background check and the Abuse Awareness Course for Adults, an individual will receive a BASE Compliant designation.

55.     USA Baseball is comprised of three levels of member organizations, including National Sports Organizations for youth, National Sports Organizations not specifically designed for youth, and general membership. USA Baseball's By-Laws outline its membership. Little League Baseball is a National Member Organization of USA Baseball.

Section 3.4 of USA Baseball's Bylaws states:

Requirements: Any member, including officers, directors and any person authorized by any member to perform any action or engage in any activities that makes such a person a "Covered Individual" under the terms of Public Law No. 115-126, "Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017" (herein "P.L. No. 115-126").

Section 3.4.1. Be familiar and in compliance with the provisions of P.L. No. 115-126, and specifically (a) Reporting to law enforcement, including, but not limited to agencies designated by the Attorney General, any allegations of child abuse of any amateur athlete who is a minor; and (b) Implementing the training, oversight practices, policies and procedures required of amateur sports organizations by P.L. No. 115-126 and promulgated by USA Baseball in accordance with P.L. No. 115-126.

Section 3.4.2. report, implement, and require of its members a program designed to comply with the requirements of P.L. No. 115-126 such as USA Baseball's Pure Baseball or an equivalent as approved by USA Baseball.

Section 3.4.3. regularly review and update its own programs to comply with the provisions of P.L. No. 115-126 and to take any action required by amendments to that law and provide information and resources to its members to enable them to do the same.

Section 3.5 Each member shall affirmatively represent its compliance with these requirements (in Section 3.4) to the Board of Directors of USA Baseball at least annually.

56.     In response to the passage of the Safe Sport Act, USA Baseball, the NGB for the sport of baseball, and with the support of the U.S. Center for Safe Sport, implemented mandatory policies for the prevention of sexual abuse and violent crimes within baseball organizations entitled "Pure Baseball by USA Baseball, Pure Baseball Policies and Procedures ("USA – Pure Baseball").

**E.      USA - Pure Baseball**

57.     USA – Pure Baseball defines National Member Organizations as a member organization of USA Baseball. At all relevant times, Little League Baseball was and currently is a NMO of USA Baseball.

Pure Baseball mandates:

1. National Member Organizations to report to USA Baseball any individual they have banned or suspended for any reason;

2. At minimum, individuals working with a NMO will be required to undergo a background check that searches the criminal Database as well as the National Criminal Database as well as the National Sex Offender Registry;

3. NMO education policy "By virtue of Senate Bill 534 (2017), individuals working with a NMO are required to complete abuse awareness training. Individuals must complete the Abuse Awareness course developed by USA Baseball unless the NMO has certified they are providing some comparable training for its members."

4. Additionally, Pure Baseball requires NMOs enforce a zero-tolerance policy, prohibit inappropriate one-on-one interactions by specifying prohibited one-on-one interactions to set clear boundaries of acceptable and unacceptable behavior to protect minor athletes and all participants.

5. Pure Baseball states adults who have regular contact with minor athletes shall not interact one-on-one with unrelated minor athletes in settings outside the training program (restaurant, travel, hotels, etc.).

6. Pure Baseball prohibits social media connections with minor athletes (are not permitted), emails must be professional in nature and for the purpose of

communicating information about team or sport events and the parent/legal guardian must be copied when communicating with a minor's email. Text messages must be professional in nature and cannot be sent to one individual minor athlete; must go to the entire team or must have additional adult included.

58.     The Safe Sport Act has effectively authorized federal "rules of best practice" for amateur athletic organizations through the designated National Governing Body with the support of the U.S. Center for Safe Sport by implementing policies and procedures for the prevention of sexual abuse and violent crimes in sports nationwide.

**F.     Mandatory Training**

59.     The foundation of child abuse prevention is mandatory training. From at least 2017 to 2020, Little League Baseball acknowledged in its Official Rulebook that education is the "most important" tool in combating child abuse; nonetheless, it failed to require such training/education and failed to monitor and enforce compliance. Training requires not only the identification of those who may already have been victimized by abuse with a list of indicators, but more importantly, teaches how to prevent sexual abuse from occurring. In other words, the training must be proactive rather than reactive. The most essential part of proactive training is to learn the process of sexual grooming of *both* minor victims and parents/guardians. Seventy-five to eighty-five percent of all sexual abuse cases in the United States are committed by an individual familiar to the victim who groomed the victim before, during, and after the abuse.

**G.     Grooming**

60.     Grooming is the process or method predators use to gain access to and prepare future victims to be compliant with abuse. The goals of grooming are (1) to gain initial cooperation of the victim; (2) decrease the likelihood of discovery; and (3) increase the likelihood of future contact. Generally, sexual grooming has five recognized stages: (1) victim selection; (2) gaining

access and isolating the child; (3) trust development; (4) desensitization to sexual content and physical contact; and (5) maintenance following the abuse. The key to preventing the grooming process is to train all participating adults in a sports organization on understanding how grooming works, identifying when grooming is occurring, and how to take appropriate action to interrupt and to intervene. All of this training is absolutely necessary because individuals cannot identify predators simply from their appearance. Thus, parents and adult participants must be trained to recognize predators' behavioral patterns.

61.     The Safe Sport Act and USA – Pure Baseball address the grooming process by establishing an Appropriate One-On-One Interaction Policy as well as a Prohibited One-On-One Interaction Policy. "While some one-on-one interactions may be necessary, specifying prohibited one-on-one interactions provides staff, volunteers, parents, minor athletes, and others with clear rules and expectations for athletes' safety. **It is important to set clear boundaries of acceptable and unacceptable behavior to protect minor athletes and all participants.**" This policy applies to adults who have regular contact with minor athletes.

62.     Appropriate One-On-One meetings must occur where interactions can easily be observed and at an interruptible distance from another adult. Individual training sessions with a minor athlete's training session should be open and observable by others. Written permission is required from parents/guardians.

63.     Prohibited One-On-One interactions state that adults who have regular contact with minor athletes **SHALL NOT** interact one-on-one **"in settings outside training programs"** (USA – Pure Baseball). In other words, the adult shall not interact with minor child in a car, camping tent, camping trailer, hotel room, restaurant, traveling, at any time. The language used—"shall not" interact one-on-one "in settings outside training programs"—is not limited in time or location. In

27

fact, the corporate representative of LLB admitted that the prohibited one-on-one interaction is not limited in time or location.

> **Q**: [D]oes [LLB] think that it's permissible for a coach to go take a couple of boys to a camp, a trailer in a camp, during **off-season** and during the regular season?
> **A**: No.

LLB knew that the documented and studied reason for this one-on-one prohibition is because part of the recognized stages of grooming include gaining access to and isolation of the child. The predator/pedophile will groom the child in the context of baseball and attempt to isolate the intended victim elsewhere. Once abuse occurs, the sport (here, baseball) is used to reinforce, reassure, or even enforce the "maintenance" of the victim. The nexus for the abuse is the sport and the authority and power of a president/coach/adult over the child athlete. Pedophiles, including Adam Isaacks, follow a predictable and reliable pattern. This is precisely the reason behind the rules regarding prohibited one-on-one interactions. If Plaintiffs had been made aware of the prohibited one-on-one interactions, they would not have allowed their children to interact with Adam Isaacks under the prohibited circumstances outlined above, and Adam Isaacks' abuse and grooming would have been stopped in its tracks and would not have happened.

64.     Had Plaintiffs as well as other parents, volunteers, and/or minor athletes been trained/educated on grooming of minors and parents, prohibited one-on-one interactions, social media and electronic communication, the Child Protection Plan, USA – Pure Baseball, Abuse Awareness, or other child safety rules, they would have followed such rules/policies and identified the red flags and concerning behavior exhibited by Adam Isaacks and, in turn, would have intervened to protect the minor Plaintiffs. Likewise, had Plaintiffs as well as other parents, volunteers, and minor athletes been warned that Little League Baseball had been infiltrated by child sexual predators in positions of authority (e.g., presidents, coaches, district administrators)

in districts and Little Leagues nationwide, they would have been on heightened alert. Additionally, had Plaintiffs been given the "Warning Signs of a Seducer" or similar warnings, they would have been armed with information to protect themselves and their children from child sexual abuse and the abuse of the minor Plaintiffs would not have happened.

**H.**     **Social Media, Emails, and Texts**

65.     In further addressing the grooming process, USA – Pure Baseball mandates that (A) adults who have regular contact with minor athletes are **not permitted** to maintain social media connections with minor athletes. "Existing social media connections with amateur athletes who are minors **shall be** discontinued" and adults are **not permitted** to accept any new personal page requests on social medial platforms who are minors; (B) A Text Message **cannot** be sent to one individual minor athlete, must go to the entire team, or must have an additional adult involved. All text messages must be professional in nature and for the purpose of communicating information about team or individual sports events; (C) Emails must be professional in nature and for the purpose of communicating information about team or individual sports events. An adult **must be** copied when communicating with a minor athlete through email; (D) And finally, USA – Pure Baseball states "electronic communication **must** only be sent between the hours of 8:00 a.m. and 8:00 p.m." If Plaintiffs had been made aware of rules surrounding social media and electronic communication, they would not have allowed communication that deviated from these guidelines, thus preventing Adam Isaacks from grooming, further grooming, and ultimately sexually abusing their children.

66.     Had Plaintiffs as well as other parents, volunteers, and/or minor athletes been trained/educated on grooming of minors and parents, prohibited one-on-one interactions, social media and electronic communication, the Child Protection Plan, USA – Pure Baseball, Abuse

Awareness, or other child safety rules, they would have followed such rules/policies and identified the red flags and concerning behavior exhibited by Adam Isaacks and, in turn, would have intervened to protect the minor Plaintiffs. Likewise, had Plaintiffs as well as other parents, volunteers, and minor athletes been warned that Little League Baseball had been infiltrated by child sexual predators in positions of authority (e.g., presidents, coaches, district administrators) in districts and Little Leagues nationwide, they would have been on heightened alert. Additionally, had Plaintiffs been given the "Warning Signs of a Seducer" or similar warnings, they would have been armed with information to protect themselves and their children from child sexual abuse.

## I.      **LLB, Incorporated**

67.    Little League Baseball is a federally chartered corporation created in 1964. 36 U.S.C. § 130501 *et seq*. The stated statutory purposes of Little League Baseball are (1) to promote, develop, supervise, and voluntarily assist in lawful ways the interest of young people who participate in Little League Baseball; (2) to help and voluntarily assist young people in developing qualities of citizenship and sportsmanship; and (3) using the disciplines of the native American game of baseball, to teach spirit and competitive will to win, physical fitness through individual sacrifice, the value of team play, and wholesome well-being through healthy social association with either youngsters under proper leadership." 36 U.S.C. §§ 130501, 130502.

68.    The Board of Directors is the governing body of Little League Baseball. Between meetings of the corporation, the board is responsible for the general policies and programs of Little League Baseball. The board is responsible for the control of all funds of Little League Baseball. The number of directors, their manner of selection (including the filling of vacancies), and their terms of office are as provided in the constitution and bylaws of LLB, Incorporated. The board shall have at least 13 directors.

69.     Officers – The officers include a chairman on the board of directors, a president, a vice president, and a secretary-treasurer. Their duties are as provided in the constitution and bylaws. The officers shall be elected annually at the annual meeting. 36 U.S.C. § 130504 (Governing Body).

70.     Little League Baseball may adopt and amend a constitution and bylaws for the management of its property and the regulation of its affairs; choose directors, officers, trustees, managers, employees, and agents as the activities of the corporation require; make contracts; acquire, own, lease, encumber, and transfer property as necessary or convenient to carry out the purposes of Little League Baseball. Additionally, Little League Baseball can charge and collect membership and subscription fees and sue and be sued. 36 U.S.C. § 130505 (Powers).

71.     Little League Baseball has the exclusive right to use and to allow others to use the names "Little League" and "Little Leaguer" and the official Little League emblem or any colorable simulation of the emblem. 36 U.S.C. § 130506 (Exclusive Right to Name and Emblem).

72.     Records – Little League Baseball shall keep (1) correct and complete records of account; (2) minutes of the proceeding of its members, board of directors, and committees having any of the authority of its board of directors; and (3) at its principal office a record of the names and addresses of its members entitled to vote. Inspections - A member entitled to vote, or an agent or attorney of the member, may impact the records of the corporation for any proper purpose, at any reasonable time. 36 U.S.C. § 130509 (Records and Inspection).

73.     **Little League Baseball** shall include in the audit report required under § 10101 (b)(1)(B) of this title a schedule of all contracts requiring payments greater than $10,000.00 and all payments of compensation or fees at a rate greater than $10,000.00 a year. 36 U.S.C. § 130510 (Statement Required in Little League Baseball, Incorporated Audit Report). Little League Baseball

31

is liable for the acts of the officers and agents acting within the scope of their authority. 36 U.S.C. § 130512 (Liability for Acts of Officers and Agents).

**J.**      **Little League Baseball Official Regulations, Playing Rules, and Operating Policies**

74.      Every year Little League Baseball produces "the Official Regulations, Playing Rules, and Operating Policies" for all divisions and leagues of Little League Baseball. Solely for the use of baseball programs chartered with LLB (chartered little league programs), and only for the calendar year designated on the cover. "All other use is prohibited, including use the leagues not chartered by Little League Baseball, Incorporated."

75.      "Any and all challenges to the meaning or applicability of the above referenced Official Regulations, Playing Rules, and Operating Policies, unless specifically stated otherwise herein, shall be interpreted and decided by Little League Baseball, Incorporated in its sole discretion and such determination shall be final and binding." "Note that any changes, updates, or correction to these Official Regulations, Playing Rules, and Operating Policies will be communicated to chartered Little League programs and District Administrators."

76.      The Official Regulations, Playing Rules, and Operating Policies of LLB states, "**Little League Baseball, Incorporated**, more commonly referred to as 'Little League' is a federally chartered corporation to which congress has granted the exclusive right and ownership of the following trademarks, secured marks, and other designations: Little League, Little Leaguer, Little League Baseball, Big League Little League Baseball, LL, LLB, and the little league emblems or logos. Collectively, these are referred to as the Little League Trademarks, which identify the program, its products, and its services in the United States and other countries including Mexico, Canada, Japan, Australia, among others."

32

77.     **LLB** instructs local leagues that they receive permission per the annual charter agreement process to use Little League Trademarks in connection with authorized local league activities as described in the OFFICIAL REGULATIONS or the OFFICIAL RULES of the Little League Rulebook. This permission is only effective while a league remains chartered.

## K.   <u>Charter – Local Little Leagues</u>

78.     Pursuant to the Rules and Regulations of LLB, every year any local Little League interested in operating a Little League Baseball program must submit an annual charter application. LLB defines a "charter" as "a written contract/agreement between Little League Baseball, Incorporated and the Board of Directors of the local organization." "It is a legal contract committing the local Board of Directors to strict adherence to Little League rules, regulations, and policies under any and all circumstances."

## L.   <u>League Charter Agreements</u>

79.     Specifically, the Charter Agreement with Little League Baseball states in part,

1. I hereby represent and warrant that I am a duly elected officer, either a President, Vice President, Treasurer or Secretary of the organization listed herein, with complete signing authority to bind the organization listed herein to the terms of this agreement.

2. I acknowledge and agree that this application requires an annual affiliation fee which I understand will be refunded if the charter is not granted, if accepted, I pledge myself and my local Little League organization to strict compliance with all Little League Rules, Regulations, and Operating Policies of Little League Baseball, Incorporated under any and all circumstances.

3. I hereby acknowledge and agree that Little League is the sole and exclusive owner of all funds, property, and trademarks acquired by my organization at any time in the name of Little League and that all of these funds and property will be devoted solely and exclusively to Little League purposes.

