```
                  THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF TEXAS
                        LUFKIN DIVISION

                        *  *  *  *  *

FAMILY ONE, ET AL            *    NO. 9:22-CV-28-MJT-ZJH
                             *       Lufkin, Texas
VS.                          *
                             *    11:45 a.m. - 1:40 p.m.
ADAM DALE ISAACKS, ET AL     *    March 2, 2023

                        *  *  *  *  *
```

**MOTION HEARING**

BEFORE THE HONORABLE ZACK J. HAWTHORN
UNITED STATES MAGISTRATE JUDGE

```
                        *  *  *  *  *
```

Proceedings recorded by computer stenography
Produced by computer-aided transcription

*Edward L. Reed*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1605

1   **APPEARANCES:**

2   For the Plaintiffs:

3        MR. DAVID E. BERNSEN
         MR. D. CADE BERNSEN
4        MS. MARIANNE E. LAINE
         **The Bernsen Law Firm**
5        420 N. Martin Luther King Pkwy
         Beaumont, TX 77701
6
         MR. TANNER G. FRANKLIN
7        **Franklin Law Firm, PLLC**
         2528 Highway 103
8        Etoile, TX 75944

9   For Evadale Little League:

10       MR. KENT M. ADAMS
         **Wilson Elser Moskowitz Edelman & Dicker, LLP**
11       909 Fannin Street, Suite 3300
         Houston, TX 77010
12
    For Little League Baseball, Inc. and
13  Texas District 12 Little League:

14       MR. WILLIAM G. FOX, JR.
         **Winston & Strawn, LLP**
15       2121 N. Pearl Street
         Suite 900
16       Dallas, TX 75201

17  Courtroom Deputy:

18       TONYA PIPER

19  Court Reporter:

20       ED REED

21

22

23

24

25

*Edward L. Reed*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1605

**P R O C E E D I N G S**

**11:45 P.M. - MARCH 2, 2023**

1

2

3    THE COURT:  The Court calls Case No.

4  9:22-CV-28, styled *Family One* all the way up through

5  it looks like *Family Eight, the Plaintiffs, vs. Adam*

6  *Isaacks, Miranda Isaacks, Little League Baseball, Inc.,*

7  *Little League Baseball International, Texas District 12,*

8  *Evadale Little League, and Bear Creek Hunting Club.*

9  We're set this morning on various discovery and

10  Protective Order related motions.

11    Who's here for the plaintiffs?

12    MR. DAVID BERNSEN:  Your Honor, David Bernsen,

13  Cade Bernsen, Marianne Laine, Tanner Franklin, and

14  Britlyn Sanders for the plaintiffs.

15    THE COURT:  Okay.  And let's see, for the

16  defendants?

17    MR. FOX:  Yes, Your Honor.  William Fox of

18  Winston & Strawn for Texas District 12 Little League

19  and Little League Baseball, Incorporated.

20    MR. ADAMS:  Your Honor, Kent Adams for Evadale

21  Little League.

22    THE COURT:  Okay, I guess nobody showed up for

23  Bear Creek Hunting Club or the Isaackses, so we'll go

24  forward.

25    Okay, let's -- I'm going to approach it

1  this way:  The first motions I'm going to talk about

2  are the Motions to Strike the Confidentiality

3  Designations.  That's Brent Stahlnecker's deposition,

4  Document No. 95; Samantha Mahaffey's deposition,

5  Document No. 98; and Various Confidentiality

6  Designations, Document No. 102.

7            I'm going to set the stage in this way:

8  I'm just going to read to the parties -- and I'm sure

9  they've read it, but just to make sure everybody is on

10  the same page, I'm going to read *Binh Hoa Le vs. Exeter*

11  *Finance Corporation,* 990 F.3d, 410, Fifth Circuit 2021,

12  and I'm just going to read some of the language from

13  that opinion, starting at page looks like 418.

14            "In our view" -- this is the Fifth Circuit

15  talking, obviously -- "courts should be ungenerous with

16  their discretion to seal judicial records, which plays

17  out in two legal standards relevant here.  The first

18  standard, requiring only 'good cause', applies to

19  Protective Orders, sealing documents produced in

20  discovery.  The second standard, a stricter balancing

21  test, applies 'once a document is filed on the public

22  record -- when a document becomes a judicial record.'

23  Under both standards, the working presumption is that

24  judicial records should not be sealed.  That's why

25  'judges, not litigants,' must undertake a case-by-case,

1   document by document, line by line, balancing of the
2   public's common right of access against the interests
3   favoring nondisclosure.  Sealings must be explained at
4   a level of detail that will allow for this Court's
5   review.  And a court abuses its discretion if it make's
6   no mention of the presumption in favor of the public's
7   access to judicial records and fails to articulate any
8   reasons that would support sealing.
9            "Perhaps most disquieting, documents
10  marked confidential" -- in this case -- "provided the
11  basis for summary judgment -- a dispositive order
12  adjudicating the litigants' substantive rights, yet
13  there was no mention of the presumption in favor of the
14  public's access to judicial records.
15           "At the *discovery* stage, when parties are
16  exchanging information, a stipulated protective order
17  under Rule 26 may well be proper.  Party-agreed secrecy
18  has its place -- for example, honoring legitimate
19  privacy interests and facilitating the efficient
20  exchange of information.  But at the *adjudicative*
21  stage, when materials enter the court record, the
22  standard for shielding records from public view is far
23  more arduous.  The conflation error -- equating the
24  standard for keeping un filed discovery confidential
25  with the standard for placing filed materials under

1  seal -- is a common one and one that over privileges
2  secrecy and devalues transparency.
3              "The secrecy of judicial records,
4  including stipulated secrecy, must be justified and
5  weighed against the presumption of openness that can be
6  rebutted only by compelling countervailing interests
7  favoring non-disclosure.
8              "Legal arguments, and the documents
9  underlying them, belong in the public domain.  When it
10  comes to protecting the right of access, the judge is
11  the public interest's principal champion.  And when the
12  parties are mutually interested in secrecy, the judge
13  is its *only* champion.
14              "With great respect, we urge litigants and
15  our judicial colleagues to zealously guard the public's
16  right of access to judicial records -- *their* judicial
17  records -- so that justice may not be done in a
18  corner."
19              Okay, so I've read the back-and-forth
20  from the parties on the deposition excerpts and the
21  exhibits, and the parties seem to be both correct, but
22  they are using different standards.
23              So, looking at the stipulated Protective
24  Order -- now, this is an agreement between the
25  plaintiffs and the defendants, it defines

1  confidential -- or excuse me, let me go to page 2,

2  Confidentiality Designation.

3              "Any producing party must designate any

4  discovery material as confidential, under the terms of

5  this order, if such party believes reasonably and in

6  good faith that it contains commercial, proprietary,

7  personal, or privileged information."

8              Now, that is about as broad as you could

9  possibly get in two ways:

10              First, anything is proprietary.  Unless

11  you are just giving somebody a blank sheet of paper,

12  anything is proprietary.  If you give the other side an

13  email, the email address is proprietary.  The fact that

14  it's on Outlook instead of Lotus is proprietary.

15  Anything is proprietary.

16              Secondly, it's a subjective standard,

17  it's not an objective standard.  So, even if it's not

18  proprietary objectively, if that party, the producing

19  party, reasonably and in good faith believes, if they

20  believe that it contains that information, it must --

21  and the language says "must" -- designate it as

22  confidential.

23              I understand why the parties, both the

24  plaintiffs and the defendants, agree to a Protective

25  Order.  I sign these in a lot of cases.  We've got a

 1    form Protective Order on some of the judges' tabs on

 2    the website.  But this standard applies just to the

 3    exchange of information.  The parties can pretty much

 4    contract whatever they want to contract to when it

 5    comes to exchanging discovery in that Protective Order.

 6            But then that different standard applies

 7    when the documents are filed in the public domain, which

 8    is where we are right now, obviously.  When that

 9    happens, the standard is -- and they didn't really set

10    it out particularly in the Fifth Circuit opinion.  They

11    just said case-by-case, line-by-line, page-by-page.

12    But the sound bite of it is there has to be some kind

13    of compelling, countervailing interest to keep

14    something sealed.

15            So here's my proposition -- and I'll get

16    feedback from the parties -- is that I've looked at

17    every single document that the plaintiffs are

18    challenging the confidentiality designation.  And I

19    don't need to go through every single one line-by-line,

20    page-by-page -- which I did -- to know that these very

21    smart lawyers over here on my left can make an argument

22    that they reasonably believe it's proprietary or

23    personal or commercial.  Commercial.  I mean, you know,

24    what's not commercial.

25            And so the motion that's pending before

1    me by the plaintiffs is a Motion to Strike the

2    confidentiality designation.  That's what's in front of

3    me.  And so the law for that is, the Protective Order

4    that the parties agreed to and Judge Truncale signed.

5              So, again, if I grant their Motion to

6    Strike the confidentiality designation, on what basis

7    would it be?  Because, like I said, these lawyers are

8    going to be able to argue that all this information

9    falls within the agreed-to definition of

10   confidentiality.