4. In the event that any dispute, infraction controversy, or dissatisfaction that may arise in connection with the charter hereby

applied for, I hereby acknowledge and agree on behalf of the league mentioned, to accept the decision of the charter committee as final and binding.

5. I agree that all charter committee decisions will be made by Little League Baseball, Incorporated in Williamsport, P.A. It is hereby acknowledged and agreed that our league recognizes the needs of Little League Baseball, Incorporated to raise the necessary funds for its annual operations from corporations and businesses via sponsorships, royalties, and donations and that such revenues benefit local little league programs.

6. Accordingly, I hereby make application for a charter and for the right to conduct a baseball and softball program under the name "Little League" for the year indicated.

7. We acknowledge that we have read and will comply with the volunteer screening and charter agreement. Application will not be processed if both signatures are not present.

80.     The LLB Charter Application and Insurance Enrollment Form includes on insurance application form with premiums predicated upon the number of teams within the league divisions. "All little league programs are required to carry accident and general liability insurance either by purchasing that insurance through the insurance program offered to all little leagues or by providing proof of local coverage. If a league chooses to submit proof of local coverage, "**Little League Baseball, Incorporated** must be listed as an additional insured."

81.     "If you would like Little League to review your current coverage, please email a copy of the declaration page of your policy. We will review your coverage and provide you with information on any changes that need to be made to that coverage to meet Little League insurance requirements for Leagues stated in Little League's Regulation 1(c) (8, 9)."

**M.**     **Volunteer Screening Agreement Local Little Leagues**

82.     In addition to the charter application, local leagues must submit:

1.   A local league constitution;

2.   A boundary map;

3.   The official list of local league board members. This listing must include: full name, position on board, mailing address, street address, day and evening telephone numbers, e-mail address **which is entered into the Data Center data base.**

**N.**     **Local League Constitutions**

83.     LLB **requires** every local little league to have a "constitution" as a condition precedent for a local little league to be chartered each year and provides a sample of a "Little League Constitution" to be executed by the local league. Regardless of whether the local league uses the sample or attempts to draft its own constitution, **Little League Baseball** must approve it before granting the charter allowing participation in the regular season and post season.

84.     The "Sample Constitution" contains a "membership" section which includes various classes of membership, (a) Player Members, (b) Regular Members, which include managers, coaches, volunteers, umpires, board members, officers of the Board, and any other person who is recognized by the Board as a volunteer in the local league including volunteers listed below: "team parent, equipment manager, coaching coordinator, sponsorship/fundraiser manager, information officer, groundskeeper, concessions manager, umpire-in-chief, etc., . . . (d) as used hereinafter, the word "member" shall mean regular member unless otherwise stated."

85.     Other affiliations – "Regular Members should not be actively engaged in the promotion and/or operation of any other baseball/softball program."

86.     The sample constitution has Articles for Dues for Regular Members (Not Players), General Membership Meetings, Board of Directors, Duties and Powers of the Board, Executive Committee, Affiliation, Financial and Accounting, and Amendments.

87.     The Affiliation Article states –

Section 1: Charter: the local league shall annually apply for a charter from Little League Baseball, Incorporated and shall do all things necessary to obtain and maintain such charter. The local league shall devote their entire energies to the activities authorized by such charter, and it shall not be affiliated with any other program or organization or operate any other program.

Section 2: Rules and Regulations: "The official Playing Rules and Regulations as published by Little League Baseball, Incorporated, Williamsport, Pennsylvania shall be binding on this local league."

Section 3: Local Rules, Ground Rules, and/or Bylaws: "the local rules, ground rules, and/or bylaws of this local league shall be adopted by the Board of Directors at a meeting to be held not less than one month previous to the first scheduled game of the season, but shall in no way conflict with the Rules, Regulations and Policies of Little League Baseball, Incorporated nor shall they conflict with this constitution. The local rules, ground rules, and/or bylaws of this local league shall expire at the end of each fiscal year and are not considered part of the constitution (see article x) section 7 for fiscal year of the league)."

88.     Article XI – Financial and Accounting contains sections on Authority, Contributing Solicitations, Disbursement of Funds, Financial Transparency, Compensation, Deposits, and Fiscal Year.

Section 3: <u>Solicitations</u> states "The Board shall not permit the solicitation of funds in the name of Little League Baseball, Incorporated unless all of the funds so raised be placed in the local league treasury."

Section 4: <u>Disbursement of Funds</u> states, "The Board shall not permit the disbursement of local league funds for other than the conduct of Little League activities in accordance with the Rules, Regulations, and Policies of Little League Baseball, Incorporated. All disbursements shall be made by check, or league credit or debit card. All checks shall be signed by the local league's treasurer and such other officer or officers, or person or persons, as the Board of Directors shall be determined.

89.    Article XII – <u>Amendments</u> states in part: "This constitution may be amended, repealed, or altered in whole or in part by a majority vote at any duly organized meeting of the Members provided notice of the proposed change included in the notice of such meeting. **Drafts of all proposed amendments shall be submitted to Little League Baseball, Incorporated, and approved before implementation.** Make one copy for the District Administrator and copies for the local league. Send original to Regional Headquarters. The local league's constitution on file at Regional Headquarters (most recently accepted copy) is the official constitution of this local league."

**O.    Little League District Administrator Organization Plan**

90.    An integral part of Little League Baseball is the District Administrator Organization Plan across the United States. The District Administrator system was authorized by the "International Board of Directors" in 1955. As stated in LLB's District Administrator Handbook and Operating Manual (emphasis added):

a. The full effectiveness of a District Administrator in service to the league and *as **an *authorized representative*** of Little League Headquarters is lost unless there is a plan.

b. The purpose of a District Organization Plan is to establish a long-range effort to consolidate gains that have been made in the area of field representation since the first congress in 1956.

c. Its objective is to provide help for the elected District Administrator and to establish a strong position in the community and in the areas in which the leagues of the district are located. In effort, it would bring **Little League and the District Administrator** into an improved position of importance and stature.

**P.**   **International Congress Little League Baseball and Softball**

91.   The first congress was held in March 22-24, 1956, in Chicago, Illinois, with the stated purpose of giving field personnel a voice in the affairs of Little League. **The need was recognized because of the expertise that could come only from individual in leadership roles who have direct contact with children in the day-by-day execution of the program in a local environment.**

92.   Regarding the Procedure for Agenda (Congress), "All Leagues and District Administrators are invited to send recommendations to the Rule Committee. This committee tabulates subjects and prepares Agenda of Subjects with greatest interests by field personnel. The Congress delegates (DAs or their approved alternatives) vote on subjects after deliberation in round-table workshop format with a moderator."

"The final vote at a General Assembly, results in referral to '**the International Board of Directors**' for implementation into Rules, Regulations, or Policy Statements, depending upon nature and status or purpose of items."

**Q.**   **Other Functions of Congress**

a. Each Region holds a meeting at the congress, usually to discuss tournament and/or other appropriate subjects.

38

    b.    Expense of delegates are handled through as escrow (special) fund, created by part of the charter fee for teams chartered in the Little League program.

    c.    Part of this added income will go into this Congress account to reduce the deficit in that fund. It should be noted that this special account is used only for Delegates' expenses (not staff).

    d.    Educational opportunities are made available to Delegates, and others, at the Congress. These are upturned subjects. There are many exhibits of equipment and supply items. Entertainment and fellowship experiences are important also.

    e.    The Congress usually convenes every four years by current schedule. This schedule assures that each District Administrator could have the opportunity to attend one or more congress sessions.

### R.    Authority of District Administrator

94.    Authority as defined and discussed in Little League Baseball publications is extended to the District Administrator, generally upon election to that office by representatives of the chartered local little leagues assigned to a specific district within a state but are limited to the proper and current interpretation of published LLB Rules, Regulations, and Policies, which govern the entire Little League Baseball and Softball Program.

95.    District Administrators are given authority and responsibility to uphold and enforce the Rules, Regulations, and Policies of LLB on the local leagues within their District. To accomplish this objective, the District Administrators are instructed that they must consult and counsel with each league's administrative officials on "a regular and frequent basis."

96.    "Violations of any Nature by a local little league which are identified by the District Administrators and confirmed by the Regional Director may result in censure, suspension of charter, privileges (such as Tournament participation and/or post-season play), or loss of charter, as determined appropriate by the Charter Committee **'at Little League International.'"**

97.    "District Administrators **are required** to file with Regional Director (LLB, Incorporated), a report annually, to include recommendations regarding:

    a.   Any league currently on suspension;

    b.   Any league with a pending action that might affect the issuance of a charter for the ensuing season of play

98.    This report must include the current findings, conditions, and any other related facts about the league's operation, and may include a recommendation to issue or withhold a charter for the ensuing season, or until corrective action is taken by the local league.

99.    The final decision regarding granting of a charter is vested in and remains solely a responsibility of the charter committee **at Little League International.**

100.    LLB has divided each state in the United States into numbered districts within a regional office structure. There are five (5) regional offices. The Southwestern Regional Office is located in Waco, Texas.

## S.    <u>Texas District 12 Little League</u>

101.    Texas is positioned within the Southwest Region of Little League Baseball. In Texas, there are approximately thirty-eight (38) Little League Districts. District 12 in Texas includes approximately sixteen (16) Little Leagues, including ELL.

102.    Each of the Little League Districts are given authority and responsibility by Little League Baseball to represent Little League Baseball in all matters pertaining to the operations and safety of "our Little League Programs." LLB directs, manages, and controls the executives, presidents, boards of directors, and coaches for each District and each Little League, including ELL.

103.    Each District within the organizational structure of Little League Baseball has a District Administrator and a District Staff who are selected by and perform their job functions pursuant to rules and procedures mandated by LLB.

104.    District 12 collects assessments from its constituent leagues.

**T.    <u>District Administrator</u>**

105.    LLB defines the responsibilities of the District Administrator as follows:

The District Administrator has been elected by the League Presidents to serve the operational needs of the district and is expected to understand the tasks that must be accomplished to move the district forward.

Little League Baseball defines the role of the District Administrator as:

The District Administrator is the liaison between the local leagues, the regional center, and the **Little League International**.

106.    LLB instructs the following regarding appointing Assistant District Administrators:

No District Administrator is expected to manage a District without help. It is important to choose wisely, selecting volunteers to serve on the District Staff.

LLB further instructs:

A District Staff will be appointed annually and is responsible for maintaining and servicing the local leagues in the District. The District Staff which may be comprised of current or former local league officials/members of the Board of Directors with representation from a majority of the leagues.

107.    District 12 Little League was required to have at all times relevant to the assaults and abuse of the Evadale Little Leaguers, a District Administrator and a District Staff compromised of positions of a Secretary, ADA Baseball, UIC Baseball, Umpire Consultant Baseball, ADA Softball, ADA Softball, UIC Softball, Umpire Consultants Softball, Treasurer, and Safety Officer.

108.    Little League Baseball mandates that:

41

There are a minimum of eight standards designed to sustain and enhance a District Administrator's ability to support and lead the local leagues he or she has been elected to serve.  These standards become the tenets of effective District Administrators and service to local leagues. **All District Administrators will sign a letter agreement as an indication of their intent to provide the highest level of consistent quality service.**

109.    The eight minimum standards are listed by LLB as:

    1) District Organization Structure;
    2) Communication and Responsiveness;
    3) Meetings;
    4) Education;
    5) League Reporting/Monitoring;
    6) Management of the International Tournament;
    7) Financial; and
    8) A Safety Awareness Program (ASAP).

## U.    ASAP: A Safety Awareness Program

110.    LLB acknowledges that "safety is a responsibility." "The very fact that it is a basic principle of Little League to provide an opportunity for most of the youngsters who sign up for a team to receive these benefits, multiplies the exposure to accidental injury. Having accepted this large group of children, **we must also accept the moral responsibility for their safety**. This obligation rests with every adult member of the league organization as well as with inactive parents who have entrusted their children to us. The full use of ASAP is the best way for local little leagues and districts to make the games safer. Besides the obvious benefits in direct savings to the leagues, statistics show that those areas taking full advantage of ASAP have far lower injury rates. As a result, it is vital that each District Administrator strives for 100% participation within his or her district. **Anything less is a disservice to the children of Little League.**" (emphasis added).

111.    "OTHER RESOURCES – In addition to our basic moral responsibility, other significant reasons for an organized effort to prevent accidents are to:

    1. Stimulate public confidence in this high caliber youth program.
    2. Hold insurance costs to a minimum.

42

3. Reassure parents as to the safety of their children.
4. Develop safety awareness for their protection later in life.

112. A continuing accident-prevention program is built on the two key positions: a District Safety Officer and a League Safety Officer. Their services are needed because a safety program in a large volunteer organization such as Little League requires direction and coordination. This can be accomplished best by the efforts of conscientious individuals having accident prevention as their main responsibility.

113. "ASAP INCENTIVES – DISTRICT ADMINISTRATOR INCENTIVES – Submission and Approval by April 1:

Districts with league participation in the ASAP Safety Awareness Program reaching the following participation levels will receive money credited on their district accounts provided the participating leagues submit a safety plan that meets **all 15 of** the ASAP requirements along with the fully completed ASAP registration form and is approved PRIOR to March 13. This reward is available even if the district achieved a participation level of 90 percent to 100 percent in the past. 87% to 100% league participation receives $350 credit. 70% to 86% league participation in ASAP receive $150 credit."

114. **ASAP REQUIREMENTS -**

Safety Program **15** Requirement Overview:

1. Have a safety officer on file at Little League International;
2. Make safety plan accessible to coaches, managers, board members and any other volunteer in the league;
3. Post and distribute emergency and league officer phone numbers;
4. Require volunteers to complete and submit the Official Little League Volunteer Application;
5. Provide fundamentals training;
6. Provide first-aid training;
7. Require field inspections before games and practices;
8. Complete the annual Facility Survey;
9. Post and utilize concession stand procedures;

43

10. Regularly inspect and replace equipment as needed;
11. Have a procedure for reporting accidents/injuries;
12. Require First Aid Kits at all league events;
13. Enforce Little League Rules & Regulations;
14. Submit League Registration Data for players, coaches, and managers; and
15. Complete survey question in LL Data Center.

## V.    Foreseeability

115.    Little League Baseball, by and through its designated "Corporate Representative," has admitted that predators are and will be drawn to its activities involving minor athletes and admits that over the years, pedophiles have infiltrated Little League Baseball's districts and local little leagues as volunteers and have sexually abused players. Indeed in 1999, Sports Illustrated published a Special Report entitled *Every Parents' Nightmare* which discusses the grooming of players and parents by the predators and the sexual assault of little leaguers by coaches, umpires, and other adults involved in little league baseball. The article warns "youth sports are a ready-made resource pool for pedophiles, and we better get our heads out of the sand before we ruin the game."

116.    LLB admitted that Little League players have the right to expect to be safe from sexual abuse while playing the Little League program and admitted that child sexual abuse would be catastrophic for the children who would suffer life-altering, long-term effects.

## W.    The Voice in the Wilderness

117.    The Safe Sport Act was filed March 6, 2017, and was signed into law on February 14, 2018, effective immediately. On July 1, 2018, Little League Baseball promoted its Liability and Crime Coordinator to the position of Little League Security Manager and charged her with the responsibilities of putting a protection plan together for all Little Leaguers in the United States.

118.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████ The Security

Manager testified that senior management made the decision to "highly encourage" Abuse

Awareness training rather than require it as mandated by federal law and USA – Pure Baseball.