11             So, with that, my impulse is to just

12   deny the Motion to Strike and I'll give them an

13   opportunity -- I'll give them some opportunity.  If the

14   plaintiffs have just some winning argument that there

15   is no way there is a good faith basis that this is not

16   proprietary, I'll give them a chance to set that

17   forward.  I'm doubtful of it, but I'll give them an

18   opportunity.

19             But moving forward, and we'll talk about

20   this, the plaintiffs' Motion to Unseal First Amended

21   Complaint, that is under the higher *Binh Hoa Le*

22   standard; okay?  So we'll analyze that as to whether

23   the defendants can point to me that those various

24   paragraphs in that First Amended Complaint -- I know

25   it's been superseded with the Second Amended One that

1   has some redactions -- they are going to have to

2   convince to me that there is some compelling

3   countervailing interest to keep those portions of it

4   sealed.

5               Now, to the extent that the plaintiffs or

6   someone else argues that just by filing the Motion to

7   Strike the confidentiality designation with the sealed

8   attachment, then it is now in the public domain and the

9   *Binh Hoa Le* standard must apply.

10              I understand that that's an attractive

11  argument, but the problem with that is, is that if that

12  were the case, then a Protective Order is not worth the

13  piece of paper it's written on because that would just

14  provide an end-around any Protective Order.

15              For example, the parties file a Title VII

16  lawsuit, or whatever.  They enter into and agreed a

17  Protective Order, standard, whatever way you want to

18  mention it.  Defendant then produces Rule 26

19  disclosures, employment files, records, business

20  information, whatever the case is.  They are very open

21  and generous with their discovery to the plaintiffs.

22              So all the plaintiff then needs to do is

23  file a motion to de-designate that confidential

24  designation under whatever grounds.  And by doing that,

25  the *Binh Hoe Le* standard then applies and the

 1  Protective Order doesn't apply, which totally

 2  circumvents the purpose of the Protective Order.  It's

 3  a full and free, efficient exchange of information.

 4              So, as it just relates to a Motion to

 5  Strike confidentiality designation and that specific

 6  concrete method, I don't believe that's in the public

 7  domain, so to speak, because we're just talking about

 8  Grist Mill Discovery Exchange, which I'm going to talk

 9  about when it's used in an adjudicative fashion here in

10  a little bit.

11              But there really is no dispute, per se,

12  among the parties about whether this document shows

13  that there is some type of joint enterprise liability

14  on behalf of Little League and District 12 and Evadale

15  Little League and things like that.  These are just

16  basically stand-alone motions having to do with the

17  confidentiality of the documents.

18              That having been said, going forward,

19  when the parties file a motion, whether it's a response

20  to a Motion for Summary Judgment, expert, Motion in

21  Limine, whatever it is -- and I know the Protective

22  Order says, if I mark this confidential, you have to

23  file it under seal -- the way our local rules are

24  written is, if you file a response to a Motion for

25  Summary Judgment and a few attachments are covered

1   within the Protective Order, you file those under seal,

2   you are supposed to accompany that with a separate

3   Motion to Seal.  That's what the parties will need to

4   do going forward.

5              And so if -- probably not a lot of

6   documents on a response to a 12(b)(6) Motion to

7   Dismiss, but let's just say that the motion recent

8   Motion to Dismiss was a Motion for Summary Judgment.  I

9   assume the plaintiffs will have a response to it with a

10  lot of attachments, probably a lot of attachments that

11  have been marked confidential.  So, according to the

12  Protective Order, unless it's amended, they will have

13  to file those under seal, but they will have to just go

14  accompany that with either a Motion to Seal or a Motion

15  to Unseal to say, "Hey, we recognize this is covered by

16  the Protective Order, but we think, under the Fifth

17  Circuit standard for public records, that, you know,

18  these need to be unsealed.  Then it will be up to

19  either myself or Judge Truncale to make that ruling.

20             Just to give the parties a head-up where

21  my head is at, again, I've gone through all these

22  exhibits, all the depo excerpts, and I find that all of

23  them don't meet the higher standard in *Binh Hoe Le,*

24  with the exception of Ms. Mahaffey's deposition, page

25  160, line 2 to 161, line 22.

1                    So, I could be persuaded otherwise, but

2     I'm just letting you know, all these exhibits and depo

3     excerpts at issue, I find they are all covered by the

4     Discovery Protective Order, but I find, except say for

5     one, are not covered by the higher-judicial-record-

6     should-not-be-unsealed standard.

7                    Okay.  So that's what I plan to do.  I'll

8     get some feedback from the plaintiffs, starting with

9     what I mentioned a few minutes ago, and that is, is

10    there any argument from the plaintiffs that any of

11    these documents at issue don't fall in the very broad

12    definition of confidential information that's on page 2

13    of the Protective Order?

14                    MS. LAINE:  Your Honor, we don't believe all

15    of them fit that definition.  However, I can see how

16    under the [u/i] confidential in the paragraph 3, that

17    it could be construed that way.  Actually, we've gotten

18    to a point now where there are in the neighborhood of

19    33,000 documents, and so we're kind of put into the

20    position that in normal or routine motion practice,

21    we're scared of violating the Protective Order.  It's

22    just become unworkable because they've labeled

23    probably, you know, 90-something percent as

24    confidential, which by itself, that's evidence of bad

25    faith.  And in order to invoke this Protective Order,

 1   it has to be reasonable and in good faith.  And so that

 2   is one basis of our argument, that it does not fall

 3   within the Protective Order.

 4         THE COURT:  Let me stop you right there.

 5   I'll be honest with everybody here.  When I sign a

 6   Protective Order, my eyes glaze over; okay?  I try to

 7   read all of it to a "T" and say, yeah, this is a good

 8   idea or a bad idea.  I used to do that when I was a

 9   younger judge and I had more energy.  Now I don't have

10   as much energy.  So I just kind of say, yeah, it looks

11   all right and I sign my name to it.  I even do that

12   much.

13         I definitely understand why the Protective

14   Order was suggested, and I don't know who suggested or

15   brought it up.  It's common sense in this case why you

16   would have one, obviously, for the privacy interest of

17   the plaintiffs.  But it appears that the plaintiffs

18   agreed to too much or too broad of a definition of

19   confidential information.  I don't think it's bad faith

20   because, like I said, these lawyers -- and I've a trial

21   with one of them -- are very smart, and they are going

22   to be able to meet that burden to say something is

23   commercial or is -- I mean, anything is commercial and

24   proprietary.

25         Now, there is nothing that prevents the

1  plaintiffs -- and this is actually set forth in the

2  Protective Order -- to file a Motion to amend it with

3  Judge Truncale or myself, to say, you know what, it's

4  gotten to a point now where this Protective Order is

5  too broad, and so we want more narrow definitions going

6  forward because we're getting 30,000 documents, 29,500

7  of which they have marked "confidential" and we can't

8  litigate this case under these handcuffs.  We just

9  can't do it.

10          And so we need to put some modifiers in

11  here on the definition of "confidential."  And whatever

12  modifiers you want to put in is up to you.  And, of

13  course, if there is some kind of disagreement between

14  the parties on the definition, then that could be

15  entertained by either Judge Truncale or myself or

16  whomever.

17          But I think going forward, that's how this

18  needs to be handled is just try to amend -- if the

19  plaintiffs think it's took restrictive, and maybe the

20  defendants do, too, I don't know.  But if there is a

21  feeling that if this is took broad and everything is

22  too confidential and it's being misused, then just file

23  a motion to amend it with the Court if it can't be

24  agreed to.  That's my suggestion.

25          MR. DAVID BERNSEN:  Your Honor, for the

1  record, David Bernsen.  And we will do so.  The

2  foundation or the beginning of the Protective Order was

3  during the Pretrial Conference when we informed the

4  Court and defense counsel that we were dealing with

5  very sensitive issues regarding the records of these

6  eight young children, these boys that had been sexually

7  abused in this case.  The defendants at that time, as I

8  recall, said, "Well, we may have some documents that

9  may need to be confidential as well."  I said that's

10  fine and we worked through it.

11          And then when they produced -- when the

12  defendants produced all these records, they summarily

13  marked everything "confidential."  Thousands, tens of

14  thousands of those documents or pages are in the public

15  domain.  They are the rules, the rules for 2018, '19,

16  '20, '21 and '22.  And it was just an effort to mark

17  everything that they produced under the guise that it's

18  protected, the document, under the Protective Order.

19          I don't think it was good faith.  That

20  wasn't what we were talking about.  We were working on

21  a relationship at that time with -- I don't even know

22  if present counsel was there at the time.  But we were

23  working with the defendants on that.  Having been on

24  the defense side, I've been there.

25          But what became apparent after each of

1    the various document dumps is that they were putting

2    that confidentiality stamp on everything.  And so we've

3    been complaining about that and going through it,

4    trying to work with defense counsel, and it's just not

5    manageable, to where we have to file a Motion to Seal

6    the Motion to Unseal the documents, and it gets to the

7    point where it isn't workable.  And quite frankly and

8    candidly, it's not in good faith.  I mean, it is an

9    effort to obscure the facts and documents that in any

10   other case would not be confidential.