██████████████████████████████████████████████████

██████████████████████████████████████████

119.    The Security Manager felt that Abuse Awareness training of Little League

volunteers was not only necessary and critical to the prevention of child abuse, but also, it

was required under the mandates of USA – Pure Baseball and the Safe Sport Act. She consulted with

outside sources for help in persuading senior management to follow the law and standards for

protecting minor athletes. Senior management, including CEO Stephen Keener, COO Pat Wilson,

CMO Liz Brown, and other Little League Baseball officers refused—despite the fact that they

knew and were being advised that Abuse Awareness training was mandated by the U.S. Congress.

Abuse Awareness training was and is absolutely necessary in any child abuse prevention program

or plan. Indeed, in several versions of its Official Rulebook up to and including the 2020 Rule

Book, Little League Baseball acknowledged that training/education is "the most important" tool

in preventing child sexual abuse—an express recognition of the effectiveness of training and

education in preventing such abuse. Nevertheless, Little League Baseball failed to require such

training/education and failed to monitor and enforce compliance. Its decision not to mandate

training was predicated upon money and self interest in avoiding accountability and protecting the

"Little League" image rather than the Little Leaguers.

120. ███████████████████████████████████████████

███████████████████████████████████████

121.    In February 2019, the Security Manager emailed the Safe Sport Compliance Director regarding LLB obtaining certificates online for the volunteers of local Little Leagues as part of the mandatory program with USA – Pure Baseball. She agreed that there was no question of whether the training was mandatory; rather, the only question was whether such training must be completed annually. The Security Manager was told by the Director of Compliance that for now, having the training completed once satisfies the requirement.

122. ███████████████████████████████████████████

████████████████████████████████████████████

███████████████████

██████████████████████████████████████

████████████████████████████

123. ███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

124. ███████████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████████

████████████████████

125.    The Security Manager testified that Prohibited One-on-One Interaction Guidelines include the following: volunteers should not interact one-on-one with unrelated minors in settings outside the regular scope of the official Little League Program (e.g., the volunteer's home, a restaurant, a vehicle, personal communications including electronic communication). This guideline is mandatory.

126.    The Security Manager further testified that grooming is a part of abuse, including sexual abuse, and that there are warning signs of a predator/seducer. In LLB's document entitled, "A Parent's Guide to the Little League Child Protection Program"—a document not distributed to the parents or volunteers of Evadale Little Leaguers—there is a list of the "Warning Signs of a Seducer." While each sign (below), taken alone, may mean very little, taken as a group, the signs may indicate a particular individual is a child sex offender:

1. Provides unwarranted gifts, trips, affection and attention to a specific child or small group of children
2. Seeks access to children
3. Gets along with children better than adults
4. "Hangs" around children more than adults
5. Has items at home or in vehicle specifically appealing to children of the ages they intend to molest, such as posters, music, videos, toys, and even alcohol or drugs
6. Displays excessive interest in children (may include inviting children on camping trips or sleepovers)
7. Single, over 25 years old (but could be married, sometimes as a "cover" and could be any age)
8. Photographs or videotapes children specifically
9. Lives alone or with parents
10. Refers to children as objects ("angel," "pure," "innocent," etc.)
11. Manipulates children easily.

127.    The Security Manager agreed that the aforementioned list of warning signs is a part of the grooming process.

128.    The Security Manager stated that the mandatory reporting of child abuse would include grooming. If an individual witnesses any type of consistent grooming, that person should give the information to law enforcement, child protection services, and Little League Baseball and Softball. Further, the Security Manager testified that a District Administrator should not allow text messages, telephone, or social media, between a coach and a child.

129.    In developing an Abuse Prevention Model, the Security Manager agreed that (A) training and equipping sports administrators, (B) providing leadership, and (C) providing support to sports organizations are critical factors influencing the successful implementation of measures and management of sexual abuse in sports organizations. Indeed, a proper and effective prevention model includes two elements: (A) preventative measures and (B) case management measures.

(A) Preventative Measures include the creation of (1) External Barriers including individual screening with background checks to prevent access into the organizations and **(2) Internal Barriers include (a) "*training*, *informing*, and *raising awareness* among sports stakeholders" and (b) implementing rules relating to behavior management to protect against predators who passed through the external barriers and are now in the organization.**

(B) Case Management Measures include (1) Disciplinary measures and action in case of non-observance, (2) complaint management policies, and (3) disclosure procedures and resources if cases arise.

130.    Experts on preventing child sexual abuse agree that the aforementioned measures, particularly training/education and warnings to parents and volunteers, will prevent child sexual abuse. Indeed, Little League Baseball had within its documents, studies confirming that training, education, warnings will prevent child sexual abuse. Accordingly, had Defendants implemented

such measures, warned participants and parents, and enforced relevant policies and procedures, the minor Plaintiffs would not have fallen victim to Adam Isaacks.

131.    The internal operational structure of Little League Baseball is devoid of the necessary leadership and commitment to protect minor athletes (i.e., Little Leaguers) from sexual abuse by implementing *all* aspects of a proper and effective Abuse Prevention Model.

## X.   **Superior Knowledge and Superior Resources**

132.    At all relevant times, Little League Baseball had superior knowledge regarding child sexual abuse within LLB, the prevention thereof, and plentiful resources to combat same.

133.    LLB had the resources, knowledge, and access to third party entities/vendors who possessed statistical data, medical articles, and studies regarding grooming, predators within sports organizations, and the catastrophic damages to a child from even one incident of sexual abuse. LLB had knowledge of and access to historical data from previous incidents of sexual abuse within Little Leagues across the country. Little League Baseball knew of specific instances of alleged sexual abuse by presidents, coaches, district administrators, umpires, and other volunteers.

134.    Published documents report that LLB has yearly revenue well in excess of $25M with less than 100 employees. Little League Baseball has access to funds through grants, advertising revenue, licensing agreements, ESPN contracts, and merchandizing, to name few.

## Y.   **Enforcement**

135.    The Security Manager agreed that "You can have all the rules and regulations in the world, but if you don't enforce them with consequences, then they're meaningless."

Q. I mean, it's like somebody said speeding. If you had speeding limits and nobody gives you the ticket, then people—what are they going to do?
**A. Speed.**
Q. And you have mandatory training, and mandatory one-on-one, and mandatory reporting, and all this information, and nobody's to enforce it—what happens?
**A. They're not going to do it.**

49

Q. …And does that send a message to predators and people that would prey on th[ese] young children that: oh, it's okay to go over here because they're not enforcing those rules and we've got a target rich environment? Would you agree with that?

**A. I would agree.**

Q. And that's in fact, what we have in this case right here is that the federal government passed these laws impacting baseball and other sports and said here are the rules, follow them. Pure Sport did. And you were **the voice in the wilderness**, if you will, telling management you got to do this. You should do this. This is the best practice. And they refused to do it. Would you agree with that?

**A. …Yes.**

136.    Then she agreed that "it was incumbent upon the management of Little League

above you who were given the red flags . . . needed to come down like with a hammer on the

people who weren't following the rules and regulations . . . that's the best practices, isn't it?"

**"Yes."**

Q. …the truth of the matter is, is that the mandatory rules of Pure Baseball goes down to the volunteers at the local level of Little League Baseball, doesn't it?

**A.  …Yes.**

Q. And that was discussed in the building over here at Little League Incorporated, was it not?

**A. …Yes.**

Q. At the higher levels than you. Correct?

**A. Yes.**

Q. Isaacks…They're all over the world for that matter. Would you agree with that?

**A. Yes.**

Q. And that's exactly why you have to put these policies and procedures in place and then enforce them to the limit—to send a message not only to predators, the pedophiles, but also to the people that are down there in the district office, the regional office, and the local leagues.

**A. I agree.**

137.    LLB admitted that when the Security Manager assumed the position of Security Manager charged with responsibilities of the Child Protection Program, Little League Baseball did not maintain a list of individuals or instances of reported child abuse.

Q. Can Little League Baseball give an explanation of that?
**A. I don't have one.**

138.    When the Security Manager assumed her role as Security Manager in June 2018, no list of previous cases of alleged sexual assaults existed at LLB. The "only records" that existed were "hard copies" kept in a storage room. She created a listing of cases that came to her attention and reported those to the U.S. Center for SafeSport. Before the Security Manager left LLB's employ, in what appears to be a hostile work environment, she reported at least four individuals due to allegations of crimes against children:

1.    Current District Administrator, NJ, 11/15/2021

2.    Little League President, NV, 12/30/2021

3.    Adam Isaacks, ELL President and coach, 01/03/2022

4.    Current District Administrator, CA, 01/07/2022

139.    Apart from these cases, Little League Baseball was aware of numerous prior cases involving allegations of child sexual abuse within Little League Baseball.

140.    The Security Manager was not asked to determine whether ELL or District 12 had complied with the mandates of the Safe Sport Act, and it appears that LLB sealed her off from any of the facts and circumstances of ELL, District 12, and the Little Leaguers who were groomed and sexually assaulted by Adam Isaacks. As of September 23, 2022, the position of Security Manager has not been filled since the Security Manager discussed herein left the employment of Little League Baseball. Her multitude of duties have been assumed by multiple other people.

**Z.**      **Joint Enterprise**

141.     Defendants LLB, Incorporated, Little League Baseball, Inc., Little League International, and LLB International, Inc. are part of and comprise a "Little League Baseball Enterprise" created by and for the benefit of these Defendants to own, maintain, control the "Little League Baseball Enterprise" via a tangled morass of entities with multiple and similar names, interlocking owners, ownership, directors, officers, committees, shared employees, volunteers, overlapping bylaws and operations, shared accounts, records, management agreements, and comingled assets. These entities are utilized to hide the true identity of the entities receiving money and spending money in the name of Little League Baseball, holding assets in the name of Little League Baseball and attempting to hide from scrutiny and accountability for years of the sexual abuse of minor athletes (Little Leaguers) across the United States.

142.     The Little League Baseball Defendants, including District 12, were and are engaged in a joint enterprise for a common purpose of the enterprise and with a pecuniary interest in the common purpose with a right to direct and control the enterprise in whole or in part.

143.     These Defendants have used the U.S. Mail, banking systems, and other electronic means to communicate with individuals, local little leagues, and districts to receive and transfer money across the jurisdictional boundaries of all 50 states in the United States as well as internationally.

144.     Plaintiffs filed a Complaint against LLB, Inc. a/k/a LL Baseball International on February 28, 2022. Defendant LLB, Inc. filed its Initial Disclosures on May 20, 2022, and stated:

The correct names of the parties to the action [ECF No. 25]

**The parties to this lawsuit are correctly named to the best of Defendants' knowledge and belief.**

The name and, if known, the address and telephone number of any potential parties to the action [ECF No. 25]
**Defendants are unaware of any other potential parties at this time.**

145.   <u>May 23, 2022</u>, Little League Baseball, Inc. filed Little League Baseball Inc.'s Rule 7.1 Disclosure Statement (Doc. 35) pursuant to Federal Rule of Civil Procedure 7.1, Little League Baseball, Inc., by and through its attorney, discloses the following:

**Little League Baseball, Inc. is a non-profit corporation with no stock.**

146.   <u>May 23, 2022</u>, District 12 filed Texas District 12 Little League's Rule 7.1 Disclosure Statement (Doc. 36) pursuant to Federal Rule of Civil Procedure 7.1, Texas District 12 Little League, by and through its attorney, discloses the following:

**Texas District 12 is a forfeited non-profit corporation with no stock.**

147.   <u>July 22, 2022</u>, filed Defendant Little League Baseball, Inc.'s Objections and Responses to Plaintiff's Third Set of Interrogatories and Responses to Plaintiffs' Third Set of Interrogatories. Plaintiffs propounded one interrogatory in the Third Set of Plaintiffs' Interrogatories:

Identify the person in charge of Little League's Child Protection Program. Please include in your answer, the person's duties and responsibilities?

"Subject to and without waiving the forgoing objection, Defendant responds that [the Security Manager] oversaw the Little League's Child Protection Program but left her employment at **Little League Baseball, Inc.**, on or about June 17, 2022, to pursue other interests. The position has not been filled since then. Her duties and responsibilities included managing the overall Child Protection Program, including the relationship with that program and the A Safety Awareness Program (ASAP) and overseeing the background check program."

The answer to this interrogatory was verified by Brent W. Stahlnecker who stated: (1) "I declare under the penalty of perjury that the following is true and correct" and "I have personal knowledge of the facts stated herein and affirm they are all true and correct." (2) "I am the Senior Director of Risk Management of Little League Baseball, Inc. Through my work experience I have personal knowledge of the facts stated herein. I am the authorized representative of Little League Baseball, Inc. for purposes of making this Declaration." Signed July 21, 2022.

148.     Brent W. Stahlnecker was designated as the Corporate Representative for "LLB, Inc." Plaintiffs took the deposition of Security Manager on September 21, 2022 and were provided portions of her employment record on September 18, 2022. During her deposition, she testified that she was employed by "LLB, Incorporated." Two days later, Mr. Stahlnecker was forced to admit under oath that Security Manger was indeed employed by LLB, Incorporated. The obvious intent of Mr. Stahlnecker and LLB, Incorporated was to mislead the Plaintiffs' pursuit of justice and is yet another overt act. LLB, by and through their officers and directors, to conceal their culpability, to protect their monetary interests and protect image of "Little League Baseball" at the expense of minor athletes who they should protect. To date, LLB has represented to Plaintiffs that the named Defendants, Little League Baseball, Incorporated, Little League Baseball, Inc., and Little League International are one and the same.

149.     Stahlnecker was also charged with the production of the insurance policies pursuant to Rule 26 Initial Disclosures. When Plaintiffs complained about Defendants' failure to produce the insurance policies, Defendants produced COI (DEC pages). When Plaintiffs pushed Defendants for complete insurance policies, the policies were different from the COI. The insurance policies revealed that the district offices across the U.S. listed LLB, Incorporated District offices. Also, Mr. Stahlnecker was forced to admit that LLB, Incorporated pays the premium for all District offices across the United States.

**AA.   Little League President Isaacks exploited his position to room, sexually abuse, and sexually assault players for years without safeguards, oversight, or reporting.**

150.     During his time as ELL President and as a coach for each of his Little League baseball teams within ELL and as agent and/or vice principal of District 12 and LLB, Adam Isaacks—at times with the assistance and knowledge of Miranda Isaacks—began a campaign of

grooming the members of his young baseball teams (which included the minor Plaintiffs) for his deviant gratification. This grooming campaign included but was not limited to inviting the minor Plaintiffs to go on overnight trips and sleepovers with the coach, at times assistant coach Miranda and/or son, and other team members, such as camping, riding recreational vehicles, and/or hunting trips with him at the Bear Creek Hunting Club in Sabine County, Texas, and trips across state lines to Georgia, Florida, Colorado, and Arkansas.

151.    During the trips, League President Isaacks would position himself to be one-on-one with the minor Plaintiffs. The camping "sleepovers" included sleeping in Issacks' small camper at the Bear Creek Hunting Club, where Adam Isaacks would share a bed with one or two of the minor Plaintiffs. Occasionally, Adam Isaacks would also share a bed with one of the minor Plaintiffs and his own minor son, with the individual minor Plaintiff sleeping between Adam Isaacks and his own son and/or Miranda.

152.    Adam Isaacks embarked on a campaign to groom the Little Leaguers who played on the teams coached by him and who were teammates of his son. He conspired to build trust and confidence in the families of the minor Plaintiffs, especially their mothers, by acts taken, either individually or jointly, in furtherance of the scheme. These include but are not limited to contribution to birthday fundraisers in the name of the minor Plaintiffs' mothers for various victims or intended victims, injecting themselves into the daily lives of the various players under the pretense of the coach.

153.    Adam Isaacks continually undertook efforts under the purview of Little League Baseball to build the trust of ELL families and players. For example, in May of 2021, Isaacks paid to have pink jerseys made for each boy with the name of each boy's mother on the back of the

jersey, and bought pink roses for each boy, many of which were victims of Isaacks' abuse, to present to their mothers on the ELL field while wearing the jersey specially created by Isaacks.