11           So we will take the Court's recommendation

12   and we will be filing a Motion to Amend it because I

13   think it's being misused and it's a tactic, if you

14   will.  The defendants will file documents in the

15   public's record, for instance, the Motion to Dismiss,

16   saying that plaintiffs don't have enough facts or

17   information to state a cause of action.  We then take

18   documents from them or that have been produced that

19   shows to the contrary what they have said in their

20   public disclosure, that their statements are not true.

21   And yet we have to circumvent the disclosure by sealing

22   it or redacting it.  And it's very frustrating and it's

23   unfair.

24           And so I hear what the Court is saying

25   concerning the lawyers that we have here on this side

```
 1  of the table.  We'll address that.  But it's -- they
 2  are using it as a sword and a shield, this
 3  confidentiality, and I think misusing it to their --
 4  or trying to use it to their advantage and our
 5  disadvantage.  And that's what our frustration is in
 6  terms of the documents, or for that matter even the
 7  depositions.
 8          THE COURT:  Okay, but here's what I'm saying,
 9  Mr. Bernsen, is I'm saying everything that I've looked
10  at, save for that one exception, it doesn't meet the
11  standard.  When they mark confidential, that's the
12  standard.  I think it's confidential under the
13  Protective Order.  I don't think it's confidential when
14  it's in the public domain.
15          So I can't decide it right now because
16  there is not a Motion to Unseal -- and I'm not talking
17  about the confidential designations.  So, when you
18  respond to that Motion for Summary Judgment, or
19  whatever it is, and all 25 of your exhibits are filed
20  under seal, okay, because they all have that stamp on
21  it and that's what you have to do under a Protective
22  Order as written, file a Motion to Unseal and say,
23  "Look, this is the *Binh Hoa Le* case.  The public has a
24  right to know.  There is no compelling necessity to
25  keep this sealed," and they'll have an opportunity to
```

1  respond.  And then Judge Truncale and myself are guided

2  by the what the Fifth Circuit has said in that case;

3  okay?

4            So it might be a problem because it's

5  tedious, but this is what y'all have agreed to and this

6  is what I have to enforce, unless there is an amended

7  order.

8            MR. DAVID BERNSEN:  All right, Judge.

9            THE COURT:  All right.  Any response from the

10  defendants?

11            MR. ADAMS:  Your Honor, Kent Adams for Evadale

12  Little League.  May I introduce someone to the Court.

13  This is his first time here.  William Fox is a partner

14  with Winston & Strawn, he's a graduate of the

15  University of Virginia, undergrad at Duke University

16  Law School, and he's worked for a Texas Supreme Court

17  Judge and a Northern District of Texas Federal Judge.

18  I just wanted to introduce him to the Court since he

19  hasn't been here, Your Honor.

20            THE COURT:  Okay.  All right, Mr. Fox, any

21  response?

22            MR. FOX:  Yes, Judge, thank you for the

23  guidance.

24            And thank you for the introduction,

25  Mr. Adams.

```
 1              We do not believe that we have ever acted
 2    in bad faith in this case.  And the example that I will
 3    provide the Court, I believe, crystallizes that -- and
 4    we will get into it, I'm sure, in a moment -- is the
 5    also pending Motion to Unseal the Amended Complaint.
 6              As Mr. Bernsen had said, there is material
 7    in that pleading that came from documents that had
 8    confidentiality designations on them.
 9         THE COURT:  Okay, let's just talk about that
10    now.  I'm not accusing anybody of bad faith, but let's
11    segue into Document 112 now, and that's the Motion to
12    Unseal.
13              So tell me, Mr. Fox, the compelling
14    countervailing interests of keeping paragraphs 109,
15    first sentence, third sentence; 111, 113, 114, 115
16    sealed from the public.
17         MR. FOX:  Yes, Judge.  May I go back to the
18    table and pick up my --
19         THE COURT:  Yes, sir.
20         MR. FOX:  So I'll start off by saying that we
21    recognize that the standard for sealing something,
22    sealing a public record, is higher than the Protective
23    Order standard.  We have to overcome the presumption of
24    public access to court records.  This was announced by
25    the Supreme Court in the Nixon case that we cite and
```

the *Apple* case from the Federal Circuit and the *Binh*
*Hoe Le* case in the Fifth Circuit and the *Trover* case
from the Eastern District of Texas.  The *Nixon* case
and the *Apple* case both recognize that one of the
situations in which the presumption is overcome is when
the document to be sealed contains sensitive business
information.

      *[Audio problem developed, after which a recess*
*is taken and the proceedings resumed as follows:]*

      THE COURT:  Mr. Fox, if you can go back to the
podium.

      MR. FOX:  Thank you, Judge.

      I believe where I left off is that I was
contending that the two categories of information in
which these six paragraphs fall, they fall into the
sensitive business information category, and within
that there are two different categories that we have
discussed in our briefing.  One of them is information
about internal budget deliberations of Little League
Baseball, and the second category is internal
deliberations about policies and procedures, mainly
draft policies and procedures.

      Mr. Stahlnecker's declaration that we
attached to Docket 144 discusses both of those things
and explains why these categories of information are

1   sensitive.

2              With regard to paragraph 109, which

3   contains the internal budgetary information, he says,

4   "Disclosing Little League's internal deliberations

5   regarding budget allocations, including about safety

6   related issues, would harm Little League's competitive

7   standing by, for example, disadvantaging Little League

8   in negotiations with current and potential vendors who

9   would not otherwise know what internal budget

10  allocations Little League makes and who could use the

11  disclosed information to secure more favorable

12  financial arrangements with Little League, that is,

13  financial arrangements less favorable to Little League.

14        THE COURT:  So how does Mr. Stahlnecker think

15  he's going to be able to try this case?  I mean, this

16  is going to come up at trial.  I mean, I've read the

17  stuff about Samantha Mahaffey back and forth:  "I was

18  only given this and, it was denied, I wanted more, we

19  spent this, but they only allocated this."

20             If this case is going to be a trial, it's

21  going to come up, and a trial was public, last I

22  checked.  So is he going to suggest the Court just

23  close its courtroom and kick everybody out because they

24  are talking about Samantha Mahaffey's budget?

25        MR. FOX:  Well, that's the position that we

1  are taking now.  We don't believe that the entire

2  trial --

3          THE COURT:  How is it going to change?  How is

4  it not going to be non-internal deliberations at trial?

5  I mean, like the character of this is not going to

6  change at trial, as it is now.  It's still business

7  information or whatever Mr. Stahlnecker thinks.  But, I

8  mean, we try cases here in Lufkin and my guess is this

9  is going to come out, probably in opening statements, I

10  would assume, because I keep hearing so much about it

11  according to the documents back and forth.  And Motions

12  to Dismiss and all that kind of stuff, not just this.

13          But I think Little League Baseball needs

14  to keep the end in mind to know that unless this case

15  settles or it's disposed of otherwise, all this is

16  coming out at trial.

17          MR. FOX:  Well, the answer to that, Your

18  Honor, honestly, just depends on how you rule under the

19  *Binh Hoa* standard and on this issue.  Because we are

20  now contending that this meets the standard given the

21  evidence in the record, Mr. Stahlnecker's declaration.

22  If this same limited information were to be discussed

23  at trial, appropriate procedures would have to be taken

24  to seal the courtroom for those parts.

25          The next category of information is the

1   internal deliberations regarding non-final policies and

2   procedures.  Mr. Stahlnecker states regarding that

3   category:

4            "Disclosing incomplete accounts of

5   internal discussions about proposed or non-final

6   changes to Little League's policies will harm Little

7   League's competitive standing by diminishing Little

8   League's ability to recruit Little League participants

9   and volunteers by creating confusion and misimpressions

10  about the content of Little League's policies."

11           So I don't have much more to say about

12  this, Your Honor.  I believe the question comes down

13  simply to whether you believe this evidence that I have

14  just discussed meets the standard.  We contend that it

15  does.  I believe it was in the *Trover* case that similar

16  declarations were submitted and they did it there.

17           So that's all I have for you on that.

18       THE COURT:  Okay.  I'm going to grant the

19  Plaintiffs' Motion to Unseal the First Amended

20  Complaint.  I don't think the paragraphs at issue meet

21  the standard set forth in *Binh Hoa Le* and *Holy Land*

22  *Foundation,* and so I'm going to grant the motion now.

23           It's not before me and I kind of glanced

24  at it, but the Second Amended Complaint -- help me out,

25  plaintiffs -- there were some redactions.  Again, there

1    is not a Motion to Unseal, but it doesn't make much

2    sense for me to unseal these particular portions of the

3    First Amended Complaint, but not do the same to the

4    Second Amended Complaint.

5              MS. LAINE:  Okay.  So, in the Second Amended

6    Complaint, I can tell you that paragraphs 118, 120,

7    122, 123 and 124, these were the same -- they are the

8    same standard that was in the First Amended Complaint.

9              THE COURT:  Okay.

10             MS. LAINE:  And so we can file another --

11             THE COURT:  Again, there is not an active

12   motion, but I don't like redacted information on the

13   docket.

14             MS. LAINE:  I agree with that.

15             THE COURT:  Unless it's a birthday or Social

16   Security number or minor plaintiff's name or something

17   that's quite obvious.  But something that just a party

18   doesn't want to get out in the public domain shouldn't

19   just be redacted.