154.    Further, Adam Isaacks posted content on social media intended to entice and build trust in unsuspecting Little League families. Adam Isaacks' Facebook page is littered with comments regarding coaches. For example, on October 8, 2020, Issacks states:

THIS IS WHY . . .

I COACH YOU
Because I care about you.

I CHALLENGE YOU
Because I care about you.

I EXPECT YOUR COMMITMENT
Because I know your family and job will.

I HOLD YOU ACCOUNTABLE
Because life will hold you accountable.

155.    On December 8, 2020, Adam Isaacks posted the following on his Facebook page:

"I LOVE my players" should never
hinge on baseball success

Conditional love - when you're pitching well,
Just hit a double, after a win . . .

Unconditional love - pays no attention
to results it's about people, period!
Fall in love with the PERSON first &
Watch what happened.

156.    The grooming activities, which constituted preparatory offenses under the Texas Penal Code §§ 15.01, 15.02, and 15.031, of Adam Isaacks were extensive and planned and the sexual abuse and assaults were constant and continuous. The grooming, abuse and assaults were year-round and undertaken on a weekly basis. Adam Isaacks was constantly taking his baseball players to his deer camp at Bear Creek, and he spent nearly every weekend with ELL baseball

players. He held private pitching and hitting lessons on ELL's field, at Bear Creek, and other locations, and drove minor Plaintiffs to and from practices, games, and/or Little League events. Isaacks began taking his players on overnight trips to his deer camp at Bear Creek as early 2018 and continued frequent trips with team players, his son, and sometimes Miranda Isaacks, to the camp thereafter up until his capture at Bear Creek in December of 2021.  In addition to his continuous activities and abuse at the Bear Creek camp, Adam Isaacks also undertook trips and getaways with his Little League Baseball players outside of Bear Creek and/or across state lines in violation of federal law.  For example, the following are but a small snapshot of such additional trips and getaways as evidenced by Isaacks' social media postings; however, there were many, many more and dating back to 2018:

157.    August 2, 2020, Isaacks took several ELL baseball players on a trip to the lake.

158.    August 22, 2020, Isaacks took several ELL baseball players to the lake for a "boys weekend."

159.    September 7, 2020, Isaacks took several ELL baseball players to a campground in Hot Springs Arkansas.

160.    September 24, 2020, Isaacks took several ELL baseball players to the lake.

161.    October 1, 2020, Isaacks flew to Atlanta Georgia with several Little League Baseball players, by way of Bush Intercontinental Airport, to watch the Atlanta Braves play baseball and have a weekend away.

162.    October 25, 2020, Isaacks took several ELL baseball players on a trip where they spent the weekend playing in a pool and hot tub at a hotel and/or campground.

163.     November 29, 2020, Isaacks took several ELL baseball players to a campground in Hot Springs Arkansas where they spent time riding jeeps and/or four wheelers on a "Thanksgiving boys trip."

164.     December 22, 2020, Isaacks took several ELL baseball players to campground in Boykin Springs where they had "3 days of absolutely no cell service or wifi."

165.     February 17, 2021, Isaacks took several ELL baseball players to a cabin and/or campground in Oklahoma during their winter break.

166.     March 17, 2021, Isaacks took several ELL baseball players with him to a monster truck show in Lufkin, for a "Quick little get away to Lufkin to watch the monster trucks" and then took the boys camping at Boykin Springs.

167.     May 2, 2021, Isaacks took several ELL baseball players to the lake.

168.     May 31, 2021, Isaacks took several ELL baseball players to Katemcy Rocks Offroad Park.

169.     July 4, 2021, Isaacks took several ELL baseball players to Colorado camping.

170.     October 2, 2021, Isaacks took several ELL baseball players back to Atlanta Georgia to watch the Braves play baseball in Atlanta. During this trip, Isaacks took the group of boys to the movie theatre to see "Candyman."

171.     November 28, 2021, Isaacks took several ELL players to a campground in Hot Springs Arkansas.

172.     During his trips with the minor Plaintiffs, Adam Isaacks sexually abused, sexually assaulted, molested, physically abused, and/or mentally abused the minor Plaintiffs.

173.     The Isaacks also had explicit sex toys and pornography in their camper at Bear Creek and/or home that were shown to each of the minor Plaintiffs as part of the grooming and

abuse of the minor Plaintiffs. At times, Adam Isaacks would provide the minor Plaintiffs alcohol and/or drugs, which they ingested and which rendered them unconscious, impaired, and/or vulnerable to Isaacks's attacks. While unconscious, impaired, and/or vulnerable, the minor Plaintiffs were each subjected to numerous or continuous sexual abuse and attacks by Adam Isaacks.

174.    Plaintiffs were young, innocent, immature, and unsophisticated. They were on numerous occasions drugged by their coach. They were not capable of understanding the wrongful nature of the activity that was being inflicted upon them.

175.    At all times mentioned in this Complaint, the minor Plaintiffs were in the care, custody, and control of Adams Isaacks. Because of their youth and of the President/coach-player relationship between the minor Plaintiffs and Adam Isaacks, the minor Plaintiffs were completely and continually dependent on Adam Isaacks, and reasonably relied on Adam Isaacks to take care of them, protect them, and to act in their best interest at all times.

176.    At all times mentioned in this Complaint, and as a result of the President/coach-player relationship between the minor Plaintiffs and Adam Isaacks, Adam Isaacks owed to the Plaintiffs and minor Plaintiffs the duties commensurate with a relationship of trust and confidence.

177.    At all times mentioned in this Complaint, Adam Isaacks was in a position of complete authority over the minor Plaintiffs. From this position of authority, Adam Isaacks exerted his dominance through mental and/or physical coercion and duress on the minor Plaintiffs in order to force them to engage in the lewd, lascivious, and sexual acts complained of in this Complaint. At no time did the minor Plaintiffs willingly consent to the acts of Adam Isaacks. Due to their extremely young age, as a matter of law, the minor Plaintiffs did not have the legal capacity to

consent to the acts of Adam Isaacks. The abuse began when some of the Plaintiffs were 7-8 years old.

178.     Having used his authority through LLB to gain the trust and confidence of Plaintiffs and minor Plaintiffs, Adam Isaacks' acts were carried out in secret, away from the sight and knowledge of the parents or guardians of the minor Plaintiffs; thus, causing the minor Plaintiffs to feel trapped, isolated, alone, and cut off from others. Adam Isaacks, like other pedophiles, followed a predictable and reliable pattern. This is precisely the reason behind the rules regarding prohibited one-on-one interactions. If Plaintiffs had been made aware of the prohibited one-on-one interactions, they would not have allowed their children to interact with Adam Isaacks under the prohibited circumstances outlined herein, and Adam Isaacks' abuse and grooming would have been stopped in its tracks.

179.     The same is true regarding the other child safety measures discussed in this Complaint. Had Plaintiffs as well as other parents, volunteers, and/or minor athletes been trained/educated on grooming of minors and parents, prohibited one-on-one interactions, social media and electronic communication, the Child Protection Plan, USA – Pure Baseball, Abuse Awareness, or other child safety rules, they would have followed such rules/policies and identified the red flags and concerning behavior exhibited by Adam Isaacks and, in turn, would have intervened to protect the minor Plaintiffs. Likewise, had Plaintiffs as well as other parents, volunteers, and minor athletes been warned that Little League Baseball had been infiltrated by child sexual predators in positions of authority in districts and Little Leagues nationwide, they would have been on heightened alert. Additionally, had Plaintiffs been given the "Warning Signs of a Seducer" or similar warnings, they would have been armed with information to protect themselves and their children from child sexual abuse.

180.    Throughout the period of abuse, Adam Isaacks intentionally or knowingly subjected the minor Plaintiffs to grooming, physical force, intimidation, threats, and duress to ensure the secrecy of the ongoing sexual assaults and abuse.

181.    At all times mentioned in this Complaint, Adam Isaacks misrepresented and concealed from the Plaintiffs and/or the parents or guardians of the minor Plaintiffs, the wrongful nature of the sexual abuse.

182.    Additionally, throughout the times mentioned in this Complaint, Defendant Miranda Isaacks knew or should have known of Adam Isaacks' acts, attacks, and/or conduct toward the minor Plaintiffs. She failed to report the sexual abuse to law enforcement and/or anyone in a position to protect the minor Plaintiffs, including the adult parents of minor Plaintiffs.

183.    At all times mentioned in this Complaint, Defendants Miranda Isaacks, District 12, ELL, and Little League Baseball, knew or should have known of Adam Isaacks' grooming, acts, attacks, and/or other conduct toward the minor Plaintiffs, and they failed to report the sexual abuse to law enforcement and/or anyone in a position to protect the minor Plaintiffs.

184.    The wrongful actions and sexual abuse by Adam Isaacks and the actions, inactions, omissions, federal statutory violations, and/or conduct of Defendants Miranda Isaacks, District 12, ELL, and Little League Baseball, proximately caused the minor Plaintiffs to suffer from severe physical and mental injury and harm which will require extensive and continuing professional care and treatment.

**BB.**   **Texas District 12 Little League – District 12 Acts, Omissions, and Failures**

185.   On October 5, 2018, the District Administrator for Texas District 12 Little League,

Jennifer Roebuck, was appointed by Stephen D. Keener:

> I am pleased to confirm your appointment.
>
> The District Administrator is in a unique position to work closely with the local leagues and to provide the guidance which will result in youngsters benefiting from their involvement in Little League.
>
> An informative packet will be sent under separate cover to assist you in your position as District Administrator and should you need additional guidance or counsel, I would suggest you contact Angela as she will be more than happy to help you.
>
> Sincerely,
>
> STEPHEN D. KEENER
> President and
> Chief Executive Officer
>
> Cc:   Patrick Wilson, Sr., V.P. Operations & Program Development
>       Angela Garcia, Southwest Region Director

186.   The District Administrator is the liaison between LLB and the local constituent

leagues. Every District Administrator is required to sign a letter of agreement as an indication of

their intent to provide the highest level of consistent quality service. Additionally, every year,

according to the policies and procedures of LLB, every District Administrator is evaluated by LLB.

LLB has the power to remove a District Administrator.

187.   As the District 12 Administrator, Ms. Roebuck was allowed a staff. Her Assistant

District Administrator for Softball was and is currently Melissa Riedinger, who has served in that

capacity since 2019. Every District Administrator is required to have a District Safety Officer on

staff, as a Safety Officer is crucial to keep Little Leaguers safe. District 12, however, did not have

a Safety Officer on staff before and for most of Ms. Roebuck's tenure.

Q. Did y'all have a safety officer in 2020?
**A. No.**
Q. Okay. Did y'all have a safety officer in 2019?
**A. No.**
Q. No. Did y'all have a safety officer in 2018?
**A. No.**

When asked about whether there was a District 12 Safety Officer in 2021, Ms. Roebuck initially did not know, but later confirmed that Clint Riedinger (husband of ADA Melissa Riedinger) was serving as Safety Officer in 2021. Clint Riedinger did not become District 12's Safety Officer until October 2021.

188.    "One of the most important functions of the District Administrator is to monitor the activities of the constituent leagues within their district." Ms. Roebuck agreed that one of LLB's requirements for District Administrators is to monitor their local leagues. "Effective monitoring includes providing league reminders about important milestones and tasks to ensure compliance with regulations and policies." Ms. Roebuck agreed with this statement. District Administrators are considered "a representative" of the Little League organization and a liaison between LLB and the local leagues. LLB online information for District Administrators states "we're going to ask you to educate, we're going to ask you to train the leagues." Additionally, LLB's online informational material stresses the importance of communication with local leagues and the use of social media. LLB states that "it is committed to enforcing its Child Protection Program."

189.    Despite the fact that per Little League Baseball, District Administrators are relied upon to be a liaison between LLB and the local leagues, Ms. Roebuck's deposition testimony highlights the wholesale failures and shortcomings in her training, education, supervision, retention, and leadership. For example, Ms. Roebuck:

- did not know of and was not familiar with USA Baseball's Pure Baseball program;

- was unable to articulate a coherent definition of grooming;

63

- received no training regarding prohibited one-on-one interactions with Little Leaguers;

- did not know if any District 12 local leagues (i.e., those under her "jurisdiction") have a prohibited one-on-one policy;

- did not know if any District 12 local league implemented a non-retaliation policy;

- received no training regarding whether a local league president should be sleeping in the same room with his players;

- had no opinion on the red flags of grooming;

- was unaware of the rule that Little League coaches and/or league presidents are not permitted to be "friends" with or interact with their players on social media;

- did not know that a coach giving his players private lessons is a red flag for child abuse;

- admitted District Administrators are required to know and follow LLB's Child Protection Program;

- admitted she did not enforce the rules set forth in the Child Protection Program on the local leagues within her district, including ELL;

- did not train or adequately train volunteers of her constituent leagues, including board members of District 12 local leagues (e.g., ELL) on the Child Protection Program;

- never enacted basic safety procedures to help parents or local leagues prevent child abuse;

- was never informed by LLB that other Little Leaguers have been sexually abused by their coaches and/or league presidents in previous years;

- never warned local league volunteers that child sexual predators had infiltrated LLB;

- never provided the parents or guardians of Little Leaguers within District 12 "A Parent's Guide to Little League Child Protection Program" or an equivalent;

- did not know when Adam Isaacks served as a coach for ELL;

- did not know whether children are more likely to be abused by an adult they know as opposed to a stranger;

- did not know if ASAP an plan was submitted by ELL during Adam Isaacks' tenure;

- failed to provide the Abuse Awareness training to local league volunteers;

- failed to require local league volunteers to take the Abuse Awareness training;

- did not take the Abuse Awareness training;

- failed to require local constituent leagues, including ELL, to comply with USA – Pure Baseball;

190.    Additionally, Assistant District Administrator for Softball, Melissa Riedinger, when questioned about how her husband, Clint Riedinger, came to be the District 12 Safety Officer in late 2021, explained: "we needed someone to do it and I 'volun told' him" even though "he had no qualifications for safety. . . ."

191.    Ms. Roebuck admitted that "A Parent's Guide to Little League Child Protection Program" could have been given to parents and players at the beginning of each season to read and sign to acknowledge receipt. She agreed giving the document to parents to read and sign would be a way of arming parents with a list of red flags and warnings to be looking for. She further agreed that the concept of having parents read and sign documentation works.

192.    As District 12 Administrator, Ms. Roebuck was required to be familiar and comply with all rules and regulations. Additionally, she was required to monitor her constituent leagues and she was encouraged to communicate with her local leagues through Facebook. Ms. Roebuck and Ms. Riedinger were both Facebook "friends" with Adam Isaacks. Adam Isaacks was Facebook "friends" with at least two of the minor Plaintiffs in this case. Additionally, Adam Isaacks posted numerous pictures of the Evadale Little League players on camping and other trips with him. When the scandal involving Adam Isaacks became public, Ms. Roebuck attempted to remove her Facebook "friendship" with Isaacks.

193.   Roebuck (and her predecessor) wholly failed District 12's constituent leagues (including ELL) by failing to adequately monitor, train, educate, supervise, and enforce rules, policies, and regulations.

## CC.   Little League Baseball's Complete Authority and Control Over Districts and Local Little Leagues

194.   **We Can Require Anything We Want**

LLB, Incorporated's designated corporate representative testified:

Q. Little League Baseball can require local leagues to do an ASAP plan that encompasses all of the Pure Baseball prohibitions and mandates, can't it? It has the authority to do that?