20             MS. LAINE:  So we will file a Motion to Unseal

21   and --

22             THE COURT:  Right, unredact.  File a motion to

23   file an unredacted.

24             MS. LAINE:  Unredacted copy of the First

25   Amended Complaint?

```
1              THE COURT:  Yes, right, that's correct.
2                   Y'all will have an opportunity to be
3    heard, you know, the defendants.  It can be opposed or
4    unopposed and you can respond and say, no, those
5    paragraphs are different or Hawthorn was wrong or
6    whatever, that's fine.  I don't care.
7              MR. FOX:  Yes, Judge.
8              THE COURT:  Okay.  All right.  Anything from
9    you, Mr. Adams?
10             MR. ADAMS:  No, Your Honor.
11             THE COURT:  All right.  I might forget about
12   you, so if you need something, just stand up and let me
13   know.
14             MR. ADAMS:  I just want to blend in the --
15             THE COURT:  Okay, if you want to have a seat,
16   okay.
17                  All right.  So let's go to the Motions to
18   Quash.  We'll start with the first one.  That's Docket
19   Entry 76.  Let me get to it real quick.
20                  Mr. Fox, if you want to come to the
21   podium, I'll address you first on this.
22                  All right.  So this is a deposition by
23   written questions geared towards, from what I
24   understand, the insurance brokers of certain entities
25   that Little League uses for insurance and defendants
```

```
 1    want to quash it under the standard boilerplate
 2    objection language.  Plaintiffs claim they need it to
 3    refute or to advance their theories of vicarious
 4    liability and joint enterprise, but something is
 5    sticking out to me on this.
 6                On some of these policies, Mr. Fox, the
 7    description of the insured says the district
 8    administrators.  So, in the Motion to Dismiss the
 9    Second Amended Complaint and throughout this
10    litigation, you know, Little League Baseball is trying
11    to position itself to say:  We're not vicariously
12    liable for what happens at the local level because we
13    have no -- I can't remember the phraseology -- direct
14    control over the manners, methods, and means.
15                And so the plaintiffs are obviously trying
16    to refute that and say:  No, you do.  And in fact, you
17    are writing insurance for -- and this is where my
18    question is.  It says Business Description.  I'm just
19    going to document 79-2, page 5.  It says the named
20    insured is Corporation, that's Little League Baseball,
21    Incorporated, and the business description is District
22    Administrators.  So who are we insuring with this
23    policy right here?
24          MR. FOX:  The District Administrators are
25    additional insureds.
```

1          THE COURT:  Okay.  And are we talking about

2    Ms. Roebuck, District Administrator, or people with

3    Little League in Williamsport?  Like who are the

4    District Administrators.

5          MR. FOX:  So, within the Little League

6    framework, you have Little League Baseball,

7    Incorporated.  That is a federally chartered

8    organization.  It's in Pennsylvania.  They have some

9    100 -- a couple of hundred employees around there.

10   They also have some employees located in other places.

11             The hierarchy below that are districts,

12   and these are regional entities that are separate

13   entities from Little League Baseball, Incorporated.  In

14   this lawsuit they are District 12 --

15         THE COURT:  You said separate?

16         MR. FOX:  Yes, sir.

17         THE COURT:  Okay, how separate?  So they are

18   insuring people they are separate from?  I mean, I

19   don't insure strangers down the street.  I don't insure

20   my next door neighbor.  I insured my kids.  But you see

21   this is why the plaintiffs want this information;

22   right?  You're saying they are separate, but you're

23   writing policies or paying for policies in which there

24   are additional insureds.

25         MR. FOX:  So this is set up so that these

 1    other entities can get insurance.

 2              THE COURT:  Okay.  So the District -- now,

 3    District Administrators, is Jennifer Roebuck somebody

 4    who's an additional insured under this policy?  So

 5    District 12 got sued.  I don't think she got -- she

 6    didn't get sued individually?

 7              MR. FOX:  Correct.

 8              THE COURT:  But let's just say, for argument's

 9    sake, she got sued individually.  Would she be insured

10    under this policy or is that a difference layer of

11    District Administrator?

12              MR. FOX:  My understanding is that these

13    policies cover the districts themselves.

14              THE COURT:  Okay, District 12?

15              MR. FOX:  Yes.

16              THE COURT:  All right.  So, according to this

17    policy, Little League is insuring District 12.  And I'm

18    not getting into your business, but you are here also

19    representing District 12; are you not?

20              MR. FOX:  Yes.

21              THE COURT:  Okay.  So I would just assume, not

22    to get into your business, but an insurance company may

23    or may not have hired y'all to represent under the same

24    policy?

25                   Well, don't answer that.  I don't want to

```
 1   get into your business.  Don't answer that.  But go

 2   ahead, you were going to say something before that.

 3           MR. FOX:  I was going to answer the question.

 4           THE COURT:  Okay.  Well, you can answer it.

 5           MR. FOX:  So the insurance policy that applies

 6   to District 12 in this case is not the same insurance

 7   policy that applies to Little League Baseball in this

 8   case.

 9           THE COURT:  All right.  But they are

10   additional insureds?  And I know -- I'm going through

11   these documents and like there are separate premiums

12   for each.

13           Okay, so going back now, just to make sure

14   I'm clear, the District Administrators are people who

15   work -- like would she -- would Jennifer Roebuck be an

16   additional insured under this policy, under District

17   Administrator?

18           MR. ADAMS:  Your Honor, the reason I'm

19   interested in this is because my client, Evadale Little

20   League, is part of the same insurance program.  And

21   Little League Baseball has their own insurance, as

22   Mr. Fox points out.  But it also has created a portal

23   for District 12, for example, and Evadale Little

24   League, to require insurance, as well as a service to

25   those entities.  And as we understand it, the officers,
```

1   the board members, the regional, the District

2   Administrators and so forth are additional insureds

3   under those policies, if that answers the Court's

4   question.

5          THE COURT:  All right.

6          MR. FOX:  So what may not have been clear is

7   that there are different policies.  Like there is a

8   policy for District 12 on which District 12 is the

9   additional insured.  That does not provide coverage of

10  Little League Baseball and District 12 at the same

11  time.

12         THE COURT:  Well, it says the named insured

13  and -- hold on.  It says:  Named insured and mailing

14  address, Little League Baseball -- I'm on the wrong

15  page, okay, sorry.

16             On Document 79-2, page 5, it says:  Named

17  insured and mailing address, Little League Baseball,

18  Incorporated, South Williamsport, Pennsylvania.

19  Business description:  District Administrators.

20             So that's a different policy?  I'm

21  unclear.

22         MR. CADE BERNSEN:  Your Honor --

23         THE COURT:  Wait, Mr. Bernsen, Mr. Younger

24  Bernsen.  No.

25         MR. CADE BERNSEN:  I'm sorry, Your Honor.

 1          MR. ADAMS:  Your Honor, now, are you looking

 2  at plaintiffs' request --

 3          THE COURT:  I'm reading an attachment to the

 4  motion -- Defendant Little League's Motion to Quash

 5  subpoenas.  And so this is an attachment to that,

 6  Exhibit D.

 7          Hold on, hold on.  No, I misspoke,

 8  Mr. Adams, sorry.  Document 79 -- I'm sorry.  This is

 9  the Plaintiffs' response to the motion -- the Motion

10  for Protection from the deposition by written

11  questions.  And so plaintiffs are attaching this

12  document to show, "Hey, you know, they are fighting us

13  tooth and nail about joint enterprise liability and

14  vicarious liability, but we've got this document in

15  which both District Administrators and Little League,

16  Incorporated are listed on the same policy when they

17  are telling us in their Motion to Dismiss that, no,

18  these are separate deals, we don't have any control

19  over them."

20          I'm just reading from an attachment that

21  the plaintiffs filed.

22          MR. FOX:  Okay.  So, Your Honor, to get to, I

23  believe, what the point of our motion is, is that we

24  have argued that these are overbroad subpoenas and

25  request irrelevant information.  In their response

1    plaintiffs have articulated a narrow theory of

2    relevance, but these requests go beyond that theory of

3    relevance.  They say, for example, "Produce

4    applications and documents submitted in connection with

5    obtaining insurance for the following policy."  That's

6    not limited in any way.

7                    And then it says in that same sentence for

8    other ones, and I'm looking at 76-3, page 10 of 29,

9    right now.

10                   And then if you go back to 76-1, page 5 of

11   19, it says, "Produce any and all materials pertaining

12   to the underwriting decision, risk selection, and

13   pricing for following policy of insurance."  And it

14   asks that about several policies of insurance.

15                   If you go to 76-2, page 5 of 19, again, it

16   asks, "Please produce any and all materials pertaining

17   to the underwriting decision, risk selection, and

18   pricing for the following policies of insurance."

19                   So, just to take one thing, the legal

20   standards that they have to meet to show *respondeat*

21   *superior* vicarious liability, for example, they have to

22   prove control over the details of the work of the

23   servant, the person they are contending is the servant,

24   for ratification.