**THE WITNESS: We can require anything we want.**

Q. Pass the Witness.

195.   Little League Baseball has complete authority and control over all districts, including District 12, as well as all local leagues, including ELL. Numerous facts regarding the structure of the Little League organization and the manner in which it operates illustrates and evidences LLB's total authority, power, and control over districts and local leagues. For example, LLB's chartering process mandates, among other things, strict compliance with all of LLB's rules, regulations, policies, and procedures:

a.     In order to create a local league, LLB requires the league to be chartered and insured.

b.     To become chartered, a local league must submit to LLB a constitution that "align[s] with Little League's rules, regulations, and operating policies." LLB often supplies local leagues with sample constitutions. The local league constitution must state that the local league will adhere in strict conformity to the policies, principles, rules, and regulations of LLB and will complete required background checks per Little League Regulation I (b) and I (c) 8 and 9. All local league constitutions must be approved by LLB before a charter is issued.

c.     LLB requires local leagues, upon acceptance of the charter application, to pledge the following:  "If accepted, I pledge myself and my local Little League

organization in strict compliance with all Little League rules, regulations, and operating policies of Little League Baseball, Incorporated under any and all circumstances."

    d.       LLB has the power to revoke or refuse to issue charters to local leagues.

    e.       LLB requires the charter submission and approval process to occur annually.

    f.       LLB sends billing statements to local leagues to pay for the charter application and insurance.

    g.       No local league constitution or charter may be amended without approval from LLB.

    h.       Local leagues are required to pay charter fees to Little League Baseball.

196.    LLB's insurance program likewise evidences control and authority over districts and local leagues. For instance, the insurance policies that reportedly cover District activities are actually issued to "Little League Baseball, Incorporated" as the named insured, showing that districts are part and parcel of LLB, Incorporated rather than separate autonomous entities. In fact, LLB, Incorporated pays the premiums for insurance that is reportedly for Districts (again, while having itself, "Little League Baseball, Incorporated," as the named insured). LLB created a Little League Risk Purchasing Group to facilitate insurance for local leagues, and LLB sends insurance premium invoices to local leagues.

197.    Little League Baseball controls all meaningful aspects of a District Administrator's job and expects District Administrators to monitor, train, oversee, and supervise local leagues. For example,

    a.       LLB has the power to appoint and remove District Administrators and/or their staff. Notably, District 12 Administrator, Jennifer Roebuck, was appointed to her position by LLB. Both Ms. Roebuck and Ms. Riedinger gave false testimony under oath, stating that Ms. Roebuck was elected to the position.

b.        Each of the Little League Districts are given authority and responsibility by LLB to represent Little League Baseball in all matters pertaining to the operations and safety of "our Little League Programs."

c.        All District Administrators are required to "sign a letter of agreement as an indication of their intent to provide the highest level of consistent quality service."

d.        LLB has set forth eight standards designed to sustain and enhance a District Administrator's ability to support and lead the local leagues he or she serves.

e.        LLB has created a "structured reporting system" that "aids in identifying areas of improvement needed, not only with the district, but with the program as a whole."

f.        District Administrators are evaluated by LLB annually. "Through the District Reporting/Monitoring Process, the staff at [LLB's] Regional Centers will be able to identify areas of improvement needed, not only with the district, but with the program as a whole, and they will be able to address those areas with individual improvement plans to held [District   Administrators] provide better service to their leagues."

g.        LLB warns that "District Administrators that choose not to work with Little League staff to improve with the goal of providing the best possible service to local Little League programs, will either be removed or not eligible" for reelection.

h.        LLB aids Districts in incorporation.

i.        District Administrators and their staff members are tasked with "implementing/overseeing all specific aspects/divisions of play of the Little League program operating within the district."

j.        LLB describes the role of the District Administrator as "the liaison between local leagues, the regional center, and Little League International."

k.        District Administrators must be responsive to LLB and local leagues.

l.        LLB states that "one of the most important functions of the District  Administrator is to monitor the activities of the constituent leagues within their district."

m.        District Administrators are considered as "a representative" of the Little League organization.

n.        District Administrators are expected to perform "oversight and assistance" with regard to "local league elections."

o.        LLB requires Districts to have a Safety Officer.

p.      LLB requires District Administrators to push each of their local leagues to submit an approved ASAP (A Safety Awareness Program) plan. Failure to have more than 50% local leagues in a given district will subject the District Administrator to become ineligible for continued service.

q.      LLB expects District Administrators to train and educate their constituent leagues. Indeed, LLB's informational videos for District Administrators state "we're going to ask you to educate, we're going to ask you to train the leagues."

198.    Little League Baseball's rules, regulations, policies, and procedures are binding upon District Administrators and local leagues. LLB has myriad rules touching nearly every aspect of Little League:

a.      LLB's Official Regulations, Playing Rules, and Operating Policies (the "Rulebook") are binding upon District Administrators and local leagues.

b.      The Rulebook provides that use of the "Official Patch is mandatory for all divisions of Little League for both regular and tournament play." According to LLB, "[t]he Little League Official Shoulder Patch is the only recognized identification which sets a Little Leaguer apart from all other children who play baseball and softball. The patch symbolizes the affiliation with the Little League program and a reminder of the mission of promoting sportsmanship, discipline, teamwork, and physical well-being for the millions of Little Leaguers around the world."

c.      LLB instructs precisely where on a player's jersey its patch should be affixed and worn.

d.      Screen-printing, sublimation, or reproduction of the Patch in any form is not permitted and is a violation of trademark rights. Any abuses should be reported immediately to Little League International at Licensing@LittleLeague.org.

e.      The Rulebook controls nearly all aspects of the game, including but not limited to: who is eligible to play (residency and school attendance requirements), league boundaries, proof of age requirements, selection of players, schedules, minor leagues, special games, use of the Little League emblem, field decorum, awards, commercialization, night games, admission to games, putting the ball in play, umpire rules, rules applicable to the batter, rules applicable to the pitcher, rules specific to tournament (e.g., organization, rules, play, officials, and conduct), lightning safety guidelines, heat illness prevention, bat modifications and alterations, communicable disease procedures, and fundraising.

199.    In addition to the numerous rules and regulations put out by LLB, which are binding upon District Administrators and local leagues, LLB has exercised control in other ways:

a.      LLB directed District 12 Administrator, Jennifer Roebuck, to instruct local league presidents to make no comments to the media unless "instructed" by LLB.

b.      In her official capacity and in the course and scope of her work for LLB and District 12, Ms. Roebuck directed ELL to remove a Facebook post about the scandal involving Adam Isaacks.

c.      LLB provides local league officials and District Administrators with prepared talking points/press statements for the media about sexual abuse incidents involving Little League.

d.      Through her role as District 12 Administrator, Ms. Roebuck, participated in the selection, approval, and appointment of Adam Isaacks as President of ELL and Miranda Isaacks as Secretary of ELL.

e.      LLB states that they require any volunteer to undergo and pass a background check before they are permitted to volunteer.

f.      All local league ASAP plans are submitted to LLB for approval.

g.      LLB communicated frequently and directly with District 12 Administrator, Jennifer Roebuck, on a variety of issues, from fundraising, to charter waivers, to residency requirements, to boundary disputes between leagues.

h.      LLB did not require District Administrators, district staff, or local league officials or volunteers to take the mandatory Abuse Awareness training available through USA Baseball for FREE.

i.      LLB initially rejected ELL's constitution, finding it "unacceptable" and requiring several changes.

j.      LLB placed ELL on "non-compliance" hold until LLB was satisfied with ELL's completion of background checks.

k.      LLB reviewed numerous charter waiver requests from local leagues (including those from within District 12), granting some and denying others.

200.    In short, Little League Baseball has complete and total control and authority over the entire Little League Baseball organization, from local leagues and their volunteers to District Administrators and their staff. It relies upon District Administrators to oversee, supervise, train, educate and enforce its policies and procedures upon local leagues.

# V.   CAUSES OF ACTION

## A.   Count One – Assault

201.   The foregoing factual allegations are incorporated by reference as if fully set forth herein.

202.   As described above, Adam Isaacks engaged in a pattern and practice of lewd, lascivious, and sexual assault with the minor Plaintiffs.  To be clear, these horrendous assaults began with sexual grooming, which constituted preparatory offenses under Texas Penal Code §§ 15.01, 15.02, and 15.031, that began and continued on the very fields on which these young boys sought to find friendship and childhood fun within the safe haven of Little League Baseball. Adam Isaacks, abusing his position of trust and authority, subjected the minor Plaintiffs to such abuse on a continuing basis for **several years**.

203.   During the course of the sexual abuse described above, Adam Isaacks inflicted injury on the minor Plaintiffs through intentional, malicious, unjustified, harmful, and offensive sexual contact without the minor Plaintiffs' consent.

204.   Defendant Isaacks was a coach and was the President of ELL. Defendant Isaacks used his position of authority and trust within the ELL to implement a scheme to sexually abuse, molest, and sexually assault young boys who participated in ELL over the course of four to five years.

205.   As a direct and proximate result of Adam Isaacks' wrongful actions and sexual abuse as described above, the minor Plaintiffs have suffered severe and continuing injuries, including, but not limited to, psychological trauma, behavioral disorders, pain and suffering, severe mental anguish, loss of enjoyment of life, and emotional distress. These injuries have resulted in damages in an amount within the jurisdictional limits of this Court.

206.    As a further direct and proximate result of Adam Isaacks' wrongful actions and sexual abuse as described above, the minor Plaintiffs sustained, and will continue to sustain, further damages, including expenses for medical care and treatment, psychological therapy, psychiatric therapy, and medication.

207.    Plaintiffs seek recovery in this case of all damages proximately caused by Adam Isaacks.

**B.**    **Count Two – Sexual Abuse**

208.    The foregoing factual allegations are incorporated by reference as if fully set forth herein.

209.    Due to the relationship between the minor Plaintiffs and Adam Isaacks, and the ages of the minor Plaintiffs when the acts of sexual abuse described above occurred, Adam Isaacks' sexual abuse constituted multiple violations of prohibited deviate sexual intercourse and indecency with a child, as those terms are defined in Section 21.01, *et seq.*, of the Texas Penal Code.  Adam Isaacks' violations of Section 21.01, *et seq.*, of the Texas Penal Code proximately caused damages to Plaintiffs and minor Plaintiffs in this case, as described more fully herein, for which damages Plaintiffs and minor Plaintiffs seek recovery in this suit from the Defendants, *jointly and severally*.

**C.**    **Count Three – *Sexual Exploitation and Other Abuse of Children* in violation of Federal Anti-Human Trafficking and other federal statutes 18 U.S.C. § 2255.**

210.    All factual allegations herein are incorporated herein by reference as if fully set forth.

211.    Plaintiffs are victims under the Federal Anti-Human Trafficking Act and other federal statutes as a result of Adam Isaacks transportation of minor Plaintiffs across state lines for purposes of engaging in illicit sexual conduct, sexual exploitation, and sexual abuse of minor Plaintiffs.

212.     Adam Isaacks transported minor Plaintiffs across state lines for the purposes of sexually abusing, molesting, assaulting and exploiting the minor Plaintiffs.  The minor Plaintiffs are victims of the federal crimes established by 18 U.S.C. § 1591 ("Sex Trafficking of children"), § 2241 ("Aggravated Sexual Abuse"), § 2242 ("Sexual Abuse"), § 2243 ("Sexual abuse of a minor"), § 2251 ("Sexual Exploitation of children"), and § 2423 ("Transportation of minors").

213.     Adam Isaacks traveled with and transported the minor Plaintiffs in interstate commerce for the purpose of engaging in illicit sexual conduct with the minor Plaintiffs in violation of federal law. As a result of the conduct described herein, Plaintiffs have suffered and continue to suffer great pain, physical injuries, mental anguish, and emotional distress and expenses for medical and psychological treatment. Thus, Defendant Isaacks is liable under 18 U.S.C. § 2255 for damages and reasonable attorneys' fees.

**D.     Count Four – Negligence Per Se of LLB, Incorporated, District 12, and ELL**

214.     The factual allegations recited elsewhere in this Amended Complaint are incorporated by reference as if fully set forth in this section. Plaintiffs also allege the following additional facts:

215.     Little League Baseball is a federally chartered corporation, see 36 U.S.C. § 130502 (emphasis added), created with the following purposes:

(1) to promote, develop, **supervise**, and voluntarily assist in all lawful ways the interest of young people who participate in Little League baseball;

(2) to help and voluntarily assist young people in developing qualities of citizenship and sportsmanship; and

(3) using the disciplines of the native American game of baseball, to teach spirit and competitive will to win, physical fitness through individual sacrifice, the values of team play, and wholesome well being through healthy social association with other youngsters **under proper leadership**.

216.    LLB has failed to "supervise" "in lawful ways the interest of young people" (i.e., Little Leaguers) as a group and, specifically, the eight minor Little Leaguers in this case. Similarly, LLB has failed to comply with Congress' mandate that it exercise proper leadership.

217.    The same institution that created the Defendant federally chartered corporation— the United States Congress—also passed the Safe Sport Act.

218.    Defendant Little League Baseball violated the "Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017," Victims of Child Abuse Act of 1990 (34 U.S.C. § 20341, as amended), the "Ted Stevens Olympic and Amateur Sports Act" (36 U.S.C. § 22050, as amended), USA Baseball's policies and procedures, including USA – Pure Baseball, and LLB's own policies and procedures. Plaintiffs belong to the class of persons the statutes were designed to protect, and their injuries are of the type the statute was designed to prevent, the statutes are ones which tort liabilities may be imposed when violated. LLB violated the statute without excuse, and LLB's acts and omissions (violations) proximately caused the Plaintiffs' injuries.

219.    District 12 violated the "Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017," Victims of Child Abuse Act of 1990 (34 U.S.C. § 20341, as amended), the "Ted Stevens Olympic and Amateur Sports Act" (36 U.S.C. § 22050, as amended), USA Baseball's policies and procedures, including USA – Pure Baseball, and LLB's policies and procedures. Plaintiffs belong to the class of persons the statutes were designed to protect, and their injuries are of the type the status was designed to prevent, the statutes are ones which tort liabilities may be imposed when violated. District 12 violated the statute without excuse, and District 12's acts and omissions (violations) proximately caused the Plaintiffs' injuries.

220.    Evadale Little League violated the "Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017," Victims of Child Abuse Act of 1990 (34 U.S.C. § 20341, as amended), the "Ted Stevens Olympic and Amateur Sports Act" (36 U.S.C. § 22050, as amended), USA Baseball's policies and procedures, including USA – Pure Baseball, and LLB's policies and procedures. Plaintiffs belong to the class of persons the statutes were designed to protect, and their injuries are of the type the status was designed to prevent, the statutes are ones which tort liabilities may be imposed when violated. Evadale Little League violated the statute without excuse, and Evadale Little League's acts and omissions (violations) proximately caused the Plaintiffs' injuries.

## E.    Count Five - Negligence

221.    The factual allegations recited elsewhere in this Second Amended Complaint are incorporated by reference as if fully set forth in this section. Plaintiffs also allege the following additional facts:

222.    LLB has failed to "supervise" "in lawful ways the interest of young people" (i.e., Little Leaguers) as a group and, specifically, the eight minor Little Leaguers in this case. Similarly, LLB has failed to comply with Congress' mandate that it exercise proper leadership.

223.    The same institution that created the Defendant federally chartered corporation— the United States Congress—also passed the Safe Sport Act. Through this legislation as well as the laws it amended, USA Baseball was designated the National Governing Body for the sport of baseball in the United States. LLB joined USA Baseball as National Member Organization. With that affiliation and membership, came LLB's responsibility to abide by and adhere to applicable USA Baseball rules, regulations, policies, and procedures, including those set forth in USA – Pure Baseball.