25                   And another of their theories of

1    liability, they have to prove that Little League

2    Baseball knowingly accepted the benefit of some

3    wrongful conduct.  For joint enterprise, they have to

4    show a community of pecuniary interests and among other

5    things, an equal right to control the enterprise of the

6    putative enterprise members.

7              So just the mere fact that Little League

8    may be providing a means for districts or local leagues

9    to purchase insurance, there may be some aspects that

10   are relevant to that, but the point of our motion is

11   that these requests go far beyond that.  The theory of

12   relevance that they propose does not match the scope of

13   these requests.

14        THE COURT:  So what can they request from

15   Lexington Insurance Company?

16        MR. FOX:  Well, they have requested nothing

17   from Lexington Insurance Company at this point.

18        THE COURT:  Okay.

19        MR. FOX:  These subpoenas are directed to

20   Keystone Risk --

21        THE COURT:  Yeah, okay.  What can they request

22   from Keystone Risk Managers, LLC?

23        MR. FOX:  I don't -- I'm hesitant to come up

24   with the language of a request for them, but I would

25   imagine it ought to be tailored to the elements of

1   their theories in some respect.

2           THE COURT:  Well, that's kind of why we're

3   here, you know.  Their theory is -- we've already

4   talked about it -- joint enterprise, ratification,

5   vicarious liability.  And, you know, they want to know,

6   what is Little League going to their insurance broker

7   with to say, "Hey, we want a policy for our District

8   Administrators.  We want a policy for us."

9           And so the insurance company, when they

10  make their underwriting decision, is going to respond

11  and say, "Okay, so how many District Administrators are

12  we additionally insuring?  Is it five people or 5,000?"

13  Like they are going to have some questions, you know,

14  to answer.

15          And so, you know, what the plaintiffs are

16  trying to get at to refute or to help -- I don't want

17  to put words in their mouth -- vicarious liability is

18  to say, "Hey, they spent X number of dollars or they

19  presented to their insurance broker that they want

20  insurance for, you know, a thousand District

21  Administrators."

22          So, of course, you know, District 12 is

23  under the control, management, and direction of Little

24  League Baseball because they provided insurance for

25  them.  Or maybe it might be the fact that, no, we're

 1  just talking about four people.  You know, I don't

 2  know, I don't know what's in there.

 3           But, you know, just dealing with insurance

 4  personally with this job is insurance companies want a

 5  lot of information from you before they assume that

 6  obligation to insure the insureds.  They want to know

 7  how old your house is, how old the roof is, the wind

 8  storm certificate, the contents, slab, foundation, how

 9  far it is from a fire station.  Like it's a pretty

10  exhaustive questionnaire, and that's just for a house.

11  These are policies that are multi-million dollar

12  liability policies.

13           So I guess what I'm coming at you with is

14  why shouldn't they -- why isn't it relevant to a claim

15  and defense?  Your defense is there is not vicarious

16  liability.  Their claim is there is.  And so one way to

17  show that is the level of control especially when it

18  comes to providing insurance for local District

19  Administrators or Little Leagues.

20           What's your response to that?

21      MR. FOX:  Well, the mere fact that the

22  entities have insurance that is through Little League

23  in some way is not enough on its own to events control.

24  We cited case law --

25           THE COURT:  You're just arguing the merits to

 1   me.  I'm not granting oral arguments for the Motion to

 2   Dismiss.  But, I mean, it does.  I mean, if I provide

 3   insurance to someone in this -- if somebody is an

 4   additional insured on my policy in this courtroom,

 5   there has got to be some kind of special relationship

 6   there.  It just is.  And it may come out that there is

 7   not.  I don't know.  But being able to provide

 8   insurance or assisting the obtaining of insurance is

 9   relevant to whether there was control or not control;

10   true or false?

11            MR. FOX:  Our position is false because that

12   the legal standard that they have to meet is that:

13   Sufficient control over a person, plaintiffs must make

14   it" -- I'm reading from our motion just to give you the

15   legal standard, Judge.

16            THE COURT:  Right.

17            MR. FOX:  They have to show that Little League

18   controlled the progress, details, and methods of

19   another's work.  That's not mere -- like your outcome

20   of this job has to be X.  For this type of relationship

21   to obtain, there has to be this extensive level of

22   control under the law.  And, you know, we just don't

23   think --

24            THE COURT:  And insuring someone is not a

25   level of control?  Purchasing insurance for somebody is

1  not a level of control?

2          MR. FOX:  Well, no, in the context of Little

3  League Baseball --

4          THE COURT:  Well, let me ask it this way:

5  Isn't it true that you won't charter a local Little

6  League if they don't have insurance either through the

7  risk pool that Little League offers or their own

8  private insurance?  They will say you are not going to

9  get your charter if you don't have insurance.

10          MR. FOX:  I believe so.

11          THE COURT:  Okay.  So we know that Little

12  League controls the patch; right?  You don't get your

13  patch unless you have insurance, whether it's

14  through our pooling agreement or through your own

15  private agreement.

16              Plus, if the local Little League does get

17  private insurance, they have to submit those documents

18  up to headquarters and they have to approve them;

19  correct?  True or not true?

20          MR. FOX:  Uh-huh.

21          THE COURT:  All right.  Okay, I've heard

22  enough on this.

23              *[Pause]*

24              Let's move on to -- okay, the bank

25  records, that's Document No. 93.  Okay, these are

1   District 12's Capital One Bank records.

2          MR. FOX:  And in addition to that, they are

3   records from an accounting firm called Blackburn, Meek,

4   Maxey, I think.

5          THE COURT:  Okay.  Do you want to argue on

6   this, Mr. Fox?

7          MR. FOX:  Yes, Judge.

8              So, again, our argument here is that

9   these requests are again overbroad and requesting

10  irrelevant information.  They request from Capital One,

11  for example -- and there are three different ones of

12  Capital One.  I'll just give you examples from one of

13  them.

14             "Please produce any and all documents

15  relating to all bank accounts in the name of Texas

16  District 12 Little League for the period including, but

17  not limited to January 1, 2012 to the present."

18             The second one asks for all bank

19  statements during this same period; all cancelled

20  checks during the same period; all deposits, slips, and

21  receipts from the same period; all check registers from

22  the same period.  And the list goes on.

23             And in plaintiff's response they again

24  propose a narrow theory of liability related to this

25  alleged relationship between local leagues, districts,

1  and Little League Baseball.

2              Again, these broad requests go far beyond

3  that theory of relevance.  They do not request merely

4  transactions among these entities, or records in which

5  District 12 interacted with the local league or with

6  Little League.  They request absolutely everything from

7  this time period.

8              THE COURT:  Well, what else would there be?

9  I mean, I thought District 12 was just set up for

10  basically the supervisor, for lack of a better term, of

11  16 Little Leagues.  Did they have another carpentry

12  business that they were doing or something?  Like I

13  thought District 12 was just set up to supervise and

14  maintain, you know, these local 16 leagues or whatever.

15  Like what else is District 12 into that's not related

16  to Little League?

17              MR. FOX:  Well, so the main set of

18  expenditures that District -- well, Texas District 12

19  Little League has is that they have a district level

20  tournament every year.

21              THE COURT:  Okay.

22              MR. FOX:  And that is the thing that they

23  spend money on.  In addition to that, if umpires, if

24  people like Jennifer Roebuck or Melissa Riedinger need

25  to travel to go to trainings of variation kinds, they

1  will pay for those things.  But the point is that there

2  are expenses that District 12 incurs that are District

3  12's expenses.

4          THE COURT:  Okay.  And what's the problem with

5  that?  I mean, they are a defendant.

6          MR. FOX:  I'm sorry, what's the problem with

7  what?

8          THE COURT:  I mean, what's the problem with

9  getting access to what District 12 is spending their

10 money on?  They are a defendant in this case.  And if

11 they are, you know, spending money on fields for

12 Evadale Little League, isn't that relevant to show some

13 type of, you know, control between District 12 and

14 Evadale Little League?

15          Well, first of all, just to be clear,

16 these are directed at Capital One, it's not directed at

17 District -- I know District 12 is the subject, but they

18 are not asking District 12 to produce these.  They are

19 not asking your clients to produce these records.  They

20 are asking Capital One to do it.  According to the

21 plaintiff, they say Capital One is ready and willing to

22 provide all these documents.  Plaintiffs have to pay

23 for it, which is probably going to be expensive.

24          But anyway, the whole unduly burdensome

25 and all those arguments, like, if somebody asks me to

1    provide my last 10 years check registers and expenses,

2    that would be a real pain for me to do that.  If they

3    want to ask my bank to do it, hey, that's fine, have at

4    it.

5                     But, you know, again, without glossing

6    over it, the biggest point of contention thus far in

7    this litigation is Adam Isaacks did these bad things to

8    these kids; okay?  Little League Baseball did not.  And

9    Little League Baseball has no kind of control over Adam

10   Isaacks, his wife, Evadale Little League, District 12,

11   okay, none of that.  And so what the plaintiffs are

12   trying to push back on is, no, there is.  There is some

13   type of cooperation.  There is a joint enterprise

14   between the local Little League, the coaches, and

15   Little League Baseball.

16                     So what the plaintiffs want is they want

17   to know -- you know, they always say follow the money.