224.    Little League Baseball holds itself out as "the world's largest and most respected youth sports organization." It also describes the organization as a "cohesive unit of more than 7,000 leagues, each with an open channel to Little League International" and advertises that it is

**One Team. One Little League®**

225.    LLB recognizes that in many abuse situations "the young victims are seduced, sometimes over a period of months or even years" and that the "child's family is lulled into believing the unusual attention being lavished is a bond of friendship between the adult and the child." "In fact, the adult abuser often uses gifts, trips, attention and affection as part of the courtship process" which sometimes "extends to the child's parents" while the real target is the child. Unfortunately, sexual abuse by coaches in the context of youth and league sports is prevalent and such organizations have a duty to protect children, create a culture of safety for children, inform and educate parents, monitor and supervise volunteers and hired workers, spread awareness, train and educate participants and their families, and to report incidents of abuse or improper behavior.

226.    Defendants LLB, District 12, and ELL knew or should have known that the minor Plaintiffs were unable to protect themselves, were vulnerable to sexual grooming, sexual abuse, and sexual molestation in the youth sport setting, and needed safeguards in place.  Defendants knew or should have known of the foreseeability of the risk of sexual grooming, sexual abuse, and sexual molestation in the youth sport setting and that Plaintiffs needed intervention by these Defendants in order to stop the abuse the minor Plaintiffs were enduring. LLB admits as much, acknowledging that Little League Baseball, as a youth sports organization, may be a "target for child abusers, since statistics show that the largest number of sexually abused children range in age from 8 to 11 years."

227.    Defendants LLB, District 12, ELL, and Miranda Isaacks had a duty to implement and enforce safeguards, protective measures, and policies and procedures aimed at preventing, education, reporting, awareness, and training against the foreseeable risk of sexual grooming, sexual molestation, sexual abuse, and sexual assault in the youth sport setting. Defendants LLB, District 12, ELL, and Miranda Isaacks had a duty to create a safe environment and protective culture for young boys and their families to participate in Little League Baseball.

228.    LLB had a duty to monitor and supervise the acts and activities of District 12 Administrator Jennifer Roebuck and her predecessor as well as District 12 staff. LLB and District 12 had a duty to monitor and supervise the acts and activities of Little League volunteers with minor participants of Little League Baseball. These Defendants had a duty to implement and comply with policies to prevent grooming and circumstances that are ripe for abuse or assault. LLB had a duty to promote awareness, educate, and train District 12 Administrator, Jennifer Roebuck, her predecessor, as well as the District 12 staff, regarding preventative culture, prohibited activities, signs of sexual grooming, signs of abuse, safety, and reporting of sexual abuse. LLB and District 12 had a duty to promote awareness, educate, and train ELL families regarding preventative culture, prohibited activities, signs of sexual grooming, signs of abuse, safety, and reporting of sexual abuse. Defendants had a duty to effectively warn Plaintiffs, minor Plaintiffs, and other volunteers of the known and foreseeable danger that child sexual predators holding positions of authority had infiltrated LLB (its districts and leagues nationwide) to gain access, target, and abuse Little Leaguers. Defendants breached these duties.

229.    Defendants LLB, District 12, and ELL voluntarily undertook a duty to protect minor participants in Little League Baseball from the foreseeable risk of sexual abuse through its Child Protection Program and adoption of the Safe Sports Act. Defendant LLB represented to the

community its commitment to enforcing Little League Baseball's Child Protection Program. As part of LLB's stated efforts, "Little League also continues to take steps to stay current by *adhering to* the youth protection standards of SafeSport and USA Baseball Pure Baseball." (emphasis added).

230.    Defendants Miranda Isaacks, District 12, ELL, and LLB wholly failed to protect the minor Plaintiffs from Adam Isaacks' outrageous behavior, failed to enlist the aid of others to protect the minor Plaintiffs from Adam Isaacks' abuse, and failed to notify appropriate authorities or the parents of the minor Plaintiffs regarding what was happening to their children at the hands of Adam Isaacks.

231.    These Defendants failed to implement and enforce reasonable safeguards or reasonable policies and procedures to avoid or prevent acts of unlawful sexual conduct by Adam Isaacks, ELL Coach and President and failed to provide effective warnings about the known risk of child sexual predators.

232.    District 12 and ELL failed to adopt, implement, and enforce a policy limiting one-on-one interactions with minors. District 12 and ELL failed to adopt, implement, and enforce an ASAP plan. LLB and District 12 failed to monitor, implement, and enforce required safety precautions, including training.

233.    At no time during the periods alleged did Defendants implement, provide, or enforce awareness, education, training, or issue effective warnings to the participants or families of ELL regarding prevention, signs, warnings, or reporting of grooming and/or sexual molestation or abuse in the youth sport setting.

234.    Defendants knew or should have known that minor children in the Little League Baseball setting were vulnerable to grooming, sexual molestation and sexual abuse by coaches and

others in a position of authority within the youth sports organization. This is particularly true, where, as here, LLB knew child sexual predators had infiltrated LLB and acknowledged in 2017 that it may be a "target" for pedophiles, given that it is a national youth sports organization, and adopted the Safe Sport Act and USA Baseball's USA – Pure Baseball program.

235.    Defendants failed to monitor, supervise, and/or oversee the activities of ELL President Isaacks. Adam Isaacks, ELL coach and ELL President, was permitted to use his position of authority and trust to implement a scheme to sexually abuse, molest, and assault young boys over a period of four to five years or more. By allowing Isaacks to serve as ELL President, Defendants represented to the minor plaintiffs, their parents, and the community, that Adam Isaacks was safe, trustworthy, and ethical. This led many parents to believe their children were safe in his care.

236.    Defendants failed to properly, reasonably, and/or effectively warn, educate, and train volunteers and hired workers participating in ELL regarding the prevention, protection against, and detection of sexual grooming, sexual molestation, sexual abuse, and sexual assault of minors in the youth sport setting. Defendants failed to properly educate and train volunteers and hired workers participating in ELL in mandatory reporting requirements.

237.    Defendants failed to properly, adequately, or reasonably train or educate families of minor children participating in ELL regarding the prevention and protection against of sexual grooming, sexual molestation, sexual abuse, and sexual assault of minors in the youth sport setting. Defendants failed to properly train and educate families of minor children participating in ELL in mandatory reporting requirements. Defendants failed to provide effective warnings to Little League volunteers and participants about the known and foreseeable risk of sexual abuse within its organization.

238.    Defendants breached their duty to take reasonable protective measures and reasonable safeguards to protect Plaintiffs and other minor participants and their families from the risk of childhood sexual abuse, sexual molestation, and sexual assault, such as the failure to properly protect, supervise, monitor, warn, train, or educate Plaintiffs and others on how to recognize and avoid such foreseeable risks.

239.    Defendants, having a duty to do so, failed to create a safe environment for minors who dreamed of playing Little League Baseball. Defendants failed to implement and enforce policies, procedures, training, education, failed to enforce their own rules, policies, and procedures, and failed to adhere to industry and organizational standards to protect the health, safety, and wellbeing of ELL participants, including Plaintiffs.

240.    The failures of Defendants, Miranda Isaacks, District 12, ELL, and LLB, described herein, constitute negligence, and such negligence was a proximate cause of severe injury and damage to the Plaintiffs and minor Plaintiffs. As a result, Plaintiffs bring this suit to recover the damages proximately caused by the negligence of Defendants Miranda Isaacks, District 12, ELL, and LLB, to which each of these Defendants is *jointly and severally* liable to Plaintiffs.

## 1.    Negligent failure to train, supervise, and monitor District 12

241.    LLB was required to ensure that the District 12 Administrator and District 12 staff were properly trained and educated in order to adequately perform the duties of the District and fulfill the needs of District 12's constituent local leagues, including ELL. LLB failed to adequately or properly train District 12 Administrator, Jennifer Roebuck, and her predecessor as well as District 12 staff. It further failed to supervise and monitor District 12 to ensure the District Administrator and staff were properly fulfilling all duties. LLB's breach of its duties proximately caused Plaintiffs' damages.

### 2.      Negligent Retention of District 12 Administrator Jennifer Roebuck

242.    LLB had a duty not to retain District 12 Administrator, Jennifer Roebuck, and her staff, who were incompetent to serve District 12 and its constituent local leagues. Nonetheless, LLB negligently retained District 12 Administrator, Jennifer Roebuck, and her staff, who were incompetent to serve District 12 and its constituent local leagues. LLB's breach of its duties proximately caused Plaintiffs' damages.

### 3.      Negligent failure to train, supervise, and monitor ELL

243.    The foregoing factual allegations are incorporated by reference as if fully set forth herein.

244.    LLB and District 12 were required to train, supervise, and monitor ELL and its board to ensure that it was following all policies, procedures, rules, and guidelines of LLB. LLB and District 12, however, failed to adequately or properly train, supervise, or monitor ELL and its board. LLB's and District 12's breach of their duties proximately caused Plaintiffs' damages.

### 4.      Negligent failure to enforce rules, regulations, policies, and procedures on District 12 and ELL

245.    LLB was required to enforce its rules, regulations, policies, and procedures on District 12 and ELL. Nonetheless, LLB failed to enforce its rules, regulations, policies, and procedures on District 12 and ELL. LLB's breach of its duties proximately caused Plaintiffs' damages.

### 5.      Negligent failure to warn

246.    LLB had a duty to warn local Little League volunteers, participants, and minors, including Plaintiffs and minor Plaintiffs of the known risks of sexual abuse by volunteers in positions of authority (such as presidents, coaches, and district administrators) within Little League Baseball. LLB knew child sexual predators holding positions of authority had infiltrated numerous

81

Little Leagues and districts nationwide, and it was aware of the "epidemic" of child sexual abuse within youth sports organizations, including Little League Baseball. Nonetheless, LLB failed to warn local Little League volunteers, participants, and minors, including Plaintiffs and minor Plaintiffs of the known risk of child sexual abuse within the Little League Baseball organization. This failure to warn proximately caused Plaintiffs' damages, as Plaintiffs and minor Plaintiffs were previously unaware of such a risk within the organization.

### 6.      Negligent Undertaking

247.    As previously set forth herein, LLB voluntarily expressed its adoption of the Safe Sport Act and the standards set forth by USA – Pure Baseball:  "As part of its efforts, Little League also continues to take steps to stay current **by adhering to the youth protection standards of SafeSport and USA Baseball Pure Baseball**."

248.    LLB voluntarily undertook a duty to protect minor participants in Little League Baseball from the foreseeable risk of sexual abuse through its Child Protection Program and adoption of the Safe Sports Act and USA – Pure Baseball. Likewise, it represented to the community its commitment to enforcing LLB's Child Protection Program. Defendants LLB, District 12, and ELL had a duty to act reasonably in implementing, enforcing, and adhering to the Child Protection Program, the Safe Sport Act, and USA – Pure Baseball.

249.    LLB undertook the duty to adhere to the youth protections standards of the Safe Sport Act and USA – Pure Baseball as well as its Child Protection Program gratuitously and/or for compensation. Indeed, LLB collected monies from Little Leaguers for their opportunity to play Little League Baseball. Defendant's actions in publishing its purported "adherence" to the Safe Sport Act and USA – Pure Baseball and its representation that it enforced its Child Protection Program require the imposition of a duty.

250.     Defendant knew or should have known that its undertaking to protect Little Leaguers by implementing, adhering to, and enforcing the aforementioned laws, guidelines, rules, policies, and/or procedures was necessary for Plaintiffs' protection. Defendant admits as much by having acknowledged that Little League Baseball, like many national youth organizations, is or could make it a "target for child abusers, since statistics show that the largest number of sexually abused children range in age from 8 to 11 years."

251.     Defendant failed to exercise reasonable care in the performing of its undertaking as set forth in this Second Amended Complaint. Additionally, Plaintiffs relied upon Defendant's performance and/or Defendant's performance increased Plaintiffs' risk of harm. Defendant's breach proximately caused Plaintiffs' damages as a result.

## F.     Count Six – Respondeat Superior

252.     The factual allegations recited elsewhere in this Second Amended Complaint are incorporated by reference as if fully set forth herein. Plaintiffs also allege the following:

253.     At all times relevant, District 12 Administrator (as well as her predecessor), District 12 staff, and ELL were volunteers of LLB and were in the course and scope of their volunteer work when Adam Isaacks abused Plaintiffs. As such, LLB is vicariously liable for the negligence of District 12.

254.     At all times relevant, ELL and its board members were volunteers of LLB and were in the course and scope of their volunteer work when Adam Isaacks abused Plaintiffs. As such, LLB is vicariously liable for the actions of ELL, Miranda Isaacks, and Adam Isaacks.

255.     At all times relevant, Adam Isaacks and Miranda Isaacks were on the board and volunteers of ELL and were in the course and scope of their volunteer work when Plaintiffs were

harmed by Adam Isaacks. As such, ELL is vicariously liable for the actions of Miranda Isaacks, and Adam Isaacks.

## G.    <u>Count Seven – Ratification</u>

256.    The factual allegations recited elsewhere in this Second Amended Complaint are incorporated by reference as if fully set forth herein. Plaintiffs also allege the following:

257.    LLB's actions herein constitute ratification and approval of the actions of all Defendants, including LLB's, District 12's, and ELL's employees, agents, managers, vice principals, high managerial staff, officers, directors, and volunteers in concert by word, act, and conduct after acquiring full knowledge of the facts and circumstances of this case which resulted in the sexual abuse of at least 8 minor athletes. LLB, by and through one or more if its agents, managers, vice principals, officers, directors, and high managerial agents, working together and in concert, sought to retain the benefits of the wrongful, illegal, and reprehensible acts by performing, voluntary and intentional acts inconsistent with rejecting that conduct and those acts. All of these acts were done with the intent to harm the Plaintiffs and all the actions of the Defendants, including LLB, District 12, and ELL employees, their managers, vice principals, agents, high managerial agents, officers, directors, and volunteers were done (i) within the scope of their offices or employment (ii) on the behalf of and for LLB's financial benefit and public well-being.

## H.    <u>Count Eight – Negligence of Defendant, Bear Creek.</u>

258.    The factual allegations recited elsewhere in this Second Amended Complaint are incorporated by reference as if fully set forth herein. Plaintiffs also allege the following:

259.    Bear Creek Hunting Club is a for-profit entity that operates as a "Hunting Club" on land it leases in Sabine and San Augustine Counties. Bear Creek is headquartered in Pineland, Texas. Members pay annual dues and are given access to a full RV camp complete with electrical

and water connections. It is a private hunting club or business enterprise formed under the laws of the State of Texas and headquartered in Pineland, Sabine County, Texas.  Bear Creek is authorized to, and does, conduct business in the State of Texas.

260.    The premises maintained and controlled by Bear Creek was the site of continuous sexual abuse of the minor Plaintiffs over numerous years.

261.    There was a continuous flow of non-family Little League minors onto the premises who were abused by Adam Isaacks. Isaacks was permitted weekend after weekend, year after year, to maintain an unregulated, unmonitored, and unprotected stream of minor guests who were sexually abused and assaulted on the premises with impunity.

262.    In addition to the acts of negligence stated in paragraphs above, Defendant Bear Creek was additionally negligent. Defendant Bear Creek had a duty to provide a reasonably safe premises, to implement safety measures, to properly screen lessees, to monitor and supervise lessees, to properly manage the premises, and to report activities of abuse. Defendant Bear Creek was negligent in the following respects:

    a.      Failing to properly secure its premises;

    b.      Failing to provide security to invited guests;

    c.      Failing to properly supervise its tenants;

    d.      Failing to ensure improper guests were not on the premises;

    e.      Failing to enforce internal policies and procedures;

    f.      Failing to ensure illegal activities were not occurring on the premises;

    g.      Failing to provide adequate and proper management of its premises;

    h.      Failing to timely and adequately respond to or to report sexual abuse of the minor Plaintiffs;

    i.      Failing to properly implement its security plan;

j.      Failing to train and supervise its security personnel; and

k.      All other acts of commission and omission discovered between now and the time of trial and proven at the trial on the merits.

l.      Failing to properly supervise the actions of those persons it invites to its leased premises;

m.      Failing to provide adequate security for its invitees;

n.      Failing to take proper precautions in reaction to the outrageous actions of Defendant, Adam Isaacks, while on its leased premises; and

o.      Failing to report the outrageous actions of Defendant, Adam Isaacks, to law enforcement authorities.