18   So I think Ms. Roebuck said they charged $2.00 per

19   player for the local little Leagues to District 12.

20   So what was that money, you know, spent on?  Did it

21   flow back to District 12 or did that go up to Little

22   League Baseball?

23                     So, like Inn of Court, for instance, for

24   our dues we have to pay a certain amount to Inn of

25   Court National, the American Inns of Court, whatever

1   that is, even though we're a local charter.  So, if

2   you've got kids who are playing Little League Baseball,

3   they are paying -- I don't know if the discovery bears

4   it out.  I assume it's the case.  A certain amount of

5   money that they pay to Evadale Little League or

6   whatever goes towards Little League Baseball.

7               So I guess my point is, why isn't it

8   relevant, I mean, where the money is flowing back and

9   forth?

10          MR. FOX:  My argument is the same, Your Honor.

11  They could have had requests that are tailored to that

12  theory of relevance.  For example, they could have

13  asked for documents pertaining to transactions between

14  District 12 and local leagues.  They could have asked

15  for documents related to local leagues just in some

16  way.  But they have not limited their requests in any

17  way whatsoever.

18          THE COURT:  Can they request documents from

19  District 12 to Little League Baseball, like how much is

20  District 12 paying Little League Baseball?

21          MR. FOX:  Not in these subpoenas.

22          THE COURT:  I mean, like District 12, I would

23  assume, is either getting money from Little League or

24  paying money to Little League; right?  Do you think?

25              I mean, I saw a document here that Tyler

 1  County Little League is paying -- I think it said,

 2  "Please remit payment to," and it's little League

 3  Baseball in Williamsport.

 4          MR. FOX:  Well, the local leagues --

 5          THE COURT:  Right.

 6          MR. FOX:  -- yes --

 7          THE COURT:  Okay.

 8          MR. FOX:  -- pay dues to Little League

 9  Baseball.

10          THE COURT:  Sure.  And does that flow through

11  District 12?

12          MR. FOX:  It's not through the district.  It's

13  like that, it's not through the district.

14          THE COURT:  Okay.  So Tyler County Little

15  League pays - writes a check, not to District 12, but

16  it pays a check to Williamsport --

17          MR. FOX:  Little League Baseball.

18          THE COURT:  -- Little League Baseball?

19          MR. FOX:  So that is separate from this two

20  dollar assessment that District 12 started asking the

21  local leagues for in recent years.  Little League

22  Baseball does not fund the districts.  They are largely

23  on their own when it comes to gathering funds to put on

24  this baseball tournament that I mentioned and to cover

25  their other expenses.  District 12 is staffed by local

1   volunteers, just like a local league would be.

2              And to answer your question from a moment

3   ago, Your Honor, when you asked about whether they have

4   requested -- and my understanding was had have they

5   requested this subpoena, documents specifically related

6   to transfers between Little League and District 12, or

7   even local leagues and District 12, while I would agree

8   that these requests encompass those things, they also

9   go beyond them, requesting other things as well.

10          THE COURT:  Any response from the plaintiffs?

11          MR. DAVID BERNSEN:  Yes, Your Honor.  For the

12   record, David Bernsen.

13              For the first Motion to Quash, which is

14   Document 76, which is the underwriting, there is a bit

15   of confusion, I think, on this side of the table.  The

16   premiums for District 12, whatever the structure is,

17   are paid by Little League Baseball, Incorporated,

18   period.

19              The problem that we have -- and the Court

20   is right on it -- is that one of their big positions

21   has been they are all autonomous, they are separate,

22   they are not related in any form or manner.

23              The policy, that document the Court was

24   reading, has the named insured as Little League

25   Baseball, Incorporated.  In the beginning there was a

1   question whether or not it was Little League Baseball,

2   Inc., was the proper defendant Little League Baseball

3   International, Incorporated.  And we had to fight

4   through those issues.  I think they have conceded

5   finally, the defendant has, that it's Little League

6   Baseball, Incorporated.

7               But the way this policy declaration reads,

8   it says the named insurance is Little League Baseball

9   Incorporated.  The named insured is corporation and the

10  business description is District Administrators.

11              Under the structure, there's Williamsport,

12  then there are regional offices, then there are District

13  Administrators.  We have sued District 12 because of

14  all the confusion, but it may be that -- and I'm not

15  sure that the answer was given, but I think it will be

16  in these documents -- is it the District Administrator,

17  themself individually, or is it the District 12 in each

18  of the various states.

19              But the underwriting will have all of

20  that.  It will have this is our business, this is how

21  we're doing it, this is how we proposed you to write us

22  insurance.  But it will have that information and it

23  goes to that issue as to the structure itself of Little

24  League Baseball.

25              The liability issues, it impacts that as

1  well, but it goes to, which we think is wrong, that

2  it's one and the same, that they are all tied together.

3  And so it's certainly relevant and material, and we

4  should have an opportunity to get that information.

5  That's with regard to the underwriting.

6            The finances of District 12, it's all

7  supposed to be about baseball.  So we just said just

8  give us your bank records as to who you are writing

9  checks to, where the income is from.  And the truth of

10  the matter is, is that the District 12 -- well, anyway,

11  it ties into the same issues as to the relationship of

12  District 12 to Little League Baseball, Incorporated,

13  the relationship of the District 12 to Evadale, and what

14  they are spending money for and where they are getting

15  money.  And that's something that goes to that one

16  issue, as to the structure of the defendants, as well

17  as to the extended issue of the liability.

18            I think the Court spoke of that, but

19  that's why we think we're entitled to it because it's

20  all relevant material, certainly because of the issues

21  raised by the defendants.

22            THE COURT:  Okay.  All right.

23            MR. DAVID BERNSEN:  Thank you.

24            THE COURT:  You're welcome.

25            MR. DAVID BERNSEN:  I didn't know if you had a

1   question.

2            THE COURT:  I'm good for right now.  Thank you.

3                   All right, Document 133, Little League

4   Baseball's Motion to Quash Third Party of Praesidium.

5   I don't know if I'm pronouncing that correctly or not.

6            MR. FOX:  I believe it's Praesidium, Your

7   Honor.

8            THE COURT:  Praesidium, okay.

9                   Let's just pinpoint, before we get too far

10  afield, what day did Little League Baseball, if at all,

11  engage Praesidium to be a consulting expert?

12           MR. FOX:  The date is in October of 2022.  I

13  don't remember the exact date.  It might have been the

14  22nd.

15           THE COURT:  Okay.  So do you have any

16  objection to producing these requested documents of

17  Praesidium prior to them being engaged as a consulting

18  expert?

19           MR. FOX:  We still do, Your Honor, and that's

20  because we believe the standard under Rule 26 includes

21  the period of time in which we had not yet formally

22  engaged them, but were speaking with them in

23  anticipation of the litigation.

24           THE COURT:  All right, so you got the

25  retention letter from the Bernsens on January of 2022.

1   So do you have any objections to producing the
2   documents prior to January of 2022?
3         MR. FOX:  No.
4         THE COURT:  All right.  So let me hear from
5   the plaintiffs what y'all want, or not -- I don't
6   know -- of documents after January of 2022.
7         MR. CADE BERNSEN:  Yes, Your Honor.
8         THE COURT:  Okay, you can explain that to me.
9         MR. CADE BERNSEN:  First, I'm sorry for
10  speaking out earlier.
11        THE COURT:  Okay.
12        MR. CADE BERNSEN:  Just too much caffeine, I
13  apologize.
14        THE COURT:  That's all right.
15        MR. CADE BERNSEN:  Okay.  Judge, I feel
16  passionate about this.  I know time is of the essence,
17  but it's like when you hire, because we've hired many,
18  many experts.  And you have, too, when you were
19  practicing.  You're a great attorney.  And your dad is,
20  too.  You know, you get into a case, you hire an
21  expert.  The lawyer hires the expert.  In this case
22  it's their client -- anyway, you hire an expert, you
23  decide whether they are going to be a consulting expert
24  or a testifying expert.
25                 In this case, what we know is that the

1  corporate rep testifies without objection, without

2  mention -- in fact, they file those errata sheets that

3  you are familiar with.  They didn't try to change it

4  then.  And he testified -- and what I've come to find

5  out in this case, in this industry, is that it is a

6  common practice, Praesidium and then the other one will

7  come in, too, Players Health, I assume.  It is common

8  for youth organizations to hire these two specific

9  companies to analyze their child protection program.

10  That's what they do.  They come in there and they say

11  this is where you're weak, this is where you're strong.

12  How can we make it better?  And that's what they do in

13  the ongoing ordinary course of business, not as experts

14  in litigation.

15            So my dad is asking the corporate rep,

16  what do y'all do?  Because Little League wholly fails

17  to do any kind of monitoring of its own program.  And

18  at the end of the deposition my dad is like "Do y'all

19  to talk to any third parties about this?"

20            And he's like, "Oh, yeah, we did.  You

21  know, starting in 2020 and 2021 we start talking with

22  Praesidium and Players Health."

23            And Judge, out of the 30,000 -- may I

24  approach?