263.    The negligence of Defendant Bear Creek proximately caused immeasurable injury and damages to the young boys who were repeatedly groomed, abused, and sexually assaulted on its premises.

## I.    **Count Nine – Gross Negligence**

264.    The factual allegations recited elsewhere in this Second Amended Complaint are incorporated by reference as if fully set forth herein. Plaintiffs also allege the following:

265.    Little League Baseball is a federally chartered corporation created by the United States Congress with the statutory purposes (1) to promote, develop, **supervise** and voluntarily assist in lawful ways the interest of young people who participate in Little League Baseball (2) to help and voluntarily assist young people in developing qualities of citizenship and sportsmanship; and (3) using the disciplines of the native American game of baseball to teach sport and competitive will to earn physical fitness through individual sacrifice, the value of team play, **and wholesome well-being through health association with other youngsters under proper leadership**. 36 U.S.C. § 130502.

266.     LLB admitted that there was a conscious, deliberate decision by upper managerial, senior management not to require mandatory training for local little leagues even though USA Baseball provided background check solutions and FREE education and training to meet the requirements set out by law and also provided a way for the organization to easily track volunteers who had completed both components.

267.     The Facebook posts of Adam Isaacks are classic, textbook red flags of a predatory grooming of a minor and parents while he was President and coach of Evadale Little League and was on the Board of Directors of District 12. Both District 12's District Administrator and ADA were Facebook friends with Adam Isaacks for years and were aware of Adam Isaacks' activities, photographs, and comments with minor Plaintiffs. ELL Little Leaguers were shown as friends of Adam Isaacks. Miranda Isaacks served as Secretary of ELL and was aware of Adam Isaacks' activities and posts. There were years of posts showing prohibited one-on-one contact that should have been reported and stopped.

268.     LLB was under a federal mandate by SB 534 Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017 (USA Pure Baseball) to establish and enforce prohibited one-on-one policies in the local Little Leagues, in settings inside and outside the training program, including but not limited to restaurants, trips, practices, transportation, hunting and fishing trips, or other activities, prohibited electronic communication, including Facebook, email, texting, or other electronic communication that are not for the purpose of communicating information about team sporting events and such communications must go to the entire team and training for volunteers.

269.     LLB knew the "warning signs of a seducer" and knew the red flags from previous cases of sexual abuse. *See* "Every Parent's Nightmare," Sports Illustrated. Roebuck, District

Administrator of District 12, was a Facebook friend of Adam Isaacks within Little League Baseball.  LLB knew and admits the sexual abuse to a child is a "life altering event" and results in catastrophic damages to the child.

270.    LLB knew that SB534 made amateur sports organizations accountable for abuse of minor athletes within their program. LLB made a conscious and deliberate decision to not follow the mandates of SB 534 even in the face of Defendants' Security Manager's warnings that the federal law required them to comply with the mandates.

> Q. And that's in fact, what we have in this case right here is that the federal government passed these laws impacting baseball and other sports and said here are the rules, follow them. Pure Baseball did. And you were **the voice in the wilderness**, if you will, telling management you got to do this. You should do this. This is the best practice. And they refused to do it. Would you agree with that? **A. …Yes.**

<u>**We Can Require Anything We Want**</u>

LLB, Incorporated's designated corporate representative testified:

> Q. Little League Baseball can require local leagues to do an ASAP plan that encompasses all of the Pure Baseball prohibitions and mandates, can't it? It has the authority to do that?

> **THE WITNESS: We can require anything we want.**

> Q. Pass the Witness.

271.    The acts and omissions of LLB show a conscious indifference to the rights, safety and welfare of the general public (minor athletes who are involved in little league baseball across the United States).

272.    Defendant LLB's acts and omissions at the time of their occurrence, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to the public (Little Leaguers in the United States) and specifically to the 8 minor Plaintiffs in this case.

273.    Defendant LLB had subjective awareness of these risks yet proceeded with conscious indifference up to and including today.

274.    The acts and omissions of LLB constituted gross negligence which proximately caused the life altering injuries and damages of Plaintiffs.

275.    LLB displayed a conscious indifference to the safety, lives, and health of minor athletes when it knowingly allowed and retained untrained and inexperienced individuals to have regular contact with amateur athletes who are minors.

276.    LLB knew that predators/pedophiles have and will be drawn to its activities involving minor athletes. LLB has known for years that pedophiles have infiltrated local little leagues as volunteers and have sexually abused the players which involved an extreme degree of risk considering the magnitude of the potential harm to minor athletes.

277.    LLB also have a lengthy and turbulent history failing to follow the statutory purposes delineated in the enabling legislation by the US Congress (1) to promote, develop, **supervise** and voluntarily assist in lawful ways the interest of young people who participate in Little League Baseball to help and assist young people . . . and wholesome well-being through healthy social association with other youngsters under **proper leadership**. Rather than supervise in lawful ways the interest of young people and provide proper leadership, LLB, in face of warnings by the Security Manager and in violation of the Safe Sport Act and USA Pure Baseball continued to display an utter disregard to catastrophic risk of injury and death to minor athletes. LLB's conduct constituted an extreme degree of risk which carries a high probability of a devastating high magnitude of potential harm.

278.    LLB, by and through its employees, agents, managers, vice principals, officers, and directors, and others acting within the scope of their office and employment on behalf of LLB,

89

displayed an actual, subjective disregard of the risk of the resulting injuries which rises to the level of a gross deviation for an ordinary standard of conduct. LLB's conduct involved a greater risk of harm to the public generally (Little Leaguers across the United States) and to the Plaintiffs, specifically, without any compensating social utility. The risk created by Defendant LLB was substantial and unjustified and was a gross deviation from reasonable care as judged by general societal standards under all circumstances as viewed from LLB's standpoint.

279.    LLB's actions herein constitute gross negligence for the ratification and approval of the actions of LLB's employees, agents, managers, vice principals, high managerial staff, officers, and directors in concert by word, act, and conduct after acquiring full knowledge of the facts and circumstances of this case which resulted in the sexual abuse of at least 8 minor athletes. LLB, by and through one or more if its agents, managers, vice principals, officers, directors, and high managerial agents, working together and in concert, sought to retain the benefits of the wrongful, illegal, and reprehensible acts by performing, voluntary and intentional acts inconsistent with rejecting that conduct and those acts. All of these acts were done with the intent to harm the Plaintiffs and all the actions of these LLB employees, managers, vice principals, agents, high managerial agents, officers, and directors were done (i) within the scope of their offices or employment (ii) on the behalf of and for LLB's financial benefit and public well-being.

## J.    <u>Count Ten – Defective Premises</u>

280.    The factual allegations recited elsewhere in this Second Amended Complaint are incorporated by reference as if fully set forth herein. Plaintiffs also allege the following:

281.    At time of trial, Plaintiffs and the minor Plaintiffs will prove that they were invitees to the premises of Bear Creek. When the risk of criminal conduct is so great that it is both unreasonable and foreseeable, Defendant Bear Creek owes a duty of care to those who might be

harmed by criminal acts committed on its premises. Defendant Bear Creek was aware or should have been aware of the potential for actual criminal acts of intentional sexual assault and intentional sexual abuse and exploitation by Adam Isaacks against the minor Plaintiffs on its property and at other locations under their control and breached duty in not caring for the safety of the minor Plaintiffs.

282.    The acts or omissions of the Defendant Bear Creek pled above proximately caused injury to Plaintiffs.

**K.**    **Count Eleven – Breach of Fiduciary Duty**

283.    The factual allegations recited elsewhere in this Second Amended Complaint are incorporated by reference as if fully set forth herein. Plaintiffs also allege the following:

284.    In accordance with the foregoing facts and claims stated above, Defendants Adam Isaacks, Miranda Isaacks, District 12, ELL, and Little League Baseball are guilty of breach of fiduciary duty that was owed to the Plaintiffs. By way of the Plaintiffs' agreements and/or the special relationships of trust and confidence that said Defendants formed with the Plaintiffs in relation to the minor Plaintiffs registering and being members of the ELL, said Defendants had established fiduciary relationships with the Plaintiffs. Because a fiduciary relationship was established with said Defendants, they owed at least the following duties to the Plaintiffs:

(1)    Duty of loyalty and utmost good faith;

(2)    Duty of candor;

(3)    Duty to refrain from self-dealing;

(4)    Duty to act with integrity of the strictest kind;

(5)    Duty of fair and honest dealing; and

(6)    Duty of full disclosure.

285.     Based on the foregoing facts and claims asserted by Plaintiffs, Defendants Miranda

Isaacks, District 12, ELL, and LLB breached at least one or more of these duties noted above that

it owed as a fiduciary to the Plaintiffs in performing their duties in managing, directing, and/or

controlling ELL and Adam Isaacks. As a result of Defendants, Miranda Isaacks, District 12, ELL,

and LLB's breach and/or breaches of their fiduciary duties owed to the Plaintiffs, the Plaintiffs

sustained actual damages that resulted in a loss to the Plaintiffs which have not been remedied to

date by said Defendants. Furthermore, said Defendants even benefited from their relationship with

Plaintiffs, despite breaching their fiduciary duties owed to the Plaintiffs.

286.     As a result of Defendants Miranda Isaacks, District 12, ELL, and LLB's breach or

breaches of its fiduciary duty owed to the Plaintiffs, Plaintiffs are entitled to recover their actual

damages, out-of-pocket losses, consequential damages, mental anguish damages and exemplary

damages, including the damages outlined herein. Moreover, Plaintiffs are entitled to recover their

attorney's fees and court costs incurred due to the Defendants' breach and/or breaches of their

fiduciary duties owed to the Plaintiffs, which the Plaintiffs seek herein.

## VI.     ADDITIONAL FACTS RELATING TO MINOR PLAINTIFFS

### A. Additional Facts Relating to Minor Plaintiff, Child One

287.     In addition to the facts stated above, Plaintiff, Family One and Minor Plaintiff,

Child One, allege that from approximately 2018 through 2021, Child One suffered physical

sickness, mental anguish and injuries as a result of sexual assaults at the hands of Adam Isaacks,

while Adam Isaacks was the President of ELL and as Child One's Little League Coach. At the

time of these incidents, Adam Isaacks was under the supervision, management, direction,

employment and/or control of Defendants, District 12, ELL, and Little League Baseball. Child

One further alleges that Adam Isaacks secretly slipped alcohol and/or drugs to Child One and other

members of his Little League baseball team (without their knowledge or awareness) in violation of the Texas Alcoholic Beverage Code, § 106.06, or similar laws, and that these actions were a violation of the Texas Penal Code and are considered contributing to the delinquency of a minor, which constitute negligence *per se*.  Adam Isaacks used his position as a vice-principal and trusted executive officer of the ELL, as a coach, and as a trusted agent of ELL, District 12, and Little League Baseball and as a role model and mentor to gain the trust and confidence of Child One and his family in order to sexually assault Child One. The interaction and grooming of the minor Plaintiffs occurred, at least in part, on ELL property, among other places, as stated above, which led to the sexual assaults.

**B.**     **Additional Facts Relating to Minor Plaintiff, Child Two**

288.     In addition to the facts stated above, Plaintiffs, Family Two and Minor Plaintiff, Child Two, allege that during approximately 2019 through 2021, Child Two suffered physical sickness, mental anguish and injuries as a result of sexual assaults at the hands of Adam Isaacks, while Adam Isaacks was the president of ELL and as Child Two's Little League coach.  At the time of these incidents, Adam Isaacks was under the supervision, management, direction, employment and/or control of Defendants, District 12, ELL and Little League Baseball.  Child Two further alleges that Adam Isaacks secretly slipped alcohol and/or drugs to Child Two and other members of his Little League baseball team (without their knowledge or awareness) in violation of the Texas Alcoholic Beverage Code, § 106.06, or similar laws, and that these actions were a violation of the Texas Penal Code and are considered contributing to the delinquency of a minor, which constitute negligence *per se*.  Adam Isaacks used his position as a trusted executive officer of the ELL, as a coach, and as a trusted agent of ELL, District 12, and Little League Baseball and as a role model and mentor to gain the trust and confidence of Child Two and his family in order to sexually assault Child Two. The interaction and grooming of the minor Plaintiffs occurred,

at least in part, on ELL property, among other places, as stated above, which led to the sexual assaults.

**C.**   **Additional Facts Relating to Minor Plaintiff, Child Three**

289.    In addition to the facts stated above, Plaintiffs, Family Three and Minor Plaintiff, Child Three, allege that during approximately 2019 through 2021, Child Three suffered physical sickness, mental anguish and injuries as a result of sexual assaults at the hands of Adam Isaacks, while Adam Isaacks was the president of ELL and as Child Three's Little League coach.  At the time of these incidents, Adam Isaacks was under the supervision, management, direction, employment and/or control of Defendants, District 12, ELL, and Little League Baseball.  Child Three further alleges that Adam Isaacks secretly slipped alcohol and/or drugs to Child Three and other members of his Little League baseball team (without their knowledge or awareness)  in violation of the Texas Alcoholic Beverage Code, § 106.06, or similar laws, and that these actions were a violation of the Texas Penal Code and are considered contributing to the delinquency of a minor, which constitute negligence *per se*.  Adam Isaacks used his position as a trusted executive officer of the ELL, as a coach, and as a trusted agent of ELL, District 12, and Little League Baseball and as a role model and mentor to gain the trust and confidence of Child Three and his family in order to sexually assault Child Three. The interaction and grooming of the minor Plaintiffs occurred, at least in part, on ELL property, among other places, as stated above, which led to the sexual assaults.

**D.**   **Additional Facts Relating to Minor Plaintiff, Child Four**

290.    In addition to the facts stated above, Plaintiff, Family Four and Minor Plaintiff, Child Four, allege that during approximately 2019 through 2021, Child Four suffered physical sickness, mental anguish and injuries as a result of sexual assaults at the hands of Adam Isaacks,

while Adam Isaacks was the president of ELL and as Child Four's Little League coach.  At the time of these incidents, Adam Isaacks was under the supervision, management, direction, employment and/or control of Defendants, District 12, ELL, and Little League Baseball. Child Four further alleges that Adam Isaacks secretly slipped alcohol and/or drugs to Child Four and other members of his Little League baseball team (without their knowledge or awareness)  in violation of the Texas Alcoholic Beverage Code, § 106.06, or similar laws, and that these actions were a violation of the Texas Penal Code and are considered contributing to the delinquency of a minor, which constitute negligence *per se*.  Adam Isaacks used his position as a trusted executive officer of the ELL, as a coach, and as a trusted agent of ELL, District 12, and Little League Baseball and as a role model and mentor to gain the trust and confidence of Child Four and his family in order to sexually assault Child Four.  The interaction and grooming of the minor Plaintiffs occurred, at least in part, on ELL property, among other places, as stated above, which led to the sexual assaults.