25            THE COURT:  Yes.

1          MR. CADE BERNSEN:  Out of the 30,000 and some
2    odd documents that they produced, we find this one
3    document, which is Bates labeled LLB031928, from
4    Praesidium to Samantha Mehaffy, who's their security
5    director that we think they didn't treat too fairly,
6    sent October 5, 2021, which, of course, is before
7    Isaacks' arrest.  And it totally corroborates
8    Stahlnecker's testimony that they are, in fact,
9    communicating with Praesidium in the ordinary course of
10   business way prior to his arrest and way prior to any
11   anticipation of litigation.
12          So we take his depo.  He mentions, oh,
13   yeah, we're working with them.  You know, we're
14   working with -- and then they try to say, well, it was
15   just discussions or whatever.  They are talking to them
16   way before the arrest.
17          And so then -- so, yes, so to me the whole
18   thing -- so, basically, we take his depo, they panic.
19   And then a month after his depo they say, "Oh, yeah,
20   he's our consulting expert."
21          And to us, frankly, it is a sham.  It is
22   an attempt to -- and it's not that lawyers had hired
23   them.  It's literally Little League that supposedly did
24   it without their trial counsel doing it.  And so we
25   think that they are trying to basically cloak and cover

 1  up all their communications with Praesidium that could

 2  be very relevant to the case.  And it's not just -- we

 3  certainly want up until January of 2022, but everything

 4  from January through October, they can't get us a

 5  precise date, which is over a month after, sounds like

 6  you said October 22nd.  I think that's literally about

 7  a month after the deposition.  We want everything up to

 8  the date they supposedly, you know, hired them as a

 9  consulting expert.

10          And then, honestly, Judge, we want

11  everything to the present day, because it's not fair

12  and people can take advantage of this.  It's like they

13  have this ongoing business relationship with Praesidium

14  and there could be some bad things in there that they

15  don't -- embarrassing things, because there has been a

16  lot of damming evidence that's come out against Little

17  League.

18          So, after the deposition and it came out

19  of his mouth, they are trying to cover it by saying,

20  "Oh, yeah, yeah, he's a consulting expert."

21          And we think it reeks of bad faith, it

22  reeks of gamesmanship, and we don't believe it.

23          So one opportunity could be we think

24  we're certainly entitled to everything up until October

25  2022.  And if they want to play that game and say that,

 1  then from October -- from the day they say he's

 2  consulting, Praesidium, from that date to present, then

 3  you could do an in-camera inspection and we would, I

 4  guess, be comfortable with that.

 5            But we certainly think -- I mean, we would

 6  like it all the way to the present because we think the

 7  whole thing is a farce.  Respectfully, I mean, we do.

 8        THE COURT:  Respectfully?

 9        MR. CADE BERNSEN:  Respectfully.

10        THE COURT:  With all due respect?

11        MR. CADE BERNSEN:  With all due respect.

12        THE COURT:  Here's what I'm going to rule.

13  I'll grant the Motion to Quash to the extent it applies

14  to anything on or after -- when did you receive -- when

15  did Little League get the retention letter from

16  Bernsen?  January something?

17        MR. DAVID BERNSEN:  Yes.  18th, maybe.

18        THE COURT:  January 18th.

19        MR. DAVID BERNSEN:  Don't hold me to that.

20        MR. FOX:  I think it was January 19.

21        THE COURT:  Sir?  January 19, okay.

22        MR. FOX:  19th.

23        THE COURT:  I'll deny the motion to protection

24  for anything that applies to prior January 19th of

25  2022.  Anything after that, I'll inspect in-camera to

1  review whether there is a consulting privilege -- or
2  excuse me, whether Praesidium meets the standards for
3  consulting expert, whether they were retained as a
4  consulting expert, things of that nature.  And then
5  I'll just review it in-camera and make that
6  determination.
7           I will say, Mr. Fox -- and you can talk
8  to your clients and the other lawyers that are handling
9  this case -- you better be real sure that you can meet
10 the standard for consulting expert.  Because once I
11 start going through all those document and it doesn't
12 meet the standard -- and I'm not saying you have.  But
13 if you say, no, they are a consulting expert, you can't
14 have it, it's not going to go over well; okay?
15          So make sure you can meet that standard.
16 If there is any question at all about it, it might
17 behoove Little League to just go ahead and produce that
18 information and withdraw that objection.  But I'll just
19 wait to see it.
20          Okay, here's the complicating factor,
21 though.  This is a third-party subpoena, I think, to
22 Praesidium, so it's directed towards them.  So how am I
23 going to tell Praesidium what to produce and not
24 produce?
25          MR. CADE BERNSEN:  One recommendation -- may I

```
 1 || sit here to answer this?
 2 ||         THE COURT:  Yeah.
 3 ||         MR. CADE BERNSEN:  One recommendation I would
 4 || say is to have them produce the entire subpoena to the
 5 || Court and then y'all could give us everything that
 6 || starts -- you know, I think that would be the easiest
 7 || way to do it, everything before January 2022.  Or
 8 || however you want to do it.
 9 ||         THE COURT:  What's your second suggestion?
10 ||         MR. CADE BERNSEN:  Give us all the documents.
11 || We'll determine what is the in-camera inspection for
12 || you and give it to you.
13 ||         THE COURT:  What's the third?
14 ||             All right, okay, I'm just -- every time I
15 || review something in-camera, discovery-wise, I always
16 || say, this is the last time I'm going to do this.  And I
17 || screw myself every single time when I recommit to doing
18 || it again.  It's necessary in this case.  So I'm sure
19 || I'll regret my decision to do an in-camera inspection
20 || once I start getting into it, if there is a lot of
21 || information.  Maybe there is not, I don't know.
22 ||             But I will just enter an order for
23 || Praesidium to give it all to me and I'll inspect it
24 || in-camera and then I'll provide anything prior to
25 || January 23rd of 2022 to the parties' counsel or
```

 1  whatever.  And then after that, I'll make a

 2  determination of consulting privilege and then kind of

 3  go from there.

 4            I still have an issue with how it's going

 5  to be -- you know, the returns or the execution.  Are

 6  you going to resubmit the deposition by written

 7  questions to Praesidium, just to say "Delivered to Judge

 8  Hawthorn" or --

 9       MR. DAVID BERNSEN:  We can do that, Your Honor.

10       THE COURT:  Okay, just try that and we'll see

11  what happens.

12            Anything on that, Mr. Fox?

13       MR. FOX:  How are we supposed to get back?

14       THE COURT:  Well, so this is a -- is the

15  discovery request directed towards Praesidium or Little

16  League Baseball?

17       MR. FOX:  Praesidium.

18       THE COURT:  Okay, Praesidium.  So you are

19  moving for protection for this subpoena or deposition

20  by written question to Praesidium; they are not

21  requesting documents from you necessarily.

22            So here's what I'm getting at.  I don't

23  know if you really necessarily need to get back to me,

24  unless Praesidium is going to give you all the

25  documents and you're going to give all the documents to

 1  me.  Like I don't -- what's your role in this is what

 2  I'm trying to ask?

 3           MR. FOX:  The reason that I asked -- and I'll

 4  preface this by saying we have a similar overbreadth

 5  objection, like the other ones that we've talked about

 6  in addition to this claim of privilege.  So we are

 7  claiming privilege.  We believe that we are entitled to

 8  that protection; we are entitled to keep these documents

 9  from being produced to anybody because of the privilege.

10           THE COURT:  But not the documents before you

11  knew you were going to get sued; correct?

12           MR. FOX:  Correct.

13           THE COURT:  Okay.

14           MR. FOX:  I'm referring to the documents on

15  the other side of --

16           THE COURT:  Right, right.  That's going to

17  come to me.

18           MR. FOX:  Okay.

19           THE COURT:  And I'm going to make an in-camera

20  inspection of it to evaluate whether the consulting

21  privilege is real and when did it occur.

22           MR. FOX:  Okay.

23           THE COURT:  To the best of my ability.  And if

24  I think there is no consulting privilege or it happened

25  on a certain date, then I'll make that determination

1   and then I'll disclose the relevant documents to the

2   other side.  Of course, I'll hold off on it for a

3   little while to give y'all an opportunity to object or

4   whatever before I give it to the other side.

5                Anyways, what was your question again?

6            MR. FOX:  I think that you've answered it.

7            THE COURT:  Okay, all right, very good.

8            MR. FOX:  Thank you.

9            THE COURT:  All right, the last one is Motion

10  for Protective Order Regarding Plaintiffs' Facially

11  Overbroad Subpoena to Players Health.

12               You can go ahead, Mr. Fox.  I looked at

13  this.  I really think that the parties can agree to --

14  y'all are pretty close on what you can and can't get,

15  or what you want.

16               So it appears that -- help me out,

17  Mr. Fox -- that Little League is saying, yes, you are

18  entitled to Players Health documents when it comes to

19  sexual assault or sexual abuse and things of that

20  nature, but it's overbroad otherwise.

21               So let me get it from you?  What's your

22  objection to this?

23          MR. FOX:  I think that you have articulated

24  the objection.

25          THE COURT:  Without giving the store away,

 1  what else is Players Health doing for Little League

 2  Baseball that doesn't regard child safety?

 3          MR. FOX:  So the answer is other things that

 4  involve child safety, but outside the realm of sexual

 5  abuse of children.