**E.      Additional Facts Relating to Minor Plaintiff, Child Five**

291.    In addition to the facts stated above, Plaintiffs, Family Five and Minor Plaintiff, Child Five, allege that during approximately 2017 through 2021, Child Five suffered physical sickness, mental anguish and injuries as a result of sexual assaults at the hands of Adam Isaacks, while Adam Isaacks was the president of ELL and as Child Five's Little League coach.  At the time of these incidents, Adam Isaacks was under the supervision, management, direction, employment and/or control of Defendants, District 12, ELL, and Little League Baseball.  Child Five further alleges that Adam Isaacks secretly slipped alcohol and/or drugs to Child Five and other members of his Little League baseball team (without their knowledge or awareness) in violation of the Texas Alcoholic Beverage Code, § 106.06, or similar laws, and that these actions

were a violation of the Texas Penal Code and are considered contributing to the delinquency of a minor, which constitute negligence *per se*. Adam Isaacks used his position as a trusted executive officer of the ELL, as a coach, and as a trusted agent of ELL, District 12, and Little League Baseball and as a role model and mentor to gain the trust and confidence of Child Five and his family in order to sexually assault Child Five. The interaction and grooming of the minor Plaintiffs occurred, at least in part, on ELL property, among other places, as stated above, which led to the sexual assaults.

**F.     Additional Facts Relating to Minor Plaintiff, Child Six**

292.     In addition to the facts stated above, Plaintiff, Family Six and Minor Plaintiff, Child Six, allege that during approximately 2019 through 2021, Child Six suffered physical sickness, mental anguish and injuries as a result of sexual assaults at the hands of Adam Isaacks, while Adam Isaacks was the president of ELL and as Child Six's Little League coach. At the time of these incidents, Adam Isaacks was under the supervision, management, direction, employment and/or control of Defendants, District 12, ELL, and Little League Baseball. Child Six further alleges that Adam Isaacks secretly slipped alcohol and/or drugs to Child Six and other members of his Little League baseball team (without their knowledge or awareness) in violation of the Texas Alcoholic Beverage Code, § 106.06, or similar laws, and that these actions were a violation of the Texas Penal Code and are considered contributing to the delinquency of a minor, which constitute negligence *per se*. Adam Isaacks used his position as a trusted executive officer of the ELL, as a coach, and as a trusted agent of ELL, District 12, and Little League Baseball and as a role model and mentor to gain the trust and confidence of Child Six and his family in order to sexually assault Child Six. The interaction and grooming of the minor Plaintiffs occurred, at least in part, on ELL property, among other places, as stated above, which led to the sexual assaults.

96

**G.** **Additional Facts Relating to Minor Plaintiff, Child Seven**

293.    In addition to the facts stated above, Plaintiff, Family Seven and Minor Plaintiff, Child Seven, allege that in 2021, Child Seven suffered physical sickness, mental anguish and injuries as a result of sexual assaults at the hands of Adam Isaacks, while Adam Isaacks was the president of ELL and as Child Seven's Little League coach.  At the time of these incidents, Adam Isaacks was under the supervision, management, direction, employment and/or control of Defendants, District 12, ELL, and Little League Baseball.  Child Seven further alleges that Adam Isaacks secretly slipped alcohol and/or drugs to Child Seven and other members of his Little League baseball team (without their knowledge or awareness) in violation of the Texas Alcoholic Beverage Code, § 106.06, or similar laws, and that these actions were a violation of the Texas Penal Code and are considered contributing to the delinquency of a minor, which constitute negligence *per se*.  Adam Isaacks used his position as a trusted executive officer of the ELL, as a coach, and as a trusted agent of ELL, District 12, and Little League Baseball and as a role model and mentor to gain the trust and confidence of Child Seven and his family in order to sexually assault Child Seven.  The interaction and grooming of the minor Plaintiffs occurred, at least in part, on ELL property, among other places, as stated above, which led to the sexual assaults.

**H.** **Additional Facts Relating to Minor Plaintiff, Child Eight**

294.    In addition to the facts stated above, Plaintiffs, Family Eight and Minor Plaintiff, Child Eight, allege that during approximately 2018 through 2021, Child Eight suffered physical sickness, mental anguish and injuries as a result of sexual assaults at the hands of Adam Isaacks, while Adam Isaacks was the president of ELL and as Child Eight's Little League coach.  At the time of these incidents, Adam Isaacks was under the supervision, management, direction, employment and/or control of Defendants, District 12, ELL, and Little League Baseball. Child

Eight further alleges that Adam Isaacks secretly slipped alcohol and/or drugs to Child Eight and other members of his Little League baseball team (without their knowledge or awareness) in violation of the Texas Alcoholic Beverage Code, § 106.06, or similar laws, and that these actions were a violation of the Texas Penal Code and are considered contributing to the delinquency of a minor, which constitute negligence per se.  Adam Isaacks used his position as a trusted executive officer of the ELL, as a coach, and as a trusted agent of ELL, District 12, and Little League Baseball and as a role model and mentor to gain the trust and confidence of Child Eight and his family in order to sexually assault Child Eight.  The interaction and/or grooming of the minor Plaintiffs occurred, at least in part, on ELL property, among other places, as stated above, which led to the sexual assaults.

## VII.   DAMAGES FOR PLAINTIFFS AND MINOR PLAINTIFFS

295.   As a result of Defendants' conduct, Plaintiffs suffered life-altering harm and seek the following damages:

### A.   Damages for Plaintiff, Family One, and Minor Plaintiff, Child One

296.   As a result of the conduct and physical sexual assaults described herein, Plaintiff, Family One and minor Plaintiff, Child One, have incurred medical and/or counseling expenses in the past and in all reasonable probability will incur medical and/or counseling expenses in the future.

297.   Minor Plaintiff, Child One, has experienced physical sickness, pain and suffering and bodily injury in the past and in all reasonable probability will sustain and suffer physical sickness, pain and suffering and bodily injury in the future.

298.   Minor Plaintiff, Child One, has suffered severe mental anguish in the past and in all reasonable probability will sustain severe mental anguish in the future.

299.     Minor Plaintiff, Child One, has suffered physical impairment in the past and in all reasonable probability will suffer physical impairment in the future.

300.     As a result of the above, minor Plaintiff, Child One, seeks damages within the jurisdictional limits of the Court.

**B.       Damages for Plaintiffs, Family Two, and Minor Plaintiff, Child Two**

301.     As a result of the conduct and physical sexual assaults described herein, Plaintiffs, Family Two and minor Plaintiff, Child Two, have incurred medical and/or counseling expenses in the past and in all reasonable probability will incur medical and/or counseling expenses in the future.

302.     Minor Plaintiff, Child Two, has experienced physical sickness, pain and suffering and bodily injury in the past and in all reasonable probability will sustain and suffer physical sickness, pain and suffering and bodily injury in the future.

303.     Minor Plaintiff, Child Two, has suffered severe mental anguish in the past and in all reasonable probability will sustain severe mental anguish in the future.

304.     Minor Plaintiff, Child Two, has suffered physical impairment in the past and in all reasonable probability will suffer physical impairment in the future.

305.     As a result of the above, minor Plaintiff, Child Two, seeks damages within the jurisdictional limits of the Court.

**C.       Damages for Plaintiffs, Family Three, and Minor Plaintiff, Child Three**

306.     As a result of the conduct and physical sexual assaults described herein, Plaintiffs, Family Three and minor Plaintiff, Child Three, have incurred medical and/or counseling expenses in the past and in all reasonable probability will incur medical and/or counseling expenses in the future.

307.     Minor Plaintiff, Child Three, has experienced physical sickness, pain and suffering and bodily injury in the past and in all reasonable probability will sustain and suffer physical sickness, pain and suffering and bodily injury in the future.

308.     Minor Plaintiff, Child Three, has suffered severe mental anguish in the past and in all reasonable probability will sustain severe mental anguish in the future.

309.     Minor Plaintiff, Child Three, has suffered physical impairment in the past and in all reasonable probability will suffer physical impairment in the future.

310.     As a result of the above, minor Plaintiff, Child Three, seeks damages within the jurisdictional limits of the Court.

**D.          Damages for Plaintiff, Family Four, and Minor Plaintiff, Child Four**

311.     As a result of the conduct and physical sexual assaults described herein, Plaintiff, Family Four and minor Plaintiff, Child Four, have incurred medical and/or counseling expenses in the past and in all reasonable probability will incur medical and/or counseling expenses in the future.

312.     Minor Plaintiff, Child Four, has experienced physical sickness, pain and suffering and bodily injury in the past and in all reasonable probability will sustain and suffer physical sickness, pain and suffering and bodily injury in the future.

313.     Minor Plaintiff, Child Four, has suffered severe mental anguish in the past and in all reasonable probability will sustain severe mental anguish in the future.

314.     Minor Plaintiff, Child Four, has suffered physical impairment in the past and in all reasonable probability will suffer physical impairment in the future.

315.     As a result of the above, minor Plaintiff, Child Four, seeks damages within the jurisdictional limits of the Court.

**E.**      **Damages for Plaintiffs, Family Five, and Minor Plaintiff, Child Five**

316.     As a result of the conduct and physical sexual assaults described herein, Plaintiffs, Family Five and minor Plaintiff, Child Five, have incurred medical and/or counseling expenses in the past and in all reasonable probability will incur medical and/or counseling expenses in the future.

317.     Minor Plaintiff, Child Five, has experienced physical sickness, pain and suffering and bodily injury in the past and in all reasonable probability will sustain and suffer physical sickness, pain and suffering and bodily injury in the future.

318.     Minor Plaintiff, Child Five, has suffered severe mental anguish in the past and in all reasonable probability will sustain severe mental anguish in the future.

319.     Minor Plaintiff, Child Five, has suffered physical impairment in the past and in all reasonable probability will suffer physical impairment in the future.

320.     As a result of the above, minor Plaintiff, Child Five, seeks damages within the jurisdictional limits of the Court.

**F.**      **Damages for Plaintiff, Family Six, and Minor Plaintiff, Child Six**

321.     As a result of the conduct and physical sexual assaults described herein, Plaintiff, Family Six and minor Plaintiff, Child Six, have incurred medical and/or counseling expenses in the past and in all reasonable probability will incur medical and/or counseling expenses in the future.

322.     Minor Plaintiff, Child Six, has experienced physical sickness, pain and suffering and bodily injury in the past and in all reasonable probability will sustain and suffer physical sickness, pain and suffering and bodily injury in the future.

323.    Minor Plaintiff, Child Six, has suffered severe mental anguish in the past and in all reasonable probability will sustain severe mental anguish in the future.

324.    Minor Plaintiff, Child Six, has suffered physical impairment in the past and in all reasonable probability will suffer physical impairment in the future.

325.    As a result of the above, minor Plaintiff, Child Six, seeks damages within the jurisdictional limits of the Court.

**G.      Damages for Plaintiff, Family Seven, and Minor Plaintiff, Child Seven**

326.    As a result of the conduct and physical sexual assaults described herein, Plaintiff, Family Seven and minor Plaintiff, Child Seven, have incurred medical and/or counseling expenses in the past and in all reasonable probability will incur medical and/or counseling expenses in the future.

327.    Minor Plaintiff, Child Seven, has experienced physical sickness, pain and suffering and bodily injury.

328.    Minor Plaintiff, Child Seven, has suffered severe mental anguish in the past and in all reasonable probability will sustain severe mental anguish in the future.

329.    Minor Plaintiff, Child Seven, has suffered physical impairment in the past and in all reasonable probability will suffer physical impairment in the future.

330.    As a result of the above, minor Plaintiff, Child Seven, seeks damages within the jurisdictional limits of the Court.

**H.      Damages for Plaintiffs, Family Eight, and Minor Plaintiff, Child Eight**

331.    As a result of the conduct and physical sexual assaults described herein, Plaintiffs, Family Eight and minor Plaintiff, Child Eight, have incurred medical and/or counseling expenses in the past and in all reasonable probability will incur medical and/or counseling expenses in the

future. Minor Plaintiff, Child Eight, has experienced physical sickness, pain and suffering and bodily injury.

332.    Minor Plaintiff, Child Eight, has suffered severe mental anguish in the past and in all reasonable probability will sustain severe mental anguish in the future.

333.    Minor Plaintiff, Child Eight, has suffered physical impairment in the past and in all reasonable probability will suffer physical impairment in the future.

334.    As a result of the above, minor Plaintiff, Child Eight, seeks damages within the jurisdictional limits of the Court.

## VIII.    PUNITIVE DAMAGES

335.    Pursuant to the foregoing facts and allegations, the Plaintiffs and minor Plaintiffs would show that the acts engaged in were intentional or were committed with reckless disregard by all Defendants, and that the Plaintiffs and minor Plaintiffs are entitled to recover punitive and exemplary damages from each of the Defendants.

## IX.    JURY DEMAND

336.    Plaintiffs requests a trial by jury and tender the appropriate fee.

## X. ATTORNEY'S FEES, INTEREST, AND COSTS

337.    Because of Defendants' conduct described above, the Plaintiffs had to engage the Bernsen Law Firm to prosecute their claims and the claims of the minor Plaintiffs asserted herein. Consequently, the Plaintiffs and minor Plaintiffs would respectfully show this Court that they are entitled to recover their reasonable and necessary attorney's fees and costs pursuant to the federal Safe Sports Act, Federal Anti-Human Trafficking Act, 18 U.S.C. § 2255, and other federal statutes, as well as for their claims of conspiracy, aiding and abetting, and breach of fiduciary duty. Plaintiffs are further entitled to and seek recovery of all prejudgment and post-judgment interest.

## XI. <u>CONDITIONS PRECEDENT</u>

338.     The Plaintiffs and minor Plaintiffs assert that all conditions precedent have occurred in order to bring the foregoing claims herein. The Plaintiffs and minor Plaintiffs reserve the right to supplement and/or amend this Complaint at a later date.

## XII. <u>ALTERNATIVE PLEADINGS</u>

339.     The causes of action asserted herein, and the supporting factual allegations to such causes of actions, by the Plaintiffs and minor Plaintiffs are pled in the alternative to one another and/or jointly, where applicable.

## XIII. <u>RELIEF REQUESTED</u>

340.     Considering the premises, the Plaintiffs pray for the following relief:

A.     An award of actual damages, consequential damages, and punitive damages to the Plaintiffs and minor Plaintiffs;

B.     An award to the Plaintiffs and minor Plaintiffs of reasonable and necessary attorneys' fees and costs incurred in an amount to be determined by the Court;

C.     Costs of suit incurred herein;

D.     Prejudgment and post-judgment interest, as provided by law, if applicable; and

E.     Such other and further relief in law or in equity to which the Plaintiffs and minor Plaintiffs may be justly entitled to receive.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs and minor Plaintiffs, pray that the Defendants herein be cited to appear and answer herein, and that upon a final trial of this case, a judgment be entered in favor of Plaintiffs and against Defendants, for all actual damages and consequential damages in the amount within the jurisdictional limits of this Court; for exemplary damages; for all attorney's fees incurred by Plaintiffs; for all pre-judgment and post-judgment interest; for all costs of court; and for any and all other relief allowed by law or in equity, that Plaintiffs may show themselves justly entitled to receive.

Respectfully submitted,

**BERNSEN LAW FIRM**

/s/ David E. Bernsen
**David E. Bernsen**
Texas Bar No. 02217500
dbernsen@bernsenlaw.com
**Cade Bernsen**
Texas Bar No. 24073918
cbernsen@bernsenlaw.com
**Marianne Laine**
Texas Bar No. 24062834
mlaine@bernsenlaw.com
**Jamie Matuska**
Texas Bar No. _____
jmatuska@bernsenlaw.com
420 N. MLK, Jr. Pkwy
Beaumont, Texas 77701
(409) 212-9994 – Telephone
(409) 212-9411 – Facsimile

**Tanner Franklin**
Franklin Law Firm PLLC
2528 Highway 103
P.O. Box 274
Etoile, Texas 75944
(936) 596-0476 – Telephone
(888) 430-2559 – Facsimile
tfranklin@tranklinlawfirm.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on the following counsel by mail, electronically, and/or via facsimile on the 1st day of February 2023.

/s/ David E. Bernsen
David E. Bernsen