 6          THE COURT:  Like just injuries, like head

 7  injuries or something like that?

 8          MR. FOX:  Sure.  And also things related to

 9  disputes that parents may have with local leagues.  I

10  don't know if you've experienced --

11          THE COURT:  Wait, parents have disputes with

12  Little League?

13          MR. FOX:  Local leagues.

14          THE COURT:  I'm shocked.

15          MR. FOX:  Regarding the sports aspect of the

16  game, who can play on what team, rule disputes.

17          THE COURT:  Okay.

18          MR. FOX:  Things of that nature.

19          THE COURT:  Can y'all come to some kind of

20  agreement on this?  I mean, Mr. Bernsen, Cade Bernsen?

21          MR. CADE BERNSEN:  We can try, yes, Your Honor.

22          THE COURT:  So what they are saying is y'all

23  can -- you can get the documents as it relates to child

24  safety, but I guess Players Health does a lot of other

25  consulting or functions for Little League Baseball

1    other than that.

2            MR. FOX:  So it --

3            THE COURT:  Sorry, go ahead, Mr. Fox.

4            MR. FOX:  If I may correct one thing that you

5    said, Judge.  So there are multiple buckets within

6    child safety.  Child safety from Players Health

7    perspective, from Little League's perspective,

8    encompasses things other than the prevention of sexual

9    abuse.  It also pertains to just other safety risks of

10   the sport.

11           And then even in addition to that,

12   there is this dynamic of parents having disputes with

13   leagues about the rules of the game and who can be on

14   what team and things like that.  We think that that

15   stuff is outside the permissible scope of discovery.

16   We think that the things pertaining to the prevention

17   of sexual abuse of children is within the permissible

18   scope of discovery.

19           THE COURT:  Mr. Cade Bernsen?

20           MR. CADE BERNSEN:  Your Honor, we think it's

21   absolutely -- first, they said it's overbroad and they

22   said -- you know, we asked for five years and Judge

23   Truncale already said 10 years is not overbroad in this

24   case, so that's out.

25           How they handle other injuries is

1  important.  For instance, in one of the handbooks we've

2  come across they have this whole concussion education

3  program where at the beginning of each season they make

4  the parents sign -- this is in Concord Little League,

5  which is the model ASAP plan that won the national

6  award for Little League.  And there is a document in

7  there and it talks about:  Here are the warning signs

8  of a concussion.  Please read this.  Here's where the

9  parent signs, here's where the kid signs.

10          So how they handle other injuries is

11  absolutely relevant.

12          THE COURT:  And I think they are agreeing to

13  that, child safety.  Child safety.  What he's talking

14  about is how to deal with crazy parents that are, "Why

15  is my son not playing on this team?"

16          MR. CADE BERNSEN:  Okay, yes, Your Honor, I'm

17  sorry, I thought he was trying to make a distinction

18  between -- okay, we just wanted all child safety as it

19  relates to anything child safety.

20          Plus, Your Honor has pointed one thing.

21  We just took a second round of depositions in

22  Williamsport and their Vice-president of Marketing

23  Communications, Liz Brown, said that Players Health

24  actually came on campus with a full delegation of

25  people and made a presentation to Little League

 1  executives as to this is what we're offering, this is

 2  what we can do for you.  And that's what Mahaffey was

 3  saying, "Show me how to get abuse awareness training

 4  into my program."  And so we obviously want anything to

 5  do with those presentations.

 6          Surprisingly enough, the corporate counsel

 7  for this company lives in Katy, Texas and she called us

 8  and was a really nice lady, and she was like, "We don't

 9  have a problem complying with this.  We're just

10  waiting -- you know, we're waiting for the Court's

11  instructions on this."  Very nice lady.  And it's weird

12  because Players Health is out of Minnesota and their

13  general counsel lives in Katy, Texas.

14          Anyway, we would certainly want anything

15  to do with players safety, regardless if it's sexual

16  abuse.  Anything player safety, and then those

17  presentations that were given in Williamsport.  If

18  that's fine with you, then we can work it out.

19          MR. FOX:  So, to be clear about my position,

20  it was that within child safety, we contend that the

21  things about the sexual abuse prevention are within the

22  permissible scope of discovery, and then the other

23  aspects of child safety are not.

24          THE COURT:  No, it's my contention that they

25  are.  So I'll let you -- I'll grant the Motion to Quash

1  as it pertains to things that are not related to child

2  safety.  And child safety includes, but is not limited

3  to injuries, concussions, emotional injury, sexual

4  abuse.  I do think that it's relevant to show and I've

5  seen this before.

6           You know, their argument may be, hey, they

7  do all these things to prevent concussions, but they

8  don't one lick of anything to prevent sexual assaults.

9  I'm not saying that's true or not, but that's what they

10 are trying to get at.  So I think that is relevant.

11          So I'll grant the protection to the

12 subpoena only as regards to things that don't relate to

13 child safety, and child safety is not just sexual abuse.

14 It's, you know, physical, mental or emotional injuries.

15         MR. FOX:  Understood.

16         THE COURT:  I don't care about the disputes of

17 the parents.

18         MR. CADE BERNSEN:  And, Your Honor, one thing,

19 on these last two, does that include the presentations

20 they did in Williamsport?

21         THE COURT:  If they regarded child safety,

22 you're going to get it.

23         MR. CADE BERNSEN:  And one other thing, Your

24 Honor.  On these last two things, Marianne, who's

25 smarter than I am, she said what about a time frame for

1   these last two --

2            THE COURT:   I think Judge Truncale read the

3   transcript from the latest hearing, or one of the

4   latest hearings she had with Judge Truncale, and he

5   said 10 years is standard.

6            MR. FOX:   We did not take an issue with the

7   time frame.

8            THE COURT:   Okay.

9            MR. CADE BERNSEN:   The time frame about which

10  we get this stuff completed.

11           THE COURT:   Right, okay, we'll talk about that

12  now, I guess.

13               It's going to be a little bit before I do

14  written orders on these motions, and they are going to

15  be brief.   But I'm just going to tell you right now,

16  I'm going to deny Motion to Quash subpoenas, Document

17  No. 76 and Document No. 93.   Again, these are

18  third-party subpoenas.   So, I mean, I'm not going to

19  call Keystone Risk managers and tell them when to

20  produce it, but that's up to y'all to get it.   If you

21  want it, you go get it.   I'm denying the Motion of the

22  Protective Order.

23               Just to rehash, the Motion to Strike the

24  Defendants' Confidentiality Designations -- that's

25  Docket Entries 95, 98, and 102 -- are all denied.

1          Plaintiff's Motion to Unseal First Amended
2   Complaint, Document No. 112, is granted.

3          The Motion to Quash Third-party Subpoena
4   to Praesidium is granted in part.  It's denied to the
5   extent that it pertains to information prior to January
6   23rd of 2022.  It's granted to the extent that anything
7   after that date needs to be submitted to the Court for
8   in-camera review.

9          Document No. 154 will be granted in part.
10  It's granted only to the extent that the request
11  pertain to information that is not related to player
12  safety.  And I'm not going to verbally give the metes
13  and bounds of what player safety is, but I'm just going
14  to say it's something like anything having to do with
15  the players' mental, physical, or emotional health.

16          Anything else further from plaintiffs?

17          MR. DAVID BERNSEN:  No, Your Honor, thank you.

18          THE COURT:  You're welcome.

19          Anything else further from the defense?
20  Mr. Fox?

21          MR. FOX:  No, Judge.

22          THE COURT:  Mr. Adams?

23          MR. ADAMS:  No, Your Honor, but it's the
24  grandparents that are the most troublesome.

25          THE COURT:  They can be.  They can be.

*Edward L. Reed*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1605

1          So, going forward, too, just to remind

2   you, because this might get lost in the wilderness,

3   when you file a motion that contains an exhibit with

4   something that's been designated as confidential,

5   according to the Protective Order, you've got to file

6   it under seal, but you need to accompany that with a

7   motion to either seal or unseal.  You know, I don't

8   know which way you are on the fence depending on who's

9   filing it.  So the other side has an opportunity to

10  respond.  And then the standard as far as I'm concerned

11  is the *Binh Hoa Le* standard.

12          But the plaintiffs know what my feelings

13  are on the current Protective Order.  It's too broad,

14  it encompasses everything.  And if you squawk about

15  them designating something confidential, that's on you.

16  You're the ones that agreed to it.

17          If you think the confidentiality -- or

18  excuse me, the Protective Order needs to be amended

19  because it's being used in bad faith or nefarious

20  purposes, then get with the other side to try to come up

21  with some qualifying languages to make it more specific,

22  more limiting.  And if you can't come to an agreement,

23  file a motion with the Court and we'll take it up.

24          All right, we're adjourned on this.

25      *[1:40 p.m. - Proceedings adjourned]*

```
                    REPORTER'S CERTIFICATE


I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled

cause.


/s/ Ed Reed                              3-9-23
Edward L. Reed                           Date
Court Reporter
```

*Edward L. Reed*
9251 Lynne Circle
Orange, Texas 77630 * 409-330-1